(Slip Opinion) OCTOBER TERM, 2022 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT AND FELLOWS OF HARVARD COLLEGE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–1199.  Argued October 31, 2022—Decided June 29, 2023*

Harvard College and the University of North Carolina (UNC) are two of the oldest institutions of higher learning in the United States. Every year, tens of thousands of students apply to each school; many fewer are admitted. Both Harvard and UNC employ a highly selective admissions process to make their decisions. Admission to each school can depend on a student's grades, recommendation letters, or extracurricular involvement. It can also depend on their race. The question presented is whether the admissions systems used by Harvard College and UNC are lawful under the Equal Protection Clause of the Fourteenth Amendment.

At Harvard, each application for admission is initially screened by a "first reader," who assigns a numerical score in each of six categories: academic, extracurricular, athletic, school support, personal, and overall. For the "overall" category—a composite of the five other ratings—a first reader can and does consider the applicant's race. Harvard's admissions subcommittees then review all applications from a particular geographic area. These regional subcommittees make recommendations to the full admissions committee, and they take an applicant's race into account. When the 40-member full admissions committee begins its deliberations, it discusses the relative breakdown of applicants by race. The goal of the process, according to Harvard's director of admissions, is ensuring there is no "dramatic drop-off" in minority admissions from the prior class. An applicant receiving a majority of

—————

*Together with No. 21–707, *Students for Fair Admissions, Inc.* v. *University of North Carolina et al.*, on certiorari before judgment to the United States Court of Appeals for the Fourth Circuit.

the full committee's votes is tentatively accepted for admission. At the end of this process, the racial composition of the tentative applicant pool is disclosed to the committee. The last stage of Harvard's admissions process, called the "lop," winnows the list of tentatively admitted students to arrive at the final class. Applicants that Harvard considers cutting at this stage are placed on the "lop list," which contains only four pieces of information: legacy status, recruited athlete status, financial aid eligibility, and race. In the Harvard admissions process, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants."

UNC has a similar admissions process. Every application is reviewed first by an admissions office reader, who assigns a numerical rating to each of several categories. Readers are required to consider the applicant's race as a factor in their review. Readers then make a written recommendation on each assigned application, and they may provide an applicant a substantial "plus" depending on the applicant's race. At this stage, most recommendations are provisionally final. A committee of experienced staff members then conducts a "school group review" of every initial decision made by a reader and either approves or rejects the recommendation. In making those decisions, the committee may consider the applicant's race.

Petitioner, Students for Fair Admissions (SFFA), is a nonprofit organization whose stated purpose is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law." SFFA filed separate lawsuits against Harvard and UNC, arguing that their race-based admissions programs violate, respectively, Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. After separate bench trials, both admissions programs were found permissible under the Equal Protection Clause and this Court's precedents. In the Harvard case, the First Circuit affirmed, and this Court granted certiorari. In the UNC case, this Court granted certiorari before judgment.

*Held*: Harvard's and UNC's admissions programs violate the Equal Protection Clause of the Fourteenth Amendment. Pp. 6–40.

(a) Because SFFA complies with the standing requirements for organizational plaintiffs articulated by this Court in *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, SFFA's obligations under Article III are satisfied, and this Court has jurisdiction to consider the merits of SFFA's claims.

The Court rejects UNC's argument that SFFA lacks standing because it is not a "genuine" membership organization. An organizational plaintiff can satisfy Article III jurisdiction in two ways, one of which is to assert "standing solely as the representative of its mem-

Syllabus

bers," *Warth* v. *Seldin,* 422 U. S. 490, 511, an approach known as representational or organizational standing. To invoke it, an organization must satisfy the three-part test in *Hunt*. Respondents do not suggest that SFFA fails *Hunt*'s test for organizational standing. They argue instead that SFFA cannot invoke organizational standing at all because SFFA was not a genuine membership organization at the time it filed suit. Respondents maintain that, under *Hunt*, a group qualifies as a genuine membership organization only if it is controlled and funded by its members. In *Hunt*, this Court determined that a state agency with no traditional members could still qualify as a genuine membership organization in substance because the agency represented the interests of individuals and otherwise satisfied *Hunt*'s three-part test for organizational standing. See 432 U. S., at 342. *Hunt*'s "indicia of membership" analysis, however, has no applicability here. As the courts below found, SFFA is indisputably a voluntary membership organization with identifiable members who support its mission and whom SFFA represents in good faith. SFFA is thus entitled to rely on the organizational standing doctrine as articulated in *Hunt*. Pp. 6–9.

(b) Proposed by Congress and ratified by the States in the wake of the Civil War, the Fourteenth Amendment provides that no State shall "deny to any person . . . the equal protection of the laws." Proponents of the Equal Protection Clause described its "foundation[al] principle" as "not permit[ing] any distinctions of law based on race or color." Any "law which operates upon one man," they maintained, should "operate equally upon all." Accordingly, as this Court's early decisions interpreting the Equal Protection Clause explained, the Fourteenth Amendment guaranteed "that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States."

Despite the early recognition of the broad sweep of the Equal Protection Clause, the Court—alongside the country—quickly failed to live up to the Clause's core commitments. For almost a century after the Civil War, state-mandated segregation was in many parts of the Nation a regrettable norm. This Court played its own role in that ignoble history, allowing in *Plessy* v. *Ferguson* the separate but equal regime that would come to deface much of America. 163 U. S. 537.

After *Plessy*, "American courts . . . labored with the doctrine [of separate but equal] for over half a century." *Brown* v. *Board of Education*, 347 U. S. 483, 491. Some cases in this period attempted to curtail the perniciousness of the doctrine by emphasizing that it required States to provide black students educational opportunities equal to—even if formally separate from—those enjoyed by white students. See, *e.g.*, *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337, 349–350. But the

inherent folly of that approach—of trying to derive equality from ine-quality—soon became apparent. As the Court subsequently recog-nized, even racial distinctions that were argued to have no palpable effect worked to subordinate the afflicted students. See, *e.g.*, *McLau-rin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637, 640–642. By 1950, the inevitable truth of the Fourteenth Amendment had thus begun to reemerge: Separate cannot be equal.

The culmination of this approach came finally in *Brown* v. *Board of Education,* 347 U. S. 483. There, the Court overturned the separate but equal regime established in *Plessy* and began on the path of inval-idating all *de jure* racial discrimination by the States and Federal Gov-ernment. The conclusion reached by the *Brown* Court was unmistak-ably clear: the right to a public education "must be made available to all on equal terms." 347 U. S., at 493. The Court reiterated that rule just one year later, holding that "full compliance" with *Brown* required schools to admit students "on a racially nondiscriminatory basis." *Brown* v. *Board of Education,* 349 U. S. 294, 300–301.

In the years that followed, *Brown*'s "fundamental principle that ra-cial discrimination in public education is unconstitutional," *id.,* at 298, reached other areas of life—for example, state and local laws requiring segregation in busing, *Gayle* v. *Browder*, 352 U. S. 903 (*per curiam*); racial segregation in the enjoyment of public beaches and bathhouses *Mayor and City Council of Baltimore* v. *Dawson*, 350 U. S. 877 (*per cu-riam*); and antimiscegenation laws, *Loving* v. *Virginia,* 388 U. S. 1. These decisions, and others like them, reflect the "core purpose" of the Equal Protection Clause: "do[ing] away with all governmentally im-posed discrimination based on race." *Palmore* v. *Sidoti*, 466 U. S. 429, 432.

Eliminating racial discrimination means eliminating all of it. Ac-cordingly, the Court has held that the Equal Protection Clause applies "without regard to any differences of race, of color, or of nationality"— it is "universal in [its] application." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369. For "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 289–290.

Any exceptions to the Equal Protection Clause's guarantee must survive a daunting two-step examination known as "strict scrutiny," *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227, which asks first whether the racial classification is used to "further compelling governmental interests," *Grutter* v. *Bollinger,* 539 U. S. 306, 326, and second whether the government's use of race is "narrowly tailored," *i.e.,* "necessary," to achieve that interest, *Fisher* v. *University of Tex. at Austin,* 570 U. S. 297, 311–312. Acceptance of race-based state action

is rare for a reason: "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice* v. *Cayetano*, 528 U. S. 495, 517. Pp. 9–16.

(c) This Court first considered whether a university may make race-based admissions decisions in *Bakke,* 438 U. S. 265. In a deeply splintered decision that produced six different opinions, Justice Powell's opinion for himself alone would eventually come to "serv[e] as the touchstone for constitutional analysis of race-conscious admissions policies." *Grutter,* 539 U. S., at 323. After rejecting three of the University's four justifications as not sufficiently compelling, Justice Powell turned to its last interest asserted to be compelling—obtaining the educational benefits that flow from a racially diverse student body. Justice Powell found that interest to be "a constitutionally permissible goal for an institution of higher education," which was entitled as a matter of academic freedom "to make its own judgments as to . . . the selection of its student body." 438 U. S., at 311–312. But a university's freedom was not unlimited—"[r]acial and ethnic distinctions of any sort are inherently suspect," Justice Powell explained, and antipathy toward them was deeply "rooted in our Nation's constitutional and demographic history." *Id.*, at 291. Accordingly, a university could not employ a two-track quota system with a specific number of seats reserved for individuals from a preferred ethnic group. *Id.,* at 315. Neither still could a university use race to foreclose an individual from all consideration. *Id.,* at 318. Race could only operate as "a 'plus' in a particular applicant's file," and even then it had to be weighed in a manner "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.,* at 317. Pp. 16–19.

(d) For years following *Bakke,* lower courts struggled to determine whether Justice Powell's decision was "binding precedent." *Grutter*, 539 U. S., at 325. Then, in *Grutter* v. *Bollinger,* the Court for the first time "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Ibid.* The *Grutter* majority's analysis tracked Justice Powell's in many respects, including its insistence on limits on how universities may consider race in their admissions programs. Those limits, *Grutter* explained, were intended to guard against two dangers that all race-based government action portends. The first is the risk that the use of race will devolve into "illegitimate . . . stereotyp[ing]." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493 (plurality opinion). Admissions programs could thus not operate on the "belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." *Grutter,* 539 U. S., at 333 (internal

quotation marks omitted). The second risk is that race would be used not as a plus, but as a negative—to discriminate *against* those racial groups that were not the beneficiaries of the race-based preference. A university's use of race, accordingly, could not occur in a manner that "unduly harm[ed] nonminority applicants." *Id.*, at 341.

To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs: At some point, the Court held, they must end. *Id.,* at 342. Recognizing that "[e]nshrining a permanent justification for racial preferences would offend" the Constitution's unambiguous guarantee of equal protection, the Court expressed its expectation that, in 25 years, "the use of racial preferences will no longer be necessary to further the interest approved today." *Id.,* at 343. Pp. 19–21.

(e) Twenty years have passed since *Grutter*, with no end to race-based college admissions in sight. But the Court has permitted race-based college admissions only within the confines of narrow restrictions: such admissions programs must comply with strict scrutiny, may never use race as a stereotype or negative, and must—at some point—end. Respondents' admissions systems fail each of these criteria and must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment. Pp. 21–34.

(1) Respondents fail to operate their race-based admissions programs in a manner that is "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny. *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 381. First, the interests that respondents view as compelling cannot be subjected to meaningful judicial review. Those interests include training future leaders, acquiring new knowledge based on diverse outlooks, promoting a robust marketplace of ideas, and preparing engaged and productive citizens. While these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny. It is unclear how courts are supposed to measure any of these goals, or if they could, to know when they have been reached so that racial preferences can end. The elusiveness of respondents' asserted goals is further illustrated by comparing them to recognized compelling interests. For example, courts can discern whether the temporary racial segregation of inmates will prevent harm to those in the prison, see *Johnson* v. *California,* 543 U. S. 499, 512–513, but the question whether a particular mix of minority students produces "engaged and productive citizens" or effectively "train[s] future leaders" is standardless.

Second, respondents' admissions programs fail to articulate a meaningful connection between the means they employ and the goals they pursue. To achieve the educational benefits of diversity, respondents measure the racial composition of their classes using racial categories

Cite as: 600 U. S. ____ (2023)          7

Syllabus

that are plainly overbroad (expressing, for example, no concern whether *South* Asian or *East* Asian students are adequately represented as "Asian"); arbitrary or undefined (the use of the category "Hispanic"); or underinclusive (no category at all for Middle Eastern students). The unclear connection between the goals that respondents seek and the means they employ preclude courts from meaningfully scrutinizing respondents' admissions programs.

The universities' main response to these criticisms is "trust us." They assert that universities are owed deference when using race to benefit some applicants but not others. While this Court has recognized a "tradition of giving a degree of deference to a university's academic decisions," it has made clear that deference must exist "within constitutionally prescribed limits." *Grutter*, 539 U. S., at 328. Respondents have failed to present an exceedingly persuasive justification for separating students on the basis of race that is measurable and concrete enough to permit judicial review, as the Equal Protection Clause requires. Pp. 22–26.

(2) Respondents' race-based admissions systems also fail to comply with the Equal Protection Clause's twin commands that race may never be used as a "negative" and that it may not operate as a stereotype. The First Circuit found that Harvard's consideration of race has resulted in fewer admissions of Asian-American students. Respondents' assertion that race is never a negative factor in their admissions programs cannot withstand scrutiny. College admissions are zero-sum, and a benefit provided to some applicants but not to others necessarily advantages the former at the expense of the latter.

Respondents admissions programs are infirm for a second reason as well: They require stereotyping—the very thing *Grutter* foreswore. When a university admits students "on the basis of race, it engages in the offensive and demeaning assumption that [students] of a particular race, because of their race, think alike." *Miller* v. *Johnson*, 515 U. S. 900, 911–912. Such stereotyping is contrary to the "core purpose" of the Equal Protection Clause. *Palmore*, 466 U. S., at 432. Pp. 26–29.

(3) Respondents' admissions programs also lack a "logical end point" as *Grutter* required. 539 U. S., at 342. Respondents suggest that the end of race-based admissions programs will occur once meaningful representation and diversity are achieved on college campuses. Such measures of success amount to little more than comparing the racial breakdown of the incoming class and comparing it to some other metric, such as the racial makeup of the previous incoming class or the population in general, to see whether some proportional goal has been reached. The problem with this approach is well established: "[O]utright racial balancing" is "patently unconstitutional." *Fisher,*

570 U. S., at 311. Respondents' second proffered end point—when students receive the educational benefits of diversity—fares no better. As explained, it is unclear how a court is supposed to determine if or when such goals would be adequately met. Third, respondents suggest the 25-year expectation in *Grutter* means that race-based preferences must be allowed to continue until at least 2028. The Court's statement in *Grutter*, however, reflected only that Court's expectation that race-based preferences would, by 2028, be unnecessary in the context of racial diversity on college campuses. Finally, respondents argue that the frequent reviews they conduct to determine whether racial preferences are still necessary obviates the need for an end point. But *Grutter* never suggested that periodic review can make unconstitutional conduct constitutional. Pp. 29–34.

(f) Because Harvard's and UNC's admissions programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points, those admissions programs cannot be reconciled with the guarantees of the Equal Protection Clause. At the same time, nothing prohibits universities from considering an applicant's discussion of how race affected the applicant's life, so long as that discussion is concretely tied to a quality of character or unique ability that the particular applicant can contribute to the university. Many universities have for too long wrongly concluded that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned, but the color of their skin. This Nation's constitutional history does not tolerate that choice. Pp. 39–40.

No. 20–1199, 980 F. 3d 157; No. 21–707, 567 F. Supp. 3d 580, reversed.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. KAVANAUGH, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN, J., joined, and in which JACKSON, J., joined as it applies to No. 21–707. JACKSON, J., filed a dissenting opinion in No. 21–707, in which SOTOMAYOR and KAGAN, JJ., joined. JACKSON, J., took no part in the consideration or decision of the case in No. 20–1199.

Cite as: 600 U. S. ____ (2023)            1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 20–1199 and 21–707

————

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

20–1199                    *v.*

### PRESIDENT AND FELLOWS OF HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

21–707                    *v.*

### UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In these cases we consider whether the admissions systems used by Harvard College and the University of North Carolina, two of the oldest institutions of higher learning in the United States, are lawful under the Equal Protection Clause of the Fourteenth Amendment.

I

A

Founded in 1636, Harvard College has one of the most

selective application processes in the country. Over 60,000 people applied to the school last year; fewer than 2,000 were admitted. Gaining admission to Harvard is thus no easy feat. It can depend on having excellent grades, glowing recommendation letters, or overcoming significant adversity. See 980 F. 3d 157, 166–169 (CA1 2020). It can also depend on your race.

The admissions process at Harvard works as follows. Every application is initially screened by a "first reader," who assigns scores in six categories: academic, extracurricular, athletic, school support, personal, and overall. *Ibid.* A rating of "1" is the best; a rating of "6" the worst. *Ibid.* In the academic category, for example, a "1" signifies "near-perfect standardized test scores and grades"; in the extracurricular category, it indicates "truly unusual achievement"; and in the personal category, it denotes "outstanding" attributes like maturity, integrity, leadership, kindness, and courage. *Id.*, at 167–168. A score of "1" on the overall rating—a composite of the five other ratings— "signifies an exceptional candidate with >90% chance of admission." *Id.*, at 169 (internal quotation marks omitted). In assigning the overall rating, the first readers "can and do take an applicant's race into account." *Ibid.*

Once the first read process is complete, Harvard convenes admissions subcommittees. *Ibid.* Each subcommittee meets for three to five days and evaluates all applicants from a particular geographic area. *Ibid.* The subcommittees are responsible for making recommendations to the full admissions committee. *Id.*, at 169–170. The subcommittees can and do take an applicant's race into account when making their recommendations. *Id.*, at 170.

The next step of the Harvard process is the full committee meeting. The committee has 40 members, and its discussion centers around the applicants who have been recommended by the regional subcommittees. *Ibid.* At the beginning of the meeting, the committee discusses the relative

Opinion of the Court

breakdown of applicants by race. The "goal," according to Harvard's director of admissions, "is to make sure that [Harvard does] not hav[e] a dramatic drop-off" in minority admissions from the prior class. 2 App. in No. 20–1199, pp. 744, 747–748. Each applicant considered by the full committee is discussed one by one, and every member of the committee must vote on admission. 980 F. 3d, at 170. Only when an applicant secures a majority of the full committee's votes is he or she tentatively accepted for admission. *Ibid.* At the end of the full committee meeting, the racial composition of the pool of tentatively admitted students is disclosed to the committee. *Ibid.*; 2 App. in No. 20–1199, at 861.

The final stage of Harvard's process is called the "lop," during which the list of tentatively admitted students is winnowed further to arrive at the final class. Any applicants that Harvard considers cutting at this stage are placed on a "lop list," which contains only four pieces of information: legacy status, recruited athlete status, financial aid eligibility, and race. 980 F. 3d, at 170. The full committee decides as a group which students to lop. 397 F. Supp. 3d 126, 144 (Mass. 2019). In doing so, the committee can and does take race into account. *Ibid.* Once the lop process is complete, Harvard's admitted class is set. *Ibid.* In the Harvard admissions process, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants." *Id.*, at 178.

B

Founded shortly after the Constitution was ratified, the University of North Carolina (UNC) prides itself on being the "nation's first public university." 567 F. Supp. 3d 580, 588 (MDNC 2021). Like Harvard, UNC's "admissions process is highly selective": In a typical year, the school "receives approximately 43,500 applications for

its freshman class of 4,200." *Id.*, at 595.

Every application the University receives is initially reviewed by one of approximately 40 admissions office readers, each of whom reviews roughly five applications per hour. *Id.*, at 596, 598. Readers are required to consider "[r]ace and ethnicity . . . as one factor" in their review. *Id.*, at 597 (internal quotation marks omitted). Other factors include academic performance and rigor, standardized testing results, extracurricular involvement, essay quality, personal factors, and student background. *Id.*, at 600. Readers are responsible for providing numerical ratings for the academic, extracurricular, personal, and essay categories. *Ibid.* During the years at issue in this litigation, underrepresented minority students were "more likely to score [highly] on their personal ratings than their white and Asian American peers," but were more likely to be "rated lower by UNC readers on their academic program, academic performance, . . . extracurricular activities," and essays. *Id.*, at 616–617.

After assessing an applicant's materials along these lines, the reader "formulates an opinion about whether the student should be offered admission" and then "writes a comment defending his or her recommended decision." *Id.*, at 598 (internal quotation marks omitted). In making that decision, readers may offer students a "plus" based on their race, which "may be significant in an individual case." *Id.*, at 601 (internal quotation marks omitted). The admissions decisions made by the first readers are, in most cases, "provisionally final." *Students for Fair Admissions, Inc.* v. *University of N. C. at Chapel Hill*, No. 1:14–cv–954 (MDNC, Nov. 9, 2020), ECF Doc. 225, p. 7, ¶52.

Following the first read process, "applications then go to a process called 'school group review' . . . where a committee composed of experienced staff members reviews every [initial] decision." 567 F. Supp. 3d, at 599. The review committee receives a report on each student which contains,

Opinion of the Court

among other things, their "class rank, GPA, and test scores; the ratings assigned to them by their initial readers; and their status as residents, legacies, or special recruits." *Ibid.* (footnote omitted). The review committee either approves or rejects each admission recommendation made by the first reader, after which the admissions decisions are finalized. *Ibid.* In making those decisions, the review committee may also consider the applicant's race. *Id.*, at 607; 2 App. in No. 21–707, p. 407.[1]

## C

Petitioner, Students for Fair Admissions (SFFA), is a

---

[1] JUSTICE JACKSON attempts to minimize the role that race plays in UNC's admissions process by noting that, from 2016–2021, the school accepted a lower "percentage of the most academically excellent in-state Black candidates"—that is, 65 out of 67 such applicants (97.01%)—than it did similarly situated Asian applicants—that is, 1118 out of 1139 such applicants (98.16%). *Post*, at 20 (dissenting opinion); see also 3 App. in No. 21–707, pp. 1078–1080. It is not clear how the rejection of just two black applicants over five years could be "indicative of a genuinely holistic [admissions] process," as JUSTICE JACKSON contends. *Post*, at 20–21. And indeed it cannot be, as the *overall* acceptance rates of academically excellent applicants to UNC illustrates full well. According to SFFA's expert, over 80% of all black applicants in the top academic decile were admitted to UNC, while under 70% of white and Asian applicants in that decile were admitted. 3 App. in No. 21–707, at 1078–1083. In the second highest academic decile, the disparity is even starker: 83% of black applicants were admitted, while 58% of white applicants and 47% of Asian applicants were admitted. *Ibid.* And in the third highest decile, 77% of black applicants were admitted, compared to 48% of white applicants and 34% of Asian applicants. *Ibid.* The dissent does not dispute the accuracy of these figures. See *post*, at 20, n. 94 (opinion of JACKSON, J.). And its contention that white and Asian students "receive a diversity plus" in UNC's race-based admissions system blinks reality. *Post*, at 18.

The same is true at Harvard. See Brief for Petitioner 24 ("[A]n African American [student] in [the fourth lowest academic] decile has a higher chance of admission (12.8%) than an Asian American in the *top* decile (12.7%)." (emphasis added)); see also 4 App. in No. 20–1199, p. 1793 (black applicants in the top four academic deciles are between four and ten times more likely to be admitted to Harvard than Asian applicants in those deciles).

nonprofit organization founded in 2014 whose purpose is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law." 980 F. 3d, at 164 (internal quotation marks omitted). In November 2014, SFFA filed separate lawsuits against Harvard College and the University of North Carolina, arguing that their race-based admissions programs violated, respectively, Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. §2000d *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment.[2]  See 397 F. Supp. 3d, at 131–132; 567 F. Supp. 3d, at 585–586.  The District Courts in both cases held bench trials to evaluate SFFA's claims. See 980 F. 3d, at 179; 567 F. Supp. 3d, at 588.  Trial in the Harvard case lasted 15 days and included testimony from 30 witnesses, after which the Court concluded that Harvard's admissions program comported with our precedents on the use of race in college admissions.  See 397 F. Supp. 3d, at 132, 183.  The First Circuit affirmed that determination.  See 980 F. 3d, at 204.  Similarly, in the UNC case, the District Court concluded after an eight-day trial that UNC's admissions program was permissible under the Equal Protection Clause.  567 F. Supp. 3d, at 588, 666.

We granted certiorari in the Harvard case and certiorari before judgment in the UNC case.  595 U. S. ___ (2022).

––––––––––

[2]Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. §2000d.  "We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23 (2003).  Although JUSTICE GORSUCH questions that proposition, no party asks us to reconsider it. We accordingly evaluate Harvard's admissions program under the standards of the Equal Protection Clause itself.

## II

Before turning to the merits, we must assure ourselves of our jurisdiction. See *Summers* v. *Earth Island Institute*, 555 U. S. 488, 499 (2009). UNC argues that SFFA lacks standing to bring its claims because it is not a "genuine" membership organization. Brief for University Respondents in No. 21–707, pp. 23–26. Every court to have considered this argument has rejected it, and so do we. See *Students for Fair Admissions, Inc.* v. *University of Tex. at Austin*, 37 F. 4th 1078, 1084–1086, and n. 8 (CA5 2022) (collecting cases).

Article III of the Constitution limits "[t]he judicial power of the United States" to "cases" or "controversies," ensuring that federal courts act only "as a necessity in the determination of real, earnest and vital" disputes. *Muskrat* v. *United States*, 219 U. S. 346, 351, 359 (1911) (internal quotation marks omitted). "To state a case or controversy under Article III, a plaintiff must establish standing." *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. 125, 133 (2011). That, in turn, requires a plaintiff to demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 338 (2016).

In cases like these, where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert "standing solely as the representative of its members." *Warth* v. *Seldin*, 422 U. S. 490, 511 (1975). The latter approach is known as representational or organizational standing. *Ibid.*; *Summers*, 555 U. S., at 497–498. To invoke it, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).

Respondents do not contest that SFFA satisfies the three-part test for organizational standing articulated in *Hunt*, and like the courts below, we find no basis in the record to conclude otherwise. See 980 F. 3d, at 182–184; 397 F. Supp. 3d, at 183–184; No. 1:14–cv–954 (MDNC, Sept. 29, 2018), App. D to Pet. for Cert. in No. 21–707, pp. 237–245 (2018 DC Opinion). Respondents instead argue that SFFA was not a "genuine 'membership organization'" when it filed suit, and thus that it could not invoke the doctrine of organizational standing in the first place. Brief for University Respondents in No. 21–707, at 24. According to respondents, our decision in *Hunt* established that groups qualify as genuine membership organizations only if they are controlled and funded by their members. And because SFFA's members did neither at the time this litigation commenced, respondents' argument goes, SFFA could not represent its members for purposes of Article III standing. Brief for University Respondents in No. 21–707, at 24 (citing *Hunt*, 432 U. S., at 343).

*Hunt* involved the Washington State Apple Advertising Commission, a state agency whose purpose was to protect the local apple industry. The Commission brought suit challenging a North Carolina statute that imposed a labeling requirement on containers of apples sold in that State. The Commission argued that it had standing to challenge the requirement on behalf of Washington's apple industry. See *id.*, at 336–341. We recognized, however, that as a state agency, "the Commission [wa]s not a traditional voluntary membership organization . . . , for it ha[d] no members at all." *Id.*, at 342. As a result, we could not easily apply the three-part test for organizational standing, which asks

Opinion of the Court

whether an organization's *members* have standing.  We nevertheless concluded that the Commission had standing because the apple growers and dealers it represented were *effectively* members of the Commission.  *Id.*, at 344.  The growers and dealers "alone elect[ed] the members of the Commission," "alone . . . serve[d] on the Commission," and "alone finance[d] its activities"—they possessed, in other words, "all of the indicia of membership."  *Ibid.*  The Commission was therefore a genuine membership organization in substance, if not in form.  And it was "clearly" entitled to rely on the doctrine of organizational standing under the three-part test recounted above.  *Id.*, at 343.

The indicia of membership analysis employed in *Hunt* has no applicability in these cases.  Here, SFFA *is* indisputably a voluntary membership organization with identifiable members—it is not, as in *Hunt*, a state agency that concededly has no members.  See 2018 DC Opinion 241–242.  As the First Circuit in the Harvard litigation observed, at the time SFFA filed suit, it was "a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission."  980 F. 3d, at 184.  Meanwhile in the UNC litigation, SFFA represented four members in particular—high school graduates who were denied admission to UNC.  See 2018 DC Opinion 234.  Those members filed declarations with the District Court stating "that they have voluntarily joined SFFA; they support its mission; they receive updates about the status of the case from SFFA's President; and they have had the opportunity to have input and direction on SFFA's case."  *Id.*, at 234–235 (internal quotation marks omitted).  Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates.  Because SFFA complies with the standing requirements demanded of organizational plaintiffs in *Hunt*, its obligations under Article III are satisfied.

### III

### A

In the wake of the Civil War, Congress proposed and the States ratified the Fourteenth Amendment, providing that no State shall "deny to any person . . . the equal protection of the laws." Amdt. 14, §1. To its proponents, the Equal Protection Clause represented a "foundation[al] principle"—"the absolute equality of all citizens of the United States politically and civilly before their own laws." Cong. Globe, 39th Cong., 1st Sess., 431 (1866) (statement of Rep. Bingham) (Cong. Globe). The Constitution, they were determined, "should not permit any distinctions of law based on race or color," Supp. Brief for United States on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1 etc., p. 41 (detailing the history of the adoption of the Equal Protection Clause), because any "law which operates upon one man [should] operate *equally* upon all," Cong. Globe 2459 (statement of Rep. Stevens). As soon-to-be President James Garfield observed, the Fourteenth Amendment would hold "over every American citizen, without regard to color, the protecting shield of law." *Id.*, at 2462. And in doing so, said Senator Jacob Howard of Michigan, the Amendment would give "to the humblest, the poorest, the most despised of the race the same rights and the same protection before the law as it gives to the most powerful, the most wealthy, or the most haughty." *Id.*, at 2766. For "[w]ithout this principle of equal justice," Howard continued, "there is no republican government and none that is really worth maintaining." *Ibid.*

At first, this Court embraced the transcendent aims of the Equal Protection Clause. "What is this," we said of the Clause in 1880, "but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States?" *Strauder* v. *West Virginia*, 100 U. S. 303, 307–309. "[T]he broad and benign provisions of the

Opinion of the Court

Fourteenth Amendment" apply "to all persons," we unanimously declared six years later; it is "hostility to . . . race and nationality" "which in the eye of the law is not justified." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 368–369, 373–374 (1886); see also *id.*, at 368 (applying the Clause to "aliens and subjects of the Emperor of China"); *Truax* v. *Raich*, 239 U. S. 33, 36 (1915) ("a native of Austria"); semble *Strauder*, 100 U. S., at 308–309 ("Celtic Irishmen") (dictum).

Despite our early recognition of the broad sweep of the Equal Protection Clause, this Court—alongside the country—quickly failed to live up to the Clause's core commitments. For almost a century after the Civil War, state-mandated segregation was in many parts of the Nation a regrettable norm. This Court played its own role in that ignoble history, allowing in *Plessy* v. *Ferguson* the separate but equal regime that would come to deface much of America. 163 U. S. 537 (1896). The aspirations of the framers of the Equal Protection Clause, "[v]irtually strangled in [their] infancy," would remain for too long only that—aspirations. J. Tussman & J. tenBroek, The Equal Protection of the Laws, 37 Cal. L. Rev. 341, 381 (1949).

After *Plessy*, "American courts . . . labored with the doctrine [of separate but equal] for over half a century." *Brown* v. *Board of Education*, 347 U. S. 483, 491 (1954). Some cases in this period attempted to curtail the perniciousness of the doctrine by emphasizing that it required States to provide black students educational opportunities equal to—even if formally separate from—those enjoyed by white students. See, *e.g.*, *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337, 349–350 (1938) ("The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups . . . ."). But the inherent folly of that approach—of trying to derive equality from inequality—soon became apparent. As the Court subse-

quently recognized, even racial distinctions that were argued to have no palpable effect worked to subordinate the afflicted students. See, *e.g.*, *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637, 640–642 (1950) ("It is said that the separations imposed by the State in this case are in form merely nominal. . . . But they signify that the State . . . sets [petitioner] apart from the other students."). By 1950, the inevitable truth of the Fourteenth Amendment had thus begun to reemerge: Separate cannot be equal.

The culmination of this approach came finally in *Brown* v. *Board of Education*. In that seminal decision, we overturned *Plessy* for good and set firmly on the path of invalidating all *de jure* racial discrimination by the States and Federal Government. 347 U. S., at 494–495. *Brown* concerned the permissibility of racial segregation in public schools. The school district maintained that such segregation was lawful because the schools provided to black students and white students were of roughly the same quality. But we held such segregation impermissible "*even though* the physical facilities and other 'tangible' factors may be equal." *Id.*, at 493 (emphasis added). The mere act of separating "children . . . because of their race," we explained, itself "generate[d] a feeling of inferiority." *Id.*, at 494.

The conclusion reached by the *Brown* Court was thus unmistakably clear: the right to a public education "must be made available to all on equal terms." *Id.*, at 493. As the plaintiffs had argued, "no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." Tr. of Oral Arg. in *Brown I*, O. T. 1952, No. 8, p. 7 (Robert L. Carter, Dec. 9, 1952); see also Supp. Brief for Appellants on Reargument in Nos. 1, 2, and 4, and for Respondents in No. 10, in *Brown* v. *Board of Education*, O. T. 1953, p. 65 ("That the Constitution is color blind is our

Opinion of the Court

dedicated belief."); *post*, at 39, n. 7 (THOMAS, J., concurring). The Court reiterated that rule just one year later, holding that "full compliance" with *Brown* required schools to admit students "on a racially nondiscriminatory basis." *Brown* v. *Board of Education*, 349 U. S. 294, 300–301 (1955). The time for making distinctions based on race had passed. *Brown*, the Court observed, "declar[ed] the fundamental principle that racial discrimination in public education is unconstitutional." *Id.*, at 298.

So too in other areas of life. Immediately after *Brown*, we began routinely affirming lower court decisions that invalidated all manner of race-based state action. In *Gayle* v. *Browder*, for example, we summarily affirmed a decision invalidating state and local laws that required segregation in busing. 352 U. S. 903 (1956) (*per curiam*). As the lower court explained, "[t]he equal protection clause requires equality of treatment before the law for all persons without regard to race or color." *Browder* v. *Gayle*, 142 F. Supp. 707, 715 (MD Ala. 1956). And in *Mayor and City Council of Baltimore* v. *Dawson*, we summarily affirmed a decision striking down racial segregation at public beaches and bathhouses maintained by the State of Maryland and the city of Baltimore. 350 U. S. 877 (1955) (*per curiam*). "It is obvious that racial segregation in recreational activities can no longer be sustained," the lower court observed. *Dawson* v. *Mayor and City Council of Baltimore*, 220 F. 2d 386, 387 (CA4 1955) (*per curiam*). "[T]he ideal of equality before the law which characterizes our institutions" demanded as much. *Ibid.*

In the decades that followed, this Court continued to vindicate the Constitution's pledge of racial equality. Laws dividing parks and golf courses; neighborhoods and businesses; buses and trains; schools and juries were undone, all by a transformative promise "stemming from our American ideal of fairness": "'the Constitution . . . forbids . . . discrimination by the General Government, or by the States,

against any citizen because of his race.'" *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954) (quoting *Gibson* v. *Mississippi*, 162 U. S. 565, 591 (1896) (Harlan, J., for the Court)). As we recounted in striking down the State of Virginia's ban on interracial marriage 13 years after *Brown*, the Fourteenth Amendment "proscri[bes] . . . all invidious racial discriminations." *Loving* v. *Virginia*, 388 U. S. 1, 8 (1967). Our cases had thus "consistently denied the constitutionality of measures which restrict the rights of citizens on account of race." *Id.*, at 11–12; *see also Yick Wo*, 118 U. S., at 373–375 (commercial property); *Shelley* v. *Kraemer*, 334 U. S. 1 (1948) (housing covenants); *Hernandez* v. *Texas*, 347 U. S. 475 (1954) (composition of juries); *Dawson*, 350 U. S., at 877 (beaches and bathhouses); *Holmes* v. *Atlanta*, 350 U. S. 879 (1955) (*per curiam*) (golf courses); *Browder*, 352 U. S., at 903 (busing); *New Orleans City Park Improvement Assn.* v. *Detiege*, 358 U. S. 54 (1958) (*per curiam*) (public parks); *Bailey* v. *Patterson*, 369 U. S. 31 (1962) (*per curiam*) (transportation facilities); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971) (education); *Batson* v. *Kentucky*, 476 U. S. 79 (1986) (peremptory jury strikes).

These decisions reflect the "core purpose" of the Equal Protection Clause: "do[ing] away with all governmentally imposed discrimination based on race." *Palmore* v. *Sidoti*, 466 U. S. 429, 432 (1984) (footnote omitted). We have recognized that repeatedly. "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving*, 388 U. S., at 10; see also *Washington* v. *Davis*, 426 U. S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964) ("[T]he historical fact [is] that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination.").

Opinion of the Court

Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies "without regard to any differences of race, of color, or of nationality"—it is "universal in [its] application." *Yick Wo*, 118 U. S., at 369. For "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 289–290 (1978) (opinion of Powell, J.). "If both are not accorded the same protection, then it is not equal." *Id.*, at 290.

Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as "strict scrutiny." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995). Under that standard we ask, first, whether the racial classification is used to "further compelling governmental interests." *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003). Second, if so, we ask whether the government's use of race is "narrowly tailored"—meaning "necessary"—to achieve that interest. *Fisher* v. *University of Tex. at Austin*, 570 U. S. 297, 311–312 (2013) (*Fisher I*) (internal quotation marks omitted).

Outside the circumstances of these cases, our precedents have identified only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute. See, *e.g.*, *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 720 (2007); *Shaw* v. *Hunt*, 517 U. S. 899, 909–910 (1996); *post*, at 19–20, 30–31 (opinion of THOMAS, J.). The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot. See *Johnson* v. *California*, 543 U. S. 499, 512–513 (2005).[3]

───────────

[3] The first time we determined that a governmental racial classification satisfied "the most rigid scrutiny" was 10 years before *Brown* v.

Our acceptance of race-based state action has been rare for a reason. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000) (quoting *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943)). That principle cannot be overridden except in the most extraordinary case.

### B

These cases involve whether a university may make admissions decisions that turn on an applicant's race. Our Court first considered that issue in *Regents of University of California* v. *Bakke*, which involved a set-aside admissions program used by the University of California, Davis, medical school. 438 U. S., at 272–276. Each year, the school held 16 of its 100 seats open for members of certain minority groups, who were reviewed on a special admissions track separate from those in the main admissions pool. *Id.*, at

_____

*Board of Education*, 347 U. S. 483 (1954), in the infamous case *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944). There, the Court upheld the internment of "all persons of Japanese ancestry in prescribed West Coast . . . areas" during World War II because "the military urgency of the situation demanded" it. *Id.*, at 217, 223. We have since overruled *Korematsu*, recognizing that it was "gravely wrong the day it was decided." *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (slip op., at 38). The Court's decision in *Korematsu* nevertheless "demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification" and that "[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 236 (1995) (internal quotation marks omitted).

The principal dissent, for its part, claims that the Court has also permitted "the use of race when that use burdens minority populations." *Post*, at 38–39 (opinion of SOTOMAYOR, J.). In support of that claim, the dissent cites two cases that have nothing to do with the Equal Protection Clause. See *ibid.* (citing *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975) (Fourth Amendment case), and *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976) (another Fourth Amendment case)).

272–275. The plaintiff, Allan Bakke, was denied admission two years in a row, despite the admission of minority applicants with lower grade point averages and MCAT scores. *Id.*, at 276–277. Bakke subsequently sued the school, arguing that its set-aside program violated the Equal Protection Clause.

In a deeply splintered decision that produced six different opinions—none of which commanded a majority of the Court—we ultimately ruled in part in favor of the school and in part in favor of Bakke. Justice Powell announced the Court's judgment, and his opinion—though written for himself alone—would eventually come to "serv[e] as the touchstone for constitutional analysis of race-conscious admissions policies." *Grutter*, 539 U. S., at 323.

Justice Powell began by finding three of the school's four justifications for its policy not sufficiently compelling. The school's first justification of "reducing the historic deficit of traditionally disfavored minorities in medical schools," he wrote, was akin to "[p]referring members of any one group for no reason other than race or ethnic origin." *Bakke*, 438 U. S., at 306–307 (internal quotation marks omitted). Yet that was "discrimination for its own sake," which "the Constitution forbids." *Id.*, at 307 (citing, *inter alia*, *Loving*, 388 U. S., at 11). Justice Powell next observed that the goal of "remedying . . . the effects of 'societal discrimination'" was also insufficient because it was "an amorphous concept of injury that may be ageless in its reach into the past." *Bakke*, 438 U. S., at 307. Finally, Justice Powell found there was "virtually no evidence in the record indicating that [the school's] special admissions program" would, as the school had argued, increase the number of doctors working in underserved areas. *Id.*, at 310.

Justice Powell then turned to the school's last interest asserted to be compelling—obtaining the educational benefits that flow from a racially diverse student body. That interest, in his view, was "a constitutionally permissible goal for

an institution of higher education." *Id.*, at 311–312. And that was so, he opined, because a university was entitled as a matter of academic freedom "to make its own judgments as to . . . the selection of its student body." *Id.*, at 312.

But a university's freedom was not unlimited. "Racial and ethnic distinctions of any sort are inherently suspect," Justice Powell explained, and antipathy toward them was deeply "rooted in our Nation's constitutional and demographic history." *Id.*, at 291. A university could not employ a quota system, for example, reserving "a specified number of seats in each class for individuals from the preferred ethnic groups." *Id.*, at 315. Nor could it impose a "multitrack program with a prescribed number of seats set aside for each identifiable category of applicants." *Ibid.* And neither still could it use race to foreclose an individual "from all consideration . . . simply because he was not the right color." *Id.*, at 318.

The role of race had to be cabined. It could operate only as "a 'plus' in a particular applicant's file." *Id.*, at 317. And even then, race was to be weighed in a manner "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Ibid.* Justice Powell derived this approach from what he called the "illuminating example" of the admissions system then used by Harvard College. *Id.*, at 316. Under that system, as described by Harvard in a brief it had filed with the Court, "the race of an applicant may tip the balance in his favor just as geographic origin or a life [experience] may tip the balance in other candidates' cases." *Ibid.* (internal quotation marks omitted). Harvard continued: "A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer." *Ibid.* (internal quotation marks omitted). The result, Harvard proclaimed, was that "race has been"—and should be—"a factor in some admission decisions." *Ibid.* (internal

Opinion of the Court

quotation marks omitted).

No other Member of the Court joined Justice Powell's opinion. Four Justices instead would have held that the government may use race for the purpose of "remedying the effects of past societal discrimination." *Id.*, at 362 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). Four other Justices, meanwhile, would have struck down the Davis program as violative of Title VI. In their view, it "seem[ed] clear that the proponents of Title VI assumed that the Constitution itself required a colorblind standard on the part of government." *Id.*, at 416 (Stevens, J., joined by Burger, C. J., and Stewart and Rehnquist, JJ., concurring in judgment in part and dissenting in part). The Davis program therefore flatly contravened a core "principle imbedded in the constitutional *and* moral understanding of the times": the prohibition against "racial discrimination." *Id.*, at 418, n. 21 (internal quotation marks omitted).

C

In the years that followed our "fractured decision in *Bakke*," lower courts "struggled to discern whether Justice Powell's" opinion constituted "binding precedent." *Grutter*, 539 U. S., at 325. We accordingly took up the matter again in 2003, in the case *Grutter* v. *Bollinger*, which concerned the admissions system used by the University of Michigan law school. *Id.*, at 311. There, in another sharply divided decision, the Court for the first time "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id.*, at 325.

The Court's analysis tracked Justice Powell's in many respects. As for compelling interest, the Court held that "[t]he Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer." *Id.*, at 328. In achieving that goal, however, the Court

made clear—just as Justice Powell had—that the law
school was limited in the means that it could pursue. The
school could not "establish quotas for members of certain
racial groups or put members of those groups on separate
admissions tracks." *Id.*, at 334. Neither could it "insulate
applicants who belong to certain racial or ethnic groups
from the competition for admission." *Ibid.* Nor still could
it desire "some specified percentage of a particular group
merely because of its race or ethnic origin." *Id.*, at 329–330
(quoting *Bakke*, 438 U. S., at 307 (opinion of Powell, J.)).

These limits, *Grutter* explained, were intended to guard
against two dangers that all race-based government action
portends. The first is the risk that the use of race will de-
volve into "illegitimate . . . stereotyp[ing]." *Richmond* v. *J.
A. Croson Co.*, 488 U. S. 469, 493 (1989) (plurality opinion).
Universities were thus not permitted to operate their ad-
missions programs on the "belief that minority students al-
ways (or even consistently) express some characteristic mi-
nority viewpoint on any issue." *Grutter*, 539 U. S., at 333
(internal quotation marks omitted). The second risk is that
race would be used not as a plus, but as a negative—to dis-
criminate *against* those racial groups that were not the ben-
eficiaries of the race-based preference. A university's use
of race, accordingly, could not occur in a manner that "unduly
harm[ed] nonminority applicants." *Id.*, at 341.

But even with these constraints in place, *Grutter* ex-
pressed marked discomfort with the use of race in college
admissions. The Court stressed the fundamental principle
that "there are serious problems of justice connected with
the idea of [racial] preference itself." *Ibid.* (quoting *Bakke*,
438 U. S., at 298 (opinion of Powell, J.)). It observed that
all "racial classifications, however compelling their goals,"
were "dangerous." *Grutter*, 539 U. S., at 342. And it cau-
tioned that all "race-based governmental action" should "re-
mai[n] subject to continuing oversight to assure that it will

Opinion of the Court

work the least harm possible to other innocent persons com-peting for the benefit." *Id.*, at 341 (internal quotation marks omitted).

To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs. At some point, the Court held, they must end. *Id.*, at 342. This require-ment was critical, and *Grutter* emphasized it repeatedly. "[A]ll race-conscious admissions programs [must] have a termination point"; they "must have reasonable durational limits"; they "must be limited in time"; they must have "sunset provisions"; they "must have a logical end point"; their "deviation from the norm of equal treatment" must be "a temporary matter." *Ibid.* (internal quotation marks omitted). The importance of an end point was not just a matter of repetition. It was the reason the Court was will-ing to dispense temporarily with the Constitution's unam-biguous guarantee of equal protection. The Court recog-nized as much: "[e]nshrining a permanent justification for racial preferences," the Court explained, "would offend this fundamental equal protection principle." *Ibid.*; see also *id.,* at 342–343 (quoting N. Nathanson & C. Bartnik, The Con-stitutionality of Preferential Treatment for Minority Appli-cants to Professional Schools, 58 Chi. Bar Rec. 282, 293 (May–June 1977), for the proposition that "[i]t would be a sad day indeed, were America to become a quota-ridden so-ciety, with each identifiable minority assigned proportional representation in every desirable walk of life").

*Grutter* thus concluded with the following caution: "It has been 25 years since Justice Powell first approved the use of race to further an interest in student body diversity in the context of public higher education. . . . We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." 539 U. S., at 343.

### IV

Twenty years later, no end is in sight.  "Harvard's view about when [race-based admissions will end] doesn't have a date on it."  Tr. of Oral Arg. in No. 20–1199, p. 85; Brief for Respondent in No. 20–1199, p. 52.  Neither does UNC's.  567 F. Supp. 3d, at 612.  Yet both insist that the use of race in their admissions programs must continue.

But we have permitted race-based admissions only within the confines of narrow restrictions.  University programs must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end.  Respondents' admissions systems—however well intentioned and implemented in good faith—fail each of these criteria.  They must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment.[4]

### A

Because "[r]acial discrimination [is] invidious in all contexts," *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 619 (1991), we have required that universities operate their race-based admissions programs in a manner that is "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny, *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 381 (2016) (*Fisher II*).  "Classifying and assigning" students based on their race "requires more than . . . an amorphous end to justify it."  *Parents Involved*, 551 U. S., at 735.

Respondents have fallen short of satisfying that burden.

--------

[4]The United States as *amicus curiae* contends that race-based admissions programs further compelling interests at our Nation's military academies.  No military academy is a party to these cases, however, and none of the courts below addressed the propriety of race-based admissions systems in that context.  This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present.

Opinion of the Court

First, the interests they view as compelling cannot be subjected to meaningful judicial review. Harvard identifies the following educational benefits that it is pursuing: (1) "training future leaders in the public and private sectors"; (2) preparing graduates to "adapt to an increasingly pluralistic society"; (3) "better educating its students through diversity"; and (4) "producing new knowledge stemming from diverse outlooks." 980 F. 3d, at 173–174. UNC points to similar benefits, namely, "(1) promoting the robust exchange of ideas; (2) broadening and refining understanding; (3) fostering innovation and problem-solving; (4) preparing engaged and productive citizens and leaders; [and] (5) enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." 567 F. Supp. 3d, at 656.

Although these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny. At the outset, it is unclear how courts are supposed to measure any of these goals. How is a court to know whether leaders have been adequately "train[ed]"; whether the exchange of ideas is "robust"; or whether "new knowledge" is being developed? *Ibid.*; 980 F. 3d, at 173–174. Even if these goals could somehow be measured, moreover, how is a court to know when they have been reached, and when the perilous remedy of racial preferences may cease? There is no particular point at which there exists sufficient "innovation and problem-solving," or students who are appropriately "engaged and productive." 567 F. Supp. 3d, at 656. Finally, the question in this context is not one of *no* diversity or *some*: it is a question of degree. How many fewer leaders Harvard would create without racial preferences, or how much poorer the education at Harvard would be, are inquiries no court could resolve.

Comparing respondents' asserted goals to interests we have recognized as compelling further illustrates their elusive nature. In the context of racial violence in a prison, for

example, courts can ask whether temporary racial segrega-
tion of inmates will prevent harm to those in the prison.
See *Johnson*, 543 U. S., at 512–513. When it comes to work-
place discrimination, courts can ask whether a race-based
benefit makes members of the discriminated class "whole
for [the] injuries [they] suffered." *Franks* v. *Bowman
Transp. Co.*, 424 U. S. 747, 763 (1976) (internal quotation
marks omitted). And in school segregation cases, courts can
determine whether any race-based remedial action pro-
duces a distribution of students "compar[able] to what it
would have been in the absence of such constitutional vio-
lations." *Dayton Bd. of Ed.* v. *Brinkman*, 433 U. S. 406, 420
(1977).

Nothing like that is possible when it comes to evaluating
the interests respondents assert here. Unlike discerning
whether a prisoner will be injured or whether an employee
should receive backpay, the question whether a particular
mix of minority students produces "engaged and productive
citizens," sufficiently "enhance[s] appreciation, respect, and
empathy," or effectively "train[s] future leaders" is stand-
ardless. 567 F. Supp. 3d, at 656; 980 F. 3d, at 173–174. The
interests that respondents seek, though plainly worthy, are
inescapably imponderable.

Second, respondents' admissions programs fail to articu-
late a meaningful connection between the means they em-
ploy and the goals they pursue. To achieve the educational
benefits of diversity, UNC works to avoid the underrepre-
sentation of minority groups, 567 F. Supp. 3d, at 591–592,
and n. 7, while Harvard likewise "guard[s] against inad-
vertent drop-offs in representation" of certain minority
groups from year to year, Brief for Respondent in No. 20–
1199, at 16. To accomplish both of those goals, in turn, the
universities measure the racial composition of their classes
using the following categories: (1) Asian; (2) Native Hawai-
ian or Pacific Islander; (3) Hispanic; (4) White; (5) African-
American; and (6) Native American. See, *e.g.*, 397

Opinion of the Court

F. Supp. 3d, at 137, 178; 3 App. in No. 20–1199, at 1278, 1280–1283; 3 App. in No. 21–707, at 1234–1241. It is far from evident, though, how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue.

For starters, the categories are themselves imprecise in many ways. Some of them are plainly overbroad: by grouping together all Asian students, for instance, respondents are apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other. Meanwhile other racial categories, such as "Hispanic," are arbitrary or undefined. See, *e.g.*, M. Lopez, J. Krogstad, & J. Passel, Pew Research Center, Who is Hispanic? (Sept. 15, 2022) (referencing the "long history of changing labels [and] shifting categories . . . reflect[ing] evolving cultural norms about what it means to be Hispanic or Latino in the U. S. today"). And still other categories are underinclusive. When asked at oral argument "how are applicants from Middle Eastern countries classified, [such as] Jordan, Iraq, Iran, [and] Egypt," UNC's counsel responded, "[I] do not know the answer to that question." Tr. of Oral Arg. in No. 21–707, p. 107; cf. *post*, at 6–7 (GORSUCH, J., concurring) (detailing the "incoherent" and "irrational stereotypes" that these racial categories further).

Indeed, the use of these opaque racial categories undermines, instead of promotes, respondents' goals. By focusing on underrepresentation, respondents would apparently prefer a class with 15% of students from Mexico over a class with 10% of students from several Latin American countries, simply because the former contains more Hispanic students than the latter. Yet "[i]t is hard to understand how a plan that could allow these results can be viewed as being concerned with achieving enrollment that is 'broadly

diverse.'" *Parents Involved*, 551 U. S., at 724 (quoting *Grutter*, 539 U. S., at 329). And given the mismatch between the means respondents employ and the goals they seek, it is especially hard to understand how courts are supposed to scrutinize the admissions programs that respondents use.

The universities' main response to these criticisms is, essentially, "trust us." None of the questions recited above need answering, they say, because universities are "owed deference" when using race to benefit some applicants but not others. Brief for University Respondents in No. 21–707, at 39 (internal quotation marks omitted). It is true that our cases have recognized a "tradition of giving a degree of deference to a university's academic decisions." *Grutter*, 539 U. S., at 328. But we have been unmistakably clear that any deference must exist "within constitutionally prescribed limits," *ibid.*, and that "deference does not imply abandonment or abdication of judicial review," *Miller–El* v. *Cockrell*, 537 U. S. 322, 340 (2003). Universities may define their missions as they see fit. The Constitution defines ours. Courts may not license separating students on the basis of race without an exceedingly persuasive justification that is measurable and concrete enough to permit judicial review. As this Court has repeatedly reaffirmed, "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) (internal quotation marks omitted). The programs at issue here do not satisfy that standard.[5]

_____

[5] For that reason, one dissent candidly advocates abandoning the demands of strict scrutiny. See *post*, at 24, 26–28 (opinion of JACKSON, J.) (arguing the Court must "get out of the way," "leav[e] well enough alone," and defer to universities and "experts" in determining who should be discriminated against). An opinion professing fidelity to history (to say nothing of the law) should surely see the folly in that approach.

Opinion of the Court

B

The race-based admissions systems that respondents employ also fail to comply with the twin commands of the Equal Protection Clause that race may never be used as a "negative" and that it may not operate as a stereotype.

First, our cases have stressed that an individual's race may never be used against him in the admissions process. Here, however, the First Circuit found that Harvard's consideration of race has led to an 11.1% decrease in the number of Asian-Americans admitted to Harvard. 980 F. 3d, at 170, n. 29. And the District Court observed that Harvard's "policy of considering applicants' race . . . overall results in fewer Asian American and white students being admitted." 397 F. Supp. 3d, at 178.

Respondents nonetheless contend that an individual's race is never a negative factor in their admissions programs, but that assertion cannot withstand scrutiny. Harvard, for example, draws an analogy between race and other factors it considers in admission. "[W]hile admissions officers may give a preference to applicants likely to excel in the Harvard-Radcliffe Orchestra," Harvard explains, "that does not mean it is a 'negative' not to excel at a musical instrument." Brief for Respondent in No. 20–1199, at 51. But on Harvard's logic, while it gives preferences to applicants with high grades and test scores, "that does not mean it is a 'negative'" to be a student with lower grades and lower test scores. *Ibid.* This understanding of the admissions process is hard to take seriously. College admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter.

Respondents also suggest that race is not a negative factor because it does not impact many admissions decisions. See *id.*, at 49; Brief for University Respondents in No. 21–707, at 2. Yet, at the same time, respondents also maintain that the demographics of their admitted classes would

meaningfully change if race-based admissions were abandoned. And they acknowledge that race is determinative for at least some—if not many—of the students they admit. See, *e.g.*, Tr. of Oral Arg. in No. 20–1199, at 67; 567 F. Supp. 3d, at 633. How else but "negative" can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been? The "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley*, 334 U. S., at 22.[6]

Respondents' admissions programs are infirm for a second reason as well. We have long held that universities may not operate their admissions programs on the "belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." *Grutter*, 539 U. S., at 333 (internal quotation marks omitted). That requirement is found throughout our Equal Protection Clause jurisprudence more generally. See, *e.g.*, *Schuette* v. *BAMN*, 572 U. S. 291, 308 (2014) (plurality opinion) ("In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike . . . .'" (quoting *Shaw* v. *Reno*, 509 U. S.

--------

[6] JUSTICE JACKSON contends that race does not play a "determinative role for applicants" to UNC. *Post*, at 24. But even the principal dissent acknowledges that race—and race alone—explains the admissions decisions for hundreds if not thousands of applicants to UNC each year. *Post*, at 33, n. 28 (opinion of SOTOMAYOR, J.); see also *Students for Fair Admissions, Inc.* v. *University of N. C. at Chapel Hill*, No. 1:14–cv–954 (MDNC, Dec. 21, 2020), ECF Doc. 233, at 23–27 (UNC expert testifying that race explains 1.2% of in state and 5.1% of out of state admissions decisions); 3 App. in No. 21–707, at 1069 (observing that UNC evaluated 57,225 in state applicants and 105,632 out of state applicants from 2016–2021). The suggestion by the principal dissent that our analysis relies on extra-record materials, see *post*, at 29–30, n. 25 (opinion of SOTOMAYOR, J.), is simply mistaken.

630, 647 (1993))).

Yet by accepting race-based admissions programs in which some students may obtain preferences on the basis of race alone, respondents' programs tolerate the very thing that *Grutter* foreswore: stereotyping. The point of respondents' admissions programs is that there is an inherent benefit in race *qua* race—in race for race's sake. Respondents admit as much. Harvard's admissions process rests on the pernicious stereotype that "a black student can usually bring something that a white person cannot offer." *Bakke*, 438 U. S., at 316 (opinion of Powell, J.) (internal quotation marks omitted); see also Tr. of Oral Arg. in No. 20–1199, at 92. UNC is much the same. It argues that race in itself "says [something] about who you are." Tr. of Oral Arg. in No. 21–707, at 97; see also *id.*, at 96 (analogizing being of a certain race to being from a rural area).

We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those "who may have little in common with one another but the color of their skin." *Shaw*, 509 U. S., at 647. The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well.

"One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice*, 528 U. S., at 517. But when a university admits students "on the basis of race, it engages in the offensive and demeaning assumption that [students] of a particular race, because of their race, think alike," *Miller* v. *Johnson*, 515 U. S. 900, 911–912 (1995) (internal quotation marks omitted)—at the very least alike in the sense of being different from nonminority students. In

doing so, the university furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Id.*, at 912 (internal quotation marks omitted). Such stereotyping can only "cause[] continued hurt and injury," *Edmonson*, 500 U. S., at 631, contrary as it is to the "core purpose" of the Equal Protection Clause, *Palmore*, 466 U. S., at 432.

C

If all this were not enough, respondents' admissions programs also lack a "logical end point." *Grutter*, 539 U. S., at 342.

Respondents and the Government first suggest that respondents' race-based admissions programs will end when, in their absence, there is "meaningful representation and meaningful diversity" on college campuses. Tr. of Oral Arg. in No. 21–707, at 167. The metric of meaningful representation, respondents assert, does not involve any "strict numerical benchmark," *id.*, at 86; or "precise number or percentage," *id.*, at 167; or "specified percentage," Brief for Respondent in No. 20–1199, at 38 (internal quotation marks omitted). So what does it involve?

Numbers all the same. At Harvard, each full committee meeting begins with a discussion of "how the breakdown of the class compares to the prior year in terms of racial identities." 397 F. Supp. 3d, at 146. And "if at some point in the admissions process it appears that a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the Admissions Committee may decide to give additional attention to applications from students within that group." *Ibid.*; see also *id.*, at 147 (District Court finding that Harvard uses race to "trac[k] how each class is shaping up relative to previous years with an eye towards achieving a level of racial diversity"); 2 App. in No. 20–1199,

Cite as: 600 U. S. ____ (2023)     31

Opinion of the Court

at 821–822.

The results of the Harvard admissions process reflect this numerical commitment. For the admitted classes of 2009 to 2018, black students represented a tight band of 10.0%–11.7% of the admitted pool. The same theme held true for other minority groups:

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

Brief for Petitioner in No. 20–1199 etc., p. 23. Harvard's focus on numbers is obvious.[7]

_____

[7] The principal dissent claims that "[t]he fact that Harvard's racial shares of admitted applicants varies relatively little . . . is unsurprising and reflects the fact that the racial makeup of Harvard's applicant pool also varies very little over this period." *Post*, at 35 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted). But that is exactly the point: Harvard must use precise racial preferences year in and year out to maintain the unyielding demographic composition of its class. The dissent is thus left to attack the numbers themselves, arguing they were "handpicked" "from a truncated period." *Ibid.*, n. 29 (opinion of SOTOMAYOR, J.). As supposed proof, the dissent notes that the share of

UNC's admissions program operates similarly. The University frames the challenge it faces as "the admission and enrollment of underrepresented minorities," Brief for University Respondents in No. 21–707, at 7, a metric that turns solely on whether a group's "percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina," 567 F. Supp. 3d, at 591, n. 7; see also Tr. of Oral Arg. in No. 21–707, at 79. The University "has not yet fully achieved its diversity-related educational goals," it explains, in part due to its failure to obtain closer to proportional representation. Brief for University Respondents in No. 21–707, at 7; see also 567 F. Supp. 3d, at 594.

The problem with these approaches is well established. "[O]utright racial balancing" is "patently unconstitutional." *Fisher I*, 570 U. S., at 311 (internal quotation marks omitted). That is so, we have repeatedly explained, because "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller,* 515 U. S., at 911 (internal quotation marks omitted). By promising to terminate their use of race only when some rough percentage of various racial groups is admitted, respondents turn that principle on its head. Their admissions programs "effectively assure[] that race will always be relevant . . . and that the ultimate goal of eliminating" race as a criterion "will never be achieved." *Croson*, 488 U. S., at 495 (internal

---

Asian students at Harvard varied significantly from 1980 to 1994—a 14-year period that ended nearly three decades ago. 4 App. in No. 20–1199, at 1770. But the relevance of that observation—handpicked and truncated as it is—is lost on us. And the dissent does not and cannot dispute that the share of black and Hispanic students at Harvard—"the primary beneficiaries" of its race-based admissions policy—has remained consistent for decades. 397 F. Supp. 3d, at 178; 4 App. in No. 20–1199, at 1770. For all the talk of holistic and contextual judgments, the racial preferences at issue here in fact operate like clockwork.

Opinion of the Court

quotation marks omitted).

Respondents' second proffered end point fares no better. Respondents assert that universities will no longer need to engage in race-based admissions when, in their absence, students nevertheless receive the educational benefits of diversity. But as we have already explained, it is not clear how a court is supposed to determine when stereotypes have broken down or "productive citizens and leaders" have been created. 567 F. Supp. 3d, at 656. Nor is there any way to know whether those goals would adequately be met in the absence of a race-based admissions program. As UNC itself acknowledges, these "qualitative standard[s]" are "difficult to measure." Tr. of Oral Arg. in No. 21–707, at 78; but see *Fisher II*, 579 U. S., at 381 (requiring race-based admissions programs to operate in a manner that is "sufficiently measurable").

Third, respondents suggest that race-based preferences must be allowed to continue for at least five more years, based on the Court's statement in *Grutter* that it "expect[ed] that 25 years from now, the use of racial preferences will no longer be necessary." 539 U. S., at 343. The 25-year mark articulated in *Grutter*, however, reflected only that Court's view that race-based preferences would, by 2028, be unnecessary to ensure a requisite level of racial diversity on college campuses. *Ibid.* That expectation was oversold. Neither Harvard nor UNC believes that race-based admissions will in fact be unnecessary in five years, and both universities thus expect to continue using race as a criterion well beyond the time limit that *Grutter* suggested. See Tr. of Oral Arg. in No. 20–1199, at 84–85; Tr. of Oral Arg. in No. 21–707, at 85–86. Indeed, the high school applicants that Harvard and UNC will evaluate this fall using their race-based admissions systems are expected to graduate in 2028—25 years after *Grutter* was decided.

Finally, respondents argue that their programs need not have an end point at all because they frequently review

them to determine whether they remain necessary. See Brief for Respondent in No. 20–1199, at 52; Brief for University Respondents in No. 21–707, at 58–59. Respondents point to language in *Grutter* that, they contend, permits "the durational requirement [to] be met" with "periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." 539 U. S., at 342. But *Grutter* never suggested that periodic review could make unconstitutional conduct constitutional. To the contrary, the Court made clear that race-based admissions programs eventually had to end—despite whatever periodic review universities conducted. *Ibid.*; see also *supra*, at 18.

Here, however, Harvard concedes that its race-based admissions program has no end point. Brief for Respondent in No. 20–1199, at 52 (Harvard "has not set a sunset date" for its program (internal quotation marks omitted)). And it acknowledges that the way it thinks about the use of race in its admissions process "is the same now as it was" nearly 50 years ago. Tr. of Oral Arg. in No. 20–1199, at 91. UNC's race-based admissions program is likewise not set to expire any time soon—nor, indeed, any time at all. The University admits that it "has not set forth a proposed time period in which it believes it can end all race-conscious admissions practices." 567 F. Supp. 3d, at 612. And UNC suggests that it might soon use race to a *greater* extent than it currently does. See Brief for University Respondents in No. 21–707, at 57. In short, there is no reason to believe that respondents will—even acting in good faith—comply with the Equal Protection Clause any time soon.

## V

The dissenting opinions resist these conclusions. They would instead uphold respondents' admissions programs based on their view that the Fourteenth Amendment permits state actors to remedy the effects of societal discrimination through explicitly race-based measures. Although

Opinion of the Court

both opinions are thorough and thoughtful in many respects, this Court has long rejected their core thesis.

The dissents' interpretation of the Equal Protection Clause is not new. In *Bakke*, four Justices would have permitted race-based admissions programs to remedy the effects of societal discrimination. 438 U. S., at 362 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). But that minority view was just that—a minority view. Justice Powell, who provided the fifth vote and controlling opinion in *Bakke*, firmly rejected the notion that societal discrimination constituted a compelling interest. Such an interest presents "an amorphous concept of injury that may be ageless in its reach into the past," he explained. *Id.*, at 307. It cannot "justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries of the [race-based] admissions program are thought to have suffered." *Id.*, at 310.

The Court soon adopted Justice Powell's analysis as its own. In the years after *Bakke*, the Court repeatedly held that ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action. "[A]n effort to alleviate the effects of societal discrimination is not a compelling interest," we said plainly in *Hunt*, a 1996 case about the Voting Rights Act. 517 U. S., at 909–910. We reached the same conclusion in *Croson*, a case that concerned a preferential government contracting program. Permitting "past societal discrimination" to "serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group." 488 U. S., at 505. Opening that door would shutter another—"[t]he dream of a Nation of equal citizens . . . would be lost," we observed, "in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Id.*, at 505–506. "[S]uch a result would be contrary to both the letter and spirit of a

constitutional provision whose central command is equality." *Id.*, at 506.

The dissents here do not acknowledge any of this. They fail to cite *Hunt*. They fail to cite *Croson*. They fail to mention that the entirety of their analysis of the Equal Protection Clause—the statistics, the cases, the history—has been considered and rejected before. There is a reason the principal dissent must invoke Justice Marshall's partial dissent in *Bakke* nearly a dozen times while mentioning Justice Powell's controlling opinion barely once (JUSTICE JACKSON's opinion ignores Justice Powell altogether). For what one dissent denigrates as "rhetorical flourishes about colorblindness," *post*, at 14 (opinion of SOTOMAYOR, J.), are in fact the proud pronouncements of cases like *Loving* and *Yick Wo*, like *Shelley* and *Bolling*—they are defining statements of law. We understand the dissents want that law to be different. They are entitled to that desire. But they surely cannot claim the mantle of *stare decisis* while pursuing it.[8]

The dissents are no more faithful to our precedent on race-based admissions. To hear the principal dissent tell it, *Grutter* blessed such programs indefinitely, until "racial inequality will end." *Post*, at 54 (opinion of SOTOMAYOR, J.). But *Grutter* did no such thing. It emphasized—not once or twice, but at least six separate times—that race-based ad-

_____

[8] Perhaps recognizing as much, the principal dissent at one point attempts to press a different remedial rationale altogether, stating that both respondents "have sordid legacies of racial exclusion." *Post*, at 21 (opinion of SOTOMAYOR, J.). Such institutions should perhaps be the very *last* ones to be allowed to make race-based decisions, let alone be accorded deference in doing so. In any event, neither university defends its admissions system as a remedy for past discrimination—their own or anyone else's. See Tr. of Oral Arg. in No. 21–707, at 90 ("[W]e're not pursuing any sort of remedial justification for our policy."). Nor has any decision of ours permitted a remedial justification for race-based college admissions. Cf. *Bakke*, 438 U. S., at 307 (opinion of Powell, J.).

Opinion of the Court

missions programs "must have reasonable durational lim-
its" and that their "deviation from the norm of equal treat-
ment" must be "a temporary matter." 539 U. S., at 342. The
Court also disclaimed "[e]nshrining a permanent justifica-
tion for racial preferences." *Ibid.* Yet the justification for
race-based admissions that the dissent latches on to is just
that—unceasing.

The principal dissent's reliance on *Fisher II* is similarly
mistaken. There, by a 4-to-3 vote, the Court upheld a "*sui
generis*" race-based admissions program used by the Uni-
versity of Texas, 579 U. S., at 377, whose "goal" it was to
enroll a "critical mass" of certain minority students, *Fisher
I*, 570 U. S., at 297. But neither Harvard nor UNC claims
to be using the critical mass concept—indeed, the universi-
ties admit they do not even know what it means. See 1 App.
in No. 21–707, at 402 ("[N]o one has directed anybody to
achieve a critical mass, and I'm not even sure we would
know what it is." (testimony of UNC administrator)); 3 App.
in No. 20–1199, at 1137–1138 (similar testimony from Har-
vard administrator).

*Fisher II* also recognized the "enduring challenge" that
race-based admissions systems place on "the constitutional
promise of equal treatment." 579 U. S., at 388. The Court
thus reaffirmed the "continuing obligation" of universities
"to satisfy the burden of strict scrutiny." *Id.*, at 379. To
drive the point home, *Fisher II* limited itself just as *Grutter*
had—in duration. The Court stressed that its decision did
"*not* necessarily mean the University may rely on the same
policy" going forward. 579 U. S., at 388 (emphasis added);
see also *Fisher I*, 570 U. S., at 313 (recognizing that "*Grut-
ter* . . . approved the plan at issue upon concluding that it
. . . was limited in time"). And the Court openly acknowl-

edged that its decision offered limited "prospective guidance." *Fisher II*, 579 U. S., at 379.[9]

The principal dissent wrenches our case law from its context, going to lengths to ignore the parts of that law it does not like. The serious reservations that *Bakke*, *Grutter*, and *Fisher* had about racial preferences go unrecognized. The unambiguous requirements of the Equal Protection Clause—"the most rigid," "searching" scrutiny it entails—go without note. *Fisher I*, 570 U. S., at 310. And the repeated demands that race-based admissions programs must end go overlooked—contorted, worse still, into a demand that such programs never stop.

Most troubling of all is what the dissent must make these omissions to defend: a judiciary that picks winners and losers based on the color of their skin. While the dissent would certainly not permit university programs that discriminated *against* black and Latino applicants, it is perfectly willing to let the programs here continue. In its view, this Court is supposed to tell state actors when they have picked the right races to benefit. Separate but equal is "*inherently* unequal," said *Brown*. 347 U. S., at 495 (emphasis added). It depends, says the dissent.

―――――――――

[9]The principal dissent rebukes the Court for not considering adequately the reliance interests respondents and other universities had in *Grutter*. But as we have explained, *Grutter* itself limited the reliance that could be placed upon it by insisting, over and over again, that race-based admissions programs be limited in time. See *supra*, at 20. *Grutter* indeed went so far as to suggest a specific period of reliance—25 years—precluding the indefinite reliance interests that the dissent articulates. Cf. *post*, at 2–4 (KAVANAUGH, J., concurring). Those interests are, moreover, vastly overstated on their own terms. Three out of every five American universities do *not* consider race in their admissions decisions. See Brief for Respondent in No. 20–1199, p. 40. And several States—including some of the most populous (California, Florida, and Michigan)—have prohibited race-based admissions outright. See Brief for Oklahoma et al. as *Amici Curiae* 9, n. 6.

That is a remarkable view of the judicial role—remarkably wrong.  Lost in the false pretense of judicial humility that the dissent espouses is a claim to power so radical, so destructive, that it required a Second Founding to undo. "Justice Harlan knew better," one of the dissents decrees. *Post*, at 5 (opinion of JACKSON, J.).  Indeed he did:

> "[I]n view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens.  There is no caste here.  Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

## VI

For the reasons provided above, the Harvard and UNC admissions programs cannot be reconciled with the guarantees of the Equal Protection Clause.  Both programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points.  We have never permitted admissions programs to work in that way, and we will not do so today.

At the same time, as all parties agree, nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise. See, *e.g.*, 4 App. in No. 21–707, at 1725–1726, 1741; Tr. of Oral Arg. in No. 20–1199, at 10.  But, despite the dissent's assertion to the contrary, universities may not simply establish through application essays or other means the regime we hold unlawful today.  (A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion.)  "[W]hat cannot be done directly cannot be done indirectly.  The Constitution deals with substance, not shadows," and the prohibition against racial discrimination is "levelled at the thing,

not the name." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867). A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race.

Many universities have for too long done just the opposite. And in doing so, they have concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin. Our constitutional history does not tolerate that choice.

The judgments of the Court of Appeals for the First Circuit and of the District Court for the Middle District of North Carolina are reversed.

*It is so ordered.*

JUSTICE JACKSON took no part in the consideration or decision of the case in No. 20–1199.

Cite as: 600 U. S. ____ (2023)      1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 20–1199 and 21–707

_____

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER
20–1199      *v.*
PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT


STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER
21–707      *v.*
UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE THOMAS, concurring.

In the wake of the Civil War, the country focused its attention on restoring the Union and establishing the legal status of newly freed slaves. The Constitution was amended to abolish slavery and proclaim that all persons born in the United States are citizens, entitled to the privileges or immunities of citizenship and the equal protection of the laws. Amdts. 13, 14. Because of that second founding, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting).

This Court's commitment to that equality principle has ebbed and flowed over time. After forsaking the principle for decades, offering a judicial *imprimatur* to segregation

and ushering in the Jim Crow era, the Court finally corrected course in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), announcing that primary schools must either desegregate with all deliberate speed or else close their doors. See also *Brown* v. *Board of Education*, 349 U. S. 294 (1955) (*Brown II*). It then pulled back in *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), permitting universities to discriminate based on race in their admissions process (though only temporarily) in order to achieve alleged "educational benefits of diversity." *Id.*, at 319. Yet, the Constitution continues to embody a simple truth: Two discriminatory wrongs cannot make a right.

I wrote separately in *Grutter*, explaining that the use of race in higher education admissions decisions—regardless of whether intended to help or to hurt—violates the Fourteenth Amendment. *Id.*, at 351 (opinion concurring in part and dissenting in part). In the decades since, I have repeatedly stated that *Grutter* was wrongly decided and should be overruled. *Fisher* v. *University of Tex. at Austin*, 570 U. S. 297, 315, 328 (2013) (concurring opinion) (*Fisher I*); *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 389 (2016) (dissenting opinion). Today, and despite a lengthy interregnum, the Constitution prevails.

Because the Court today applies genuine strict scrutiny to the race-conscious admissions policies employed at Harvard and the University of North Carolina (UNC) and finds that they fail that searching review, I join the majority opinion in full. I write separately to offer an originalist defense of the colorblind Constitution; to explain further the flaws of the Court's *Grutter* jurisprudence; to clarify that all forms of discrimination based on race—including so-called affirmative action—are prohibited under the Constitution; and to emphasize the pernicious effects of all such discrimination.

I

In the 1860s, Congress proposed and the States ratified the Thirteenth and Fourteenth Amendments. And, with the authority conferred by these Amendments, Congress passed two landmark Civil Rights Acts. Throughout the debates on each of these measures, their proponents repeatedly affirmed their view of equal citizenship and the racial equality that flows from it. In fact, they held this principle so deeply that their crowning accomplishment—the Fourteenth Amendment—ensures racial equality *with no textual reference to race whatsoever*. The history of these measures' enactment renders their motivating principle as clear as their text: All citizens of the United States, regardless of skin color, are equal before the law.

I do not contend that all of the individuals who put forth and ratified the Fourteenth Amendment universally believed this to be true. Some Members of the proposing Congress, for example, opposed the Amendment. And, the historical record—particularly with respect to the debates on ratification in the States—is sparse. Nonetheless, substantial evidence suggests that the Fourteenth Amendment was passed to "establis[h] the broad constitutional principle of full and complete equality of all persons under the law," forbidding "all legal distinctions based on race or color." Supp. Brief for United States on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1 etc., p. 115 (U. S. *Brown* Reargument Brief).

This was Justice Harlan's view in his lone dissent in *Plessy*, where he observed that "[o]ur Constitution is colorblind." 163 U. S., at 559. It was the view of the Court in *Brown*, which rejected "'any authority . . . to use race as a factor in affording educational opportunities.'" *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 747 (2007). And, it is the view adopted in the Court's opinion today, requiring "the absolute equality of all citizens" under the law. *Ante*, at 10 (internal quotation

marks omitted).

### A

In its 1864 election platform, the Republican Party pledged to amend the Constitution to accomplish the "utter and complete extirpation" of slavery from "the soil of the Republic." 2 A. Schlesinger, History of U. S. Political Parties 1860–1910, p. 1303 (1973). After their landslide victory, Republicans quickly moved to make good on that promise. Congress proposed what would become the Thirteenth Amendment to the States in January 1865, and it was ratified as part of the Constitution later that year. The new Amendment stated that "[n]either slavery nor involuntary servitude . . . shall exist" in the United States "except as a punishment for crime whereof the party shall have been duly convicted." §1. It thus not only prohibited States from themselves enslaving persons, but also obligated them to end enslavement by private individuals within their borders. Its Framers viewed the text broadly, arguing that it "allowed Congress to legislate not merely against slavery itself, but against all the badges and relics of a slave system." A. Amar, America's Constitution: A Biography 362 (2005) (internal quotation marks omitted). The Amendment also authorized "Congress . . . to enforce" its terms "by appropriate legislation"—authority not granted in any prior Amendment. §2. Proponents believed this enforcement clause permitted legislative measures designed to accomplish the Amendment's broader goal of equality for the freedmen.

It quickly became clear, however, that further amendment would be necessary to safeguard that goal. Soon after the Thirteenth Amendment's adoption, the reconstructed Southern States began to enact "Black Codes," which circumscribed the newly won freedoms of blacks. The Black Code of Mississippi, for example, "imposed all sorts of disabilities" on blacks, "including limiting their freedom of

THOMAS, J., concurring

movement and barring them from following certain occupa-
tions, owning firearms, serving on juries, testifying in cases
involving whites, or voting." E. Foner, The Second Found-
ing 48 (2019).

Congress responded with the landmark Civil Rights Act
of 1866, 14 Stat. 27, in an attempt to pre-empt the Black
Codes. The 1866 Act promised such a sweeping form of
equality that it would lead many to say that it exceeded the
scope of Congress' authority under the Thirteenth Amend-
ment. As enacted, it stated:

> "*Be it enacted by the Senate and House of Represent-
> atives of the United States of America in Congress as-
> sembled*, That all persons born in the United States
> and not subject to any foreign power, excluding Indians
> not taxed, are hereby declared to be citizens of the
> United States; and such citizens, of every race and
> color, without regard to any previous condition of slav-
> ery or involuntary servitude, except as a punishment
> for crime whereof the party shall have been duly con-
> victed, shall have the same right, in every State and
> Territory in the United States, to make and enforce
> contracts, to sue, be parties, and give evidence, to in-
> herit, purchase, lease, sell, hold, and convey real and
> personal property, and to full and equal benefit of all
> laws and proceedings for the security of person and
> property, as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, and penalties, and to
> none other, any law, statute, ordinance, regulation, or
> custom, to the contrary notwithstanding."

The text of the provision left no doubt as to its aim: All per-
sons born in the United States were equal citizens entitled
to the same rights and subject to the same penalties as
white citizens in the categories enumerated. See M.
McConnell, Originalism and the Desegregation Decisions,
81 Va. L. Rev. 947, 958 (1995) ("Note that the bill neither

forbade racial discrimination generally nor did it guarantee particular rights to all persons. Rather, it required an equality in certain specific rights"). And, while the 1866 Act used the rights of "white citizens" as a benchmark, its rule was decidedly colorblind, safeguarding legal equality for *all* citizens "of every race and color" and providing the same rights to all.

The 1866 Act's evolution further highlights its rule of equality. To start, *Dred Scott* v. *Sandford*, 19 How. 393 (1857), had previously held that blacks "were not regarded as a portion of the people or citizens of the Government" and "had no rights which the white man was bound to respect." *Id.*, at 407, 411. The Act, however, would effectively overrule *Dred Scott* and ensure the equality that had been promised to blacks. But the Act went further still. On January 29, 1866, Senator Lyman Trumbull, the bill's principal sponsor in the Senate, proposed text stating that "all persons of African descent born in the United States are hereby declared to be citizens." Cong. Globe, 39th Cong., 1st Sess., 474. The following day, Trumbull revised his proposal, removing the reference to "African descent" and declaring more broadly that "all persons born in the United States, and not subject to any foreign Power," are "citizens of the United States." *Id.*, at 498.

"In the years before the Fourteenth Amendment's adoption, jurists and legislators often connected citizenship with equality," where "the absence or presence of one entailed the absence or presence of the other." *United States* v. *Vaello Madero*, 596 U. S. ___, ___ (2022) (THOMAS, J., concurring) (slip op., at 6). The addition of a citizenship guarantee thus evidenced an intent to broaden the provision, extending beyond recently freed blacks and incorporating a more general view of equality for *all* Americans. Indeed, the drafters later included a specific carveout for "Indians not taxed," demonstrating the breadth of the bill's other-

wise general citizenship language. 14 Stat. 27.[1] As Trumbull explained, the provision created a bond between all Americans; "any statute which is not equal to *all*, and which deprives any citizen of civil rights which are secured to other citizens," was "an unjust encroachment upon his liberty" and a "badge of servitude" prohibited by the Constitution. Cong. Globe, 39th Cong., 1st Sess., at 474 (emphasis added).

Trumbull and most of the Act's other supporters identified the Thirteenth Amendment as a principal source of constitutional authority for the Act's nondiscrimination provisions. See, *e.g.*, *id.*, at 475 (statement of Sen. Trumbull); *id.*, at 1152 (statement of Rep. Thayer); *id.*, at 503–504 (statement of Sen. Howard). In particular, they explained that the Thirteenth Amendment allowed Congress not merely to legislate against slavery itself, but also to counter measures "which depriv[e] any citizen of civil rights which are secured to other citizens." *Id.*, at 474.

But opponents argued that Congress' authority did not sweep so broadly. President Andrew Johnson, for example, contended that Congress lacked authority to pass the measure, seizing on the breadth of the citizenship text and emphasizing state authority over matters of state citizenship. See S. Doc. No. 31, 39th Cong., 1st Sess., 1, 6 (1866) (Johnson veto message). Consequently, "doubts about the constitutional authority conferred by that measure led supporters to supplement their Thirteenth Amendment arguments with other sources of constitutional authority." R. Williams, Originalism and the Other Desegregation Decision, 99 Va. L. Rev. 493, 532–533 (2013) (describing appeals to the naturalization power and the inherent power to protect

--------

[1] In fact, Indians would not be considered citizens until several decades later. Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (declaring that all Indians born in the United States are citizens).

the rights of citizens). As debates continued, it became increasingly apparent that safeguarding the 1866 Act, including its promise of black citizenship and the equal rights that citizenship entailed, would require further submission to the people of the United States in the form of a proposed constitutional amendment. See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 498 (statement of Sen. Van Winkle).

### B

Critically, many of those who believed that Congress lacked the authority to enact the 1866 Act also supported the principle of racial equality. So, almost immediately following the ratification of the Thirteenth Amendment, several proposals for further amendments were submitted in Congress. One such proposal, approved by the Joint Committee on Reconstruction and then submitted to the House of Representatives on February 26, 1866, would have declared that "[t]he Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." *Id.*, at 1033–1034. Representative John Bingham, its drafter, was among those who believed Congress lacked the power to enact the 1866 Act. See *id.*, at 1291. Specifically, he believed the "very letter of the Constitution" already required equality, but the enforcement of that requirement "is of the reserved powers of the States." Cong. Globe, 39th Cong., 1st Sess., at 1034, 1291 (statement of Rep. Bingham). His proposed constitutional amendment accordingly would provide a clear constitutional basis for the 1866 Act and ensure that future Congresses would be unable to repeal it. See W. Nelson, The Fourteenth Amendment 48–49 (1988).

Discussion of Bingham's initial draft was later postponed in the House, but the Joint Committee on Reconstruction

THOMAS, J., concurring

continued its work. See 2 K. Lash, The Reconstruction Amendments 8 (2021). In April, Representative Thaddeus Stevens proposed to the Joint Committee an amendment that began, "[n]o discrimination shall be made by any State nor by the United States as to the civil rights of persons because of race, color, or previous condition of servitude." S. Doc. No. 711, 63d Cong., 1st Sess., 31–32 (1915) (reprinting the Journal of the Joint Committee on Reconstruction for the Thirty-Ninth Congress). Stevens' proposal was later revised to read as follows: "'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'" *Id.*, at 39. This revised text was submitted to the full House on April 30, 1866. Cong. Globe, 39th Cong., 1st Sess., at 2286–2287. Like the eventual first section of the Fourteenth Amendment, this proposal embodied the familiar Privileges or Immunities, Due Process, and Equal Protection Clauses. And, importantly, it also featured an enforcement clause—with text borrowed from the Thirteenth Amendment—conferring upon Congress the power to enforce its provisions. *Ibid.*

Stevens explained that the draft was intended to "allo[w] Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate *equally* upon all." *Id.*, at 2459. Moreover, Stevens' later statements indicate that he did not believe there was a difference "in substance between the new proposal and" earlier measures calling for impartial and equal treatment without regard to race. U. S. *Brown* Reargument Brief 44 (noting a distinction only with respect to a suffrage provision). And, Bingham argued that the need for the proposed text was "one of the lessons that have been taught . . . by the history of the past four years of terrific conflict" during the Civil War. Cong. Globe, 39th Cong., 1st Sess., at 2542.

The proposal passed the House by a vote of 128 to 37.  *Id.*, at 2545.

Senator Jacob Howard introduced the proposed Amendment in the Senate, powerfully asking, "Ought not the time to be now passed when one measure of justice is to be meted out to a member of one caste while another and a different measure is meted out to the member of another caste, both castes being alike citizens of the United States, both bound to obey the same laws, to sustain the burdens of the same Government, and both equally responsible to justice and to God for the deeds done in the body?"  *Id.*, at 2766.  In keeping with this view, he proposed an introductory sentence, declaring that "'all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside.'"  *Id.*, at 2869.  This text, the Citizenship Clause, was the final missing element of what would ultimately become §1 of the Fourteenth Amendment.  Howard's draft for the proposed citizenship text was modeled on the Civil Rights Act of 1866's text, and he suggested the alternative language to "remov[e] all doubt as to what persons are or are not citizens of the United States," a question which had "long been a great desideratum in the jurisprudence and legislation of this country."  *Id.*, at 2890.  He further characterized the addition as "simply declaratory of what I regard as the law of the land already."  *Ibid.*

The proposal was approved in the Senate by a vote of 33 to 11.  *Id.*, at 3042.  The House then reconciled differences between the two measures, approving the Senate's changes by a vote of 120 to 32.  See *id.*, at 3149.  And, in June 1866, the amendment was submitted to the States for their consideration and ratification.  Two years later, it was ratified by the requisite number of States and became the Fourteenth Amendment to the United States Constitution.  See 15 Stat. 706–707; *id.*, at 709–711.  Its opening words instilled in our Nation's Constitution a new birth of freedom:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." §1.

As enacted, the text of the Fourteenth Amendment provides a firm statement of equality before the law. It begins by guaranteeing citizenship status, invoking the "longstanding political and legal tradition that closely associated the status of citizenship with the entitlement to legal equality." *Vaello Madero*, 596 U. S., at ___ (THOMAS, J., concurring) (slip op., at 6) (internal quotation marks omitted). It then confirms that States may not "abridge the rights of national citizenship, including whatever civil equality is guaranteed to 'citizens' under the Citizenship Clause." *Id.*, at ___, n. 3 (slip op., at 13, n. 3). Finally, it pledges that even noncitizens must be treated equally "as individuals, and not as members of racial, ethnic, or religious groups." *Missouri* v. *Jenkins*, 515 U. S. 70, 120–121 (1995) (THOMAS, J., concurring).

The drafters and ratifiers of the Fourteenth Amendment focused on this broad equality idea, offering surprisingly little explanation of which term was intended to accomplish which part of the Amendment's overall goal. "The available materials . . . show," however, "that there were widespread expressions of a general understanding of the broad scope of the Amendment similar to that abundantly demonstrated in the Congressional debates, namely, that the first section of the Amendment would establish the full constitutional right of all persons to equality before the law and would prohibit legal distinctions based on race or color."

U. S. *Brown* Reargument Brief 65 (citation omitted). For
example, the Pennsylvania debate suggests that the Four-
teenth Amendment was understood to make the law "what
justice is represented to be, blind" to the "color of [one's]
skin." App. to Pa. Leg. Record XLVIII (1867) (Rep. Mann).

The most commonly held view today—consistent with the
rationale repeatedly invoked during the congressional de-
bates, see, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 2458–
2469—is that the Amendment was designed to remove any
doubts regarding Congress' authority to enact the Civil
Rights Act of 1866 and to establish a nondiscrimination rule
that could not be repealed by future Congresses. See, *e.g.*,
J. Harrison, Reconstructing the Privileges or Immunities
Clause, 101 Yale L. J. 1385, 1388 (1992) (noting that the
"primary purpose" of the Fourteenth Amendment "was to
mandate certain rules of racial equality, especially those
contained in Section 1 of the Civil Rights Act of 1866").[2] The
Amendment's phrasing supports this view, and there does
not appear to have been any argument to the contrary pre-
dating *Brown*.

Consistent with the Civil Rights Act of 1866's aim, the
Amendment definitively overruled Chief Justice Taney's
opinion in *Dred Scott* that blacks "were not regarded as a
portion of the people or citizens of the Government" and
"had no rights which the white man was bound to respect."
19 How., at 407, 411. And, like the 1866 Act, the Amend-
ment also clarified that American citizenship conferred

---

[2]There is "some support" in the history of enactment for at least "four
interpretations of the first section of the proposed amendment, and in
particular of its Privileges [or] Immunities Clause: it would authorize
Congress to enforce the Privileges and Immunities Clause of Article IV;
it would forbid discrimination between citizens with respect to funda-
mental rights; it would establish a set of basic rights that all citizens
must enjoy; and it would make the Bill of Rights applicable to the states."
D. Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406
(2008) (citing sources). Notably, those four interpretations are all color-
blind.

THOMAS, J., concurring

rights not just against the Federal Government but also the government of the citizen's State of residence. Unlike the Civil Rights Act, however, the Amendment employed a wholly race-neutral text, extending privileges or immunities to all "citizens"—even if its practical effect was to provide all citizens with the same privileges then enjoyed by whites. That citizenship guarantee was often linked with the concept of equality. *Vaello Madero*, 596 U. S., at ___ (THOMAS, J., concurring) (slip op., at 10). Combining the citizenship guarantee with the Privileges or Immunities Clause and the Equal Protection Clause, the Fourteenth Amendment ensures protection for all equal citizens of the Nation without regard to race. Put succinctly, "[o]ur Constitution is color-blind." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

### C

In the period closely following the Fourteenth Amendment's ratification, Congress passed several statutes designed to enforce its terms, eliminating government-based Black Codes—systems of government-imposed segregation—and criminalizing racially motivated violence. The marquee legislation was the Civil Rights Act of 1875, ch. 114, 18 Stat. 335–337, and the justifications offered by proponents of that measure are further evidence for the color-blind view of the Fourteenth Amendment.

The Civil Rights Act of 1875 sought to counteract the systems of racial segregation that had arisen in the wake of the Reconstruction era. Advocates of so-called separate-but-equal systems, which allowed segregated facilities for blacks and whites, had argued that laws permitting or requiring such segregation treated members of both races precisely alike: Blacks could not attend a white school, but symmetrically, whites could not attend a black school. See *Plessy*, 163 U. S., at 544 (arguing that, in light of the social

circumstances at the time, racial segregation did not "necessarily imply the inferiority of either race to the other"). Congress was not persuaded. Supporters of the soon-to-be 1875 Act successfully countered that symmetrical restrictions did not constitute equality, and they did so on colorblind terms.

For example, they asserted that "free government demands the abolition of all distinctions founded on color and race." 2 Cong. Rec. 4083 (1874). And, they submitted that "[t]he time has come when all distinctions that grew out of slavery ought to disappear." Cong. Globe, 42d Cong., 2d Sess., 3193 (1872) ("[A]s long as you have distinctions and discriminations between white and black in the enjoyment of legal rights and privileges[,] you will have discontent and parties divided between black and white"). Leading Republican Senator Charles Sumner compellingly argued that "any rule excluding a man on account of his color is an indignity, an insult, and a wrong." *Id.*, at 242; see also *ibid.* ("I insist that by the law of the land all persons without distinction of color shall be equal before the law"). Far from conceding that segregation would be perceived as inoffensive if race roles were reversed, he declared that "[t]his is plain oppression, which you . . . would feel keenly were it directed against you or your child." *Id.*, at 384. He went on to paraphrase the English common-law rule to which he subscribed: "[The law] makes no discrimination on account of color." *Id.*, at 385.

Others echoed this view. Representative John Lynch declared that "[t]he duty of the law-maker is to know no race, no color, no religion, no nationality, except to prevent distinctions on any of these grounds, so far as the law is concerned." 3 Cong. Rec. 945 (1875). Senator John Sherman believed that the route to peace was to "[w]ipe out all legal discriminations between white and black [and] make no distinction between black and white." Cong. Globe, 42d Cong., 2d Sess., at 3193. And, Senator Henry Wilson

THOMAS, J., concurring

sought to "make illegal all distinctions on account of color" because "there should be no distinction recognized by the laws of the land." *Id.*, at 819; see also 3 Cong. Rec., at 956 (statement of Rep. Cain) ("[M]en [are] formed of God equally . . . . The civil-rights bill simply declares this: that there shall be no discriminations between citizens of this land so far as the laws of the land are concerned"). The view of the Legislature was clear: The Constitution "neither knows nor tolerates classes among citizens." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

### D

The earliest Supreme Court opinions to interpret the Fourteenth Amendment did so in colorblind terms. Their statements characterizing the Amendment evidence its commitment to equal rights for all citizens, regardless of the color of their skin. See *ante*, at 10–11.

In the *Slaughter-House Cases*, 16 Wall. 36 (1873), the Court identified the "pervading purpose" of the Reconstruction Amendments as "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Id.*, at 67–72. Yet, the Court quickly acknowledged that the language of the Amendments did not suggest "that no one else but the negro can share in this protection." *Id.*, at 72. Rather, "[i]f Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, [the Thirteenth Amendment] may safely be trusted to make it void." *Ibid.* And, similarly, "if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be of African descent." *Ibid.*

The Court thus made clear that the Fourteenth Amendment's equality guarantee applied to members of *all* races, including Asian Americans, ensuring all citizens equal treatment under law.

Seven years later, the Court relied on the *Slaughter-House* view to conclude that "[t]he words of the [Fourteenth A]mendment . . . contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored." *Strauder* v. *West Virginia*, 100 U. S. 303, 307–308 (1880). The Court thus found that the Fourteenth Amendment banned "expres[s]" racial classifications, no matter the race affected, because these classifications are "a stimulant to . . . race prejudice." *Id.*, at 308. See also *ante*, at 10–11. Similar statements appeared in other cases decided around that time. See *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880) ("The plain object of these statutes [enacted to enforce the Fourteenth Amendment], as of the Constitution which authorized them, was to place the colored race, in respect of civil rights, upon a level with whites. They made the rights and responsibilities, civil and criminal, of the two races exactly the same"); *Ex parte Virginia*, 100 U. S. 339, 344–345 (1880) ("One great purpose of [the Thirteenth and Fourteenth Amendments] was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States").

This Court's view of the Fourteenth Amendment reached its nadir in *Plessy*, infamously concluding that the Fourteenth Amendment "could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either." 163 U. S., at 544. That holding stood in sharp contrast to the Court's earlier embrace of the Fourteenth Amendment's equality

Thomas, J., concurring

ideal, as Justice Harlan emphasized in dissent: The Reconstruction Amendments had aimed to remove "the race line from our systems of governments." *Id.*, at 563. For Justice Harlan, the Constitution was colorblind and categorically rejected laws designed to protect "a dominant race—a superior class of citizens," while imposing a "badge of servitude" on others. *Id.*, at 560–562.

History has vindicated Justice Harlan's view, and this Court recently acknowledged that *Plessy* should have been overruled immediately because it "betrayed our commitment to 'equality before the law.'" *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. ___, ___ (2022) (slip op., at 44). Nonetheless, and despite Justice Harlan's efforts, the era of state-sanctioned segregation persisted for more than a half century.

E

Despite the extensive evidence favoring the colorblind view, as detailed above, it appears increasingly in vogue to embrace an "antisubordination" view of the Fourteenth Amendment: that the Amendment forbids only laws that hurt, but not help, blacks. Such a theory lacks any basis in the original meaning of the Fourteenth Amendment. Respondents cite a smattering of federal and state statutes passed during the years surrounding the ratification of the Fourteenth Amendment. And, Justice Sotomayor's dissent argues that several of these statutes evidence the ratifiers' understanding that the Equal Protection Clause "permits consideration of race to achieve its goal." *Post*, at 6. Upon examination, however, it is clear that these statutes are fully consistent with the colorblind view.

Start with the 1865 Freedmen's Bureau Act. That Act established the Freedmen's Bureau to issue "provisions, clothing, and fuel . . . needful for the immediate and temporary shelter and supply of destitute and suffering refugees and freedmen and their wives and children" and the setting

"apart, for the use of loyal refugees and freedmen," abandoned, confiscated, or purchased lands, and assigning "to every male citizen, whether refugee or freedman, . . . not more than forty acres of such land." Ch. 90, §§2, 4, 13 Stat. 507. The 1866 Freedmen's Bureau Act then expanded upon the prior year's law, authorizing the Bureau to care for all loyal refugees and freedmen. Ch. 200, 14 Stat. 173–174. Importantly, however, the Acts applied to *freedmen* (and refugees), a formally race-neutral category, not blacks writ large. And, because "not all blacks in the United States were former slaves," "'freedman'" was a decidedly under-inclusive proxy for race. M. Rappaport, Originalism and the Colorblind Constitution, 89 Notre Dame L. Rev. 71, 98 (2013) (Rappaport). Moreover, the Freedmen's Bureau served newly freed slaves alongside white refugees. P. Moreno, Racial Classifications and Reconstruction Legislation, 61 J. So. Hist. 271, 276–277 (1995); R. Barnett & E. Bernick, The Original Meaning of the Fourteenth Amendment 119 (2021). And, advocates of the law explicitly disclaimed any view rooted in modern conceptions of antisubordination. To the contrary, they explicitly clarified that the equality sought by the law was not one in which all men shall be "six feet high"; rather, it strove to ensure that freedmen enjoy "equal rights before the law" such that "each man shall have the right to pursue in his own way life, liberty, and happiness." Cong. Globe, 39th Cong., 1st Sess., at 322, 342.

Several additional federal laws cited by respondents appear to classify based on race, rather than previous condition of servitude. For example, an 1866 law adopted special rules and procedures for the payment of "colored" servicemen in the Union Army to agents who helped them secure bounties, pensions, and other payments that they were due. 14 Stat. 367–368. At the time, however, Congress believed that many "black servicemen were significantly overpaying for these agents' services in part because [the servicemen]

did not understand how the payment system operated."
Rappaport 110; see also S. Siegel, The Federal Government's Power To Enact Color-Conscious Laws: An Originalist Inquiry, 92 Nw. U. L. Rev. 477, 561 (1998). Thus, while this legislation appears to have provided a discrete race-based benefit, its aim—to prohibit race-based exploitation—may not have been possible at the time without using a racial screen. In other words, the statute's racial classifications may well have survived strict scrutiny. See Rappaport 111–112. Another law, passed in 1867, provided funds for "freedmen or destitute colored people" in the District of Columbia. Res. of Mar. 16, 1867, No. 4, 15 Stat. 20. However, when a prior version of this law targeting only blacks was criticized for being racially discriminatory, "it was defended on the grounds that there were various places in the city where former slaves . . . lived in densely populated shantytowns." Rappaport 104–105 (citing Cong. Globe, 39th Cong., 1st Sess., at 1507). Congress thus may have enacted the measure not because of race, but rather to address a special problem in shantytowns in the District where blacks lived.

These laws—even if targeting race as such—likely were also constitutionally permissible examples of Government action "undo[ing] the effects of past discrimination in [a way] that do[es] not involve classification by race," even though they had "a racially disproportionate impact." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 526 (1989) (Scalia, J., concurring in judgment) (internal quotation marks omitted). The government can plainly remedy a race-based injury that it has inflicted—though such remedies must be meant to further a colorblind government, not perpetuate racial consciousness. See *id.*, at 505 (majority opinion). In that way, "[r]ace-based government measures during the 1860's and 1870's to remedy *state-enforced slavery* were . . . not inconsistent with the colorblind Constitution." *Parents Involved*, 551 U. S., at 772, n. 19 (THOMAS, J., concurring).

Moreover, the very same Congress passed both these laws *and* the unambiguously worded Civil Rights Act of 1866 that clearly prohibited discrimination on the basis of race.[3] And, as noted above, the proponents of these laws explicitly sought equal rights without regard to race while disavowing any antisubordination view.

JUSTICE SOTOMAYOR argues otherwise, pointing to "a number of race-conscious" federal laws passed around the time of the Fourteenth Amendment's enactment. *Post*, at 6 (dissenting opinion). She identifies the Freedmen's Bureau Act of 1865, already discussed above, as one such law, but she admits that the programs did not benefit blacks exclusively. She also does not dispute that legislation targeting the needs of newly freed blacks in 1865 could be understood as directly remedial. Even today, nothing prevents the States from according an admissions preference to identified victims of discrimination. See *Croson*, 488 U. S., at 526 (opinion of Scalia, J.) ("While most of the beneficiaries might be black, neither the beneficiaries nor those disadvantaged by the preference would be identified *on the basis of their race*" (emphasis in original)); see also *ante*, at 39.

JUSTICE SOTOMAYOR points also to the Civil Rights Act of 1866, which as discussed above, mandated that all citizens have the same rights as those "enjoyed by white citizens." 14 Stat. 27. But these references to the station of white citizens do not refute the view that the Fourteenth Amendment is colorblind. Rather, they specify that, in meeting the Amendment's goal of equal citizenship, States must level up. The Act did not single out a group of citizens for

---

[3] UNC asserts that the Freedmen's Bureau gave money to Berea College at a time when the school sought to achieve a 50–50 ratio of black to white students. Brief for University Respondents in No. 21–707, p. 32. But, evidence suggests that, at the relevant time, Berea conducted its admissions without distinction by race. S. Wilson, Berea College: An Illustrated History 2 (2006) (quoting Berea's first president's statement that the school "would welcome 'all races of men, without distinction'").

special treatment—rather, all citizens were meant to be treated the same as those who, at the time, had the full rights of citizenship. Other provisions of the 1866 Act reinforce this view, providing for equality in civil rights. See Rappaport 97. Most notably, §14 stated that the basic civil rights of citizenship shall be secured "without respect to race or color." 14 Stat. 176–177. And, §8 required that funds from land sales must be used to support schools "without distinction of color or race, . . . in the parishes of" the area where the land had been sold. *Id.*, at 175.

In addition to these federal laws, Harvard also points to two state laws: a South Carolina statute that placed the burden of proof on the defendant when a "colored or black" plaintiff claimed a violation, 1870 S. C. Acts pp. 387–388, and Kentucky legislation that authorized a county superintendent to aid "negro paupers" in Mercer County, 1871 Ky. Acts pp. 273–274. Even if these statutes provided race-based benefits, they do not support respondents' and JUSTICE SOTOMAYOR's view that the Fourteenth Amendment was contemporaneously understood to permit differential treatment based on race, prohibiting only caste legislation while authorizing antisubordination measures. Cf., *e.g.*, O. Fiss, Groups and the Equal Protection Clause, 5 Philos. & Pub. Aff. 107, 147 (1976) (articulating the antisubordination view); R. Siegel, Equality Talk: Antisubordination and Anticlassification Values in Constitutional Struggles Over *Brown*, 117 Harv. L. Rev. 1470, 1473, n. 8 (2004) (collecting scholarship). At most, these laws would support the kinds of discrete remedial measures that our precedents have permitted.

If services had been given only to white persons up to the Fourteenth Amendment's adoption, then providing those same services only to previously excluded black persons would work to equalize treatment against a concrete baseline of government-imposed inequality. It thus may have been the case that Kentucky's county-specific, race-based

public aid law was necessary because that particular county was not providing certain services to local poor blacks. Similarly, South Carolina's burden-shifting framework (where the substantive rule being applied remained notably race neutral) may have been necessary to streamline litigation around the most commonly litigated type of case: a lawsuit seeking to remedy discrimination against a member of the large population of recently freed black Americans. See 1870 S. C. Acts, at 386 (documenting "persist[ent]" racial discrimination by state-licensed entities).

Most importantly, however, there was a wide range of federal and state statutes enacted at the time of the Fourteenth Amendment's adoption and during the period thereafter that explicitly sought to discriminate *against* blacks on the basis of race or a proxy for race. See Rappaport 113–115. These laws, hallmarks of the race-conscious Jim Crow era, are precisely the sort of enactments that the Framers of the Fourteenth Amendment sought to eradicate. Yet, proponents of an antisubordination view necessarily do not take those laws as evidence of the Fourteenth Amendment's true meaning. And rightly so. Neither those laws, nor a small number of laws that appear to target blacks for preferred treatment, displace the equality vision reflected in the history of the Fourteenth Amendment's enactment. This is particularly true in light of the clear equality requirements present in the Fourteenth Amendment's text. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. ___, ___–___ (2022) (slip op., at 26–27) (noting that text controls over inconsistent postratification history).

## II

Properly understood, our precedents have largely adhered to the Fourteenth Amendment's demand for colorblind laws.[4] That is why, for example, courts "must subject

––––––––––

[4]The Court has remarked that Title VI is coextensive with the Equal Protection Clause. See *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23

all racial classifications to the strictest of scrutiny." *Jenkins*, 515 U. S., at 121 (THOMAS, J., concurring); see also *ante*, at 15, n. 4 (emphasizing the consequences of an insufficiently searching inquiry). And, in case after case, we have employed strict scrutiny vigorously to reject various forms of racial discrimination as unconstitutional. See *Fisher I*, 570 U. S., at 317–318 (THOMAS, J., concurring). The Court today rightly upholds that tradition and acknowledges the consequences that have flowed from *Grutter*'s contrary approach.

Three aspects of today's decision warrant comment: First, to satisfy strict scrutiny, universities must be able to establish an actual link between racial discrimination and educational benefits. Second, those engaged in racial discrimination do not deserve deference with respect to their reasons for discriminating. Third, attempts to remedy past governmental discrimination must be closely tailored to address *that* particular past governmental discrimination.

### A

To satisfy strict scrutiny, universities must be able to establish a compelling reason to racially discriminate. *Grutter* recognized "only one" interest sufficiently compelling to justify race-conscious admissions programs: the "educational benefits of a diverse student body." 539 U. S., at 328,

———————

(2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI"); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause"). As JUSTICE GORSUCH points out, the language of Title VI makes no allowance for racial considerations in university admissions. See *post*, at 2–3 (concurring opinion). Though I continue to adhere to my view in *Bostock* v. *Clayton County*, 590 U. S. ___, ___–___ (2020) (ALITO, J., dissenting) (slip op., at 1–54), I agree with JUSTICE GORSUCH's concurrence in this case. The plain text of Title VI reinforces the colorblind view of the Fourteenth Amendment.

333. Expanding on this theme, Harvard and UNC have offered a grab bag of interests to justify their programs, spanning from "'training future leaders in the public and private sectors'" to "'enhancing appreciation, respect, and empathy,'" with references to "'better educating [their] students through diversity'" in between. *Ante*, at 22–23. The Court today finds that each of these interests are too vague and immeasurable to suffice, *ibid.*, and I agree.

Even in *Grutter*, the Court failed to clearly define "the educational benefits of a diverse student body." 539 U. S., at 333. Thus, in the years since *Grutter*, I have sought to understand exactly how racial diversity yields *educational* benefits. With nearly 50 years to develop their arguments, neither Harvard nor UNC—two of the foremost research institutions in the world—nor any of their *amici* can explain that critical link.

Harvard, for example, offers a report finding that meaningful representation of racial minorities promotes several goals. Only one of those goals—"producing new knowledge stemming from diverse outlooks," 980 F. 3d 157, 174 (CA1 2020)—bears any possible relationship to educational benefits. Yet, it too is extremely vague and offers no indication that, for example, student test scores increased as a result of Harvard's efforts toward racial diversity.

More fundamentally, it is not clear how racial diversity, as opposed to other forms of diversity, uniquely and independently advances Harvard's goal. This is particularly true because Harvard blinds itself to other forms of applicant diversity, such as religion. See 2 App. in No. 20–1199, pp. 734–743. It may be the case that exposure to different perspectives and thoughts can foster debate, sharpen young minds, and hone students' reasoning skills. But, it is not clear how diversity with respect to race, *qua* race, furthers this goal. Two white students, one from rural Appalachia and one from a wealthy San Francisco suburb, may well

have more diverse outlooks on this metric than two students from Manhattan's Upper East Side attending its most elite schools, one of whom is white and other of whom is black. If Harvard cannot even *explain* the link between racial diversity and education, then surely its interest in racial diversity cannot be compelling enough to overcome the constitutional limits on race consciousness.

UNC fares no better. It asserts, for example, an interest in training students to "live together in a diverse society." Brief for University Respondents in No. 21–707, p. 39. This may well be important to a university experience, but it is a *social* goal, not an educational one. See *Grutter*, 539 U. S., at 347–348 (Scalia, J., concurring in part and dissenting in part) (criticizing similar rationales as divorced from educational goals). And, again, UNC offers no reason why seeking a diverse society would not be equally supported by admitting individuals with diverse perspectives and backgrounds, rather than varying skin pigmentation.

Nor have *amici* pointed to any concrete and quantifiable *educational* benefits of racial diversity. The United States focuses on alleged civic benefits, including "increasing tolerance and decreasing racial prejudice." Brief for United States as *Amicus Curiae* 21–22. Yet, when it comes to educational benefits, the Government offers only one study purportedly showing that "college diversity experiences are significantly and positively related to cognitive development" and that "interpersonal interactions with racial diversity are the most strongly related to cognitive development." N. Bowman, College Diversity Experiences and Cognitive Development: A Meta-Analysis, 80 Rev. Educ. Research 4, 20 (2010). Here again, the link is, at best, tenuous, unspecific, and stereotypical. Other *amici* assert that diversity (generally) fosters the even-more nebulous values of "creativity" and "innovation," particularly in graduates' future workplaces. See, *e.g.*, Brief for Major American Busi-

ness Enterprises as *Amici Curiae* 7–9; Brief for Massachu-
setts Institute of Technology et al. as *Amici Curiae* 16–17
(describing experience at IBM). Yet, none of those asser-
tions deals exclusively with *racial* diversity—as opposed to
cultural or ideological diversity. And, none of those *amici*
demonstrate measurable or concrete benefits that have re-
sulted from universities' race-conscious admissions pro-
grams.

Of course, even if these universities had shown that ra-
cial diversity yielded any concrete or measurable benefits,
they would still face a very high bar to show that their in-
terest is compelling. To survive strict scrutiny, any such
benefits would have to outweigh the tremendous harm in-
flicted by sorting individuals on the basis of race. See
*Cooper* v. *Aaron*, 358 U. S. 1, 16 (1958) (following *Brown*,
"law and order are not here to be preserved by depriving the
Negro children of their constitutional rights"). As the
Court's opinions in these cases make clear, all racial stere-
otypes harm and demean individuals. That is why "only
those measures the State must take to provide a bulwark
against anarchy, or to prevent violence, will constitute a
pressing public necessity" sufficient to satisfy strict scru-
tiny today. *Grutter*, 539 U. S., at 353 (opinion of THOMAS,
J.) (internal quotations marks omitted). Cf. *Lee* v. *Wash-
ington*, 390 U. S. 333, 334 (1968) (Black, J., concurring)
(protecting prisoners from violence might justify narrowly
tailored discrimination); *Croson*, 488 U. S., at 521 (opinion
of Scalia, J.) ("At least where state or local action is at issue,
only a social emergency rising to the level of imminent dan-
ger to life and limb . . . can justify [racial discrimination]").
For this reason, "just as the alleged educational benefits of
segregation were insufficient to justify racial discrimina-
tion [in the 1950s], see *Brown* v. *Board of Education*, the
alleged educational benefits of diversity cannot justify ra-
cial discrimination today." *Fisher I*, 570 U. S., at 320
(THOMAS, J., concurring) (citation omitted).

Thomas, J., concurring

## B

The Court also correctly refuses to defer to the universities' own assessments that the alleged benefits of race-conscious admissions programs are compelling. It instead demands that the "interests [universities] view as compelling" must be capable of being "subjected to meaningful judicial review." *Ante*, at 22. In other words, a court must be able to measure the goals asserted and determine when they have been reached. *Ante*, at 22–24. The Court's opinion today further insists that universities must be able to "articulate a meaningful connection between the means they employ and the goals they pursue." *Ante*, at 24. Again, I agree. Universities' self-proclaimed righteousness does not afford them license to discriminate on the basis of race.

In fact, it is error for a court to defer to the views of an alleged discriminator while assessing claims of racial discrimination. See *Grutter*, 539 U. S., at 362–364 (opinion of Thomas, J.); see also *Fisher I*, 570 U. S., at 318–319 (Thomas, J., concurring); *United States* v. *Virginia*, 518 U. S. 515, 551, n. 19 (1996) (refusing to defer to the Virginia Military Institute's judgment that the changes necessary to accommodate the admission of women would be too great and characterizing the necessary changes as "manageable"). We would not offer such deference in any other context. In employment discrimination lawsuits under Title VII of the Civil Rights Act, for example, courts require only a minimal prima facie showing by a complainant before shifting the burden onto the shoulders of the alleged-discriminator employer. See *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 803–805 (1973). And, Congress has passed numerous laws—such as the Civil Rights Act of 1875—under its authority to enforce the Fourteenth Amendment, each designed to counter discrimination and each relying on courts to bring a skeptical eye to alleged discriminators.

This judicial skepticism is vital. History has repeatedly

shown that purportedly benign discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct. Take, for example, the university respondents here. Harvard's "holistic" admissions policy began in the 1920s when it was developed to exclude Jews. See M. Synnott, The Half-Opened Door: Discrimination and Admission at Harvard, Yale, and Princeton, 1900–1970, pp. 58–59, 61, 69, 73–74 (2010). Based on *de facto* quotas that Harvard quietly implemented, the proportion of Jews in Harvard's freshman class declined from 28% as late as 1925 to just 12% by 1933. J. Karabel, The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton 172 (2005). During this same period, Harvard played a prominent role in the eugenics movement. According to then-President Abbott Lawrence Lowell, excluding Jews from Harvard would help maintain admissions opportunities for Gentiles and perpetuate the purity of the Brahmin race—New England's white, Protestant upper crust. See D. Okrent, The Guarded Gate 309, and n. * (2019).

UNC also has a checkered history, dating back to its time as a segregated university. It admitted its first black undergraduate students in 1955—but only after being ordered to do so by a court, following a long legal battle in which UNC sought to keep its segregated status. Even then, UNC did not turn on a dime: The first three black students admitted as undergraduates enrolled at UNC but ultimately earned their bachelor's degrees elsewhere. See M. Beauregard, Column: The Desegregation of UNC, The Daily Tar Heel, Feb. 16, 2022. To the extent past is prologue, the university respondents' histories hardly recommend them as trustworthy arbiters of whether racial discrimination is necessary to achieve educational goals.

Of course, none of this should matter in any event; courts have an independent duty to interpret and uphold the Constitution that no university's claimed interest may override.

THOMAS, J., concurring

See *ante*, at 26, n. 5. The Court today makes clear that, in the future, universities wishing to discriminate based on race in admissions must articulate and justify a compelling and measurable state interest based on concrete evidence. Given the strictures set out by the Court, I highly doubt any will be able to do so.

### C

In an effort to salvage their patently unconstitutional programs, the universities and their *amici* pivot to argue that the Fourteenth Amendment permits the use of race to benefit only certain racial groups—rather than applicants writ large. Yet, this is just the latest disguise for discrimination. The sudden narrative shift is not surprising, as it has long been apparent that "'diversity [was] merely the current rationale of convenience'" to support racially discriminatory admissions programs. *Grutter*, 539 U. S., at 393 (Kennedy, J., dissenting). Under our precedents, this new rationale is also lacking.

To start, the case for affirmative action has emphasized a number of rationales over the years, including: (1) restitution to compensate those who have been victimized by past discrimination, (2) fostering "diversity," (3) facilitating "integration" and the destruction of perceived racial castes, and (4) countering longstanding and diffuse racial prejudice. See R. Kennedy, For Discrimination: Race, Affirmative Action, and the Law 78 (2013); see also P. Schuck, Affirmative Action: Past, Present, and Future, 20 Yale L. & Pol'y Rev. 1, 22–46 (2002). Again, this Court has only recognized one interest as compelling: the educational benefits of diversity embraced in *Grutter*. Yet, as the universities define the "diversity" that they practice, it encompasses social and aesthetic goals far afield from the education-based interest discussed in *Grutter*. See *supra*, at 23. The dissents too attempt to stretch the diversity rationale, suggesting that it supports broad remedial interests. See, *e.g.*, *post*,

at 23, 43, 67 (opinion of Sotomayor, J.) (noting that UNC's black admissions percentages "do not reflect the diversity of the State"; equating the diversity interest under the Court's precedents with a goal of "integration in higher education" more broadly; and warning of "the dangerous consequences of an America where its leadership does not reflect the diversity of the People"); *post*, at 23 (opinion of Jackson, J.) (explaining that diversity programs close wealth gaps). But language—particularly the language of controlling opinions of this Court—is not so elastic. See J. Pieper, Abuse of Language—Abuse of Power 23 (L. Krauth transl. 1992) (explaining that propaganda, "in contradiction to the nature of language, intends not to communicate but to manipulate" and becomes an "[i]nstrument of power" (emphasis deleted)).

The Court refuses to engage in this lexicographic drift, seeing these arguments for what they are: a remedial rationale in disguise. See *ante*, at 34–35. As the Court points out, the interest for which respondents advocate has been presented to and rejected by this Court many times before. In *Regents of University of California* v. *Bakke*, 438 U. S. 265 (1978), the University of California made clear its rationale for the quota system it had established: It wished to "counteract effects of generations of pervasive discrimination" against certain minority groups. Brief for Petitioner, O. T. 1977, No. 76–811, p. 2. But, the Court rejected this distinctly remedial rationale, with Justice Powell adopting in its place the familiar "diversity" interest that appeared later in *Grutter*. See *Bakke*, 438 U. S., at 306 (plurality opinion). The Court similarly did not adopt the broad remedial rationale in *Grutter*; and it rejects it again today. Newly and often minted theories cannot be said to be commanded by our precedents.

Indeed, our precedents have repeatedly and soundly distinguished between programs designed to compensate vic-

THOMAS, J., concurring

tims of past governmental discrimination from so-called be-
nign race-conscious measures, such as affirmative action.
*Croson*, 488 U. S., at 504–505; *Adarand Constructors, Inc.*
v. *Peña*, 515 U. S. 200, 226–227 (1995). To enforce that dis-
tinction, our precedents explicitly require that any attempt
to compensate victims of past governmental discrimination
must be concrete and traceable to the *de jure* segregated
system, which must have some discrete and continuing dis-
criminatory effect that warrants a present remedy. See
*United States* v. *Fordice*, 505 U. S. 717, 731 (1992). Today's
opinion for the Court reaffirms the need for such a close re-
medial fit, hewing to the same line we have consistently
drawn. *Ante*, at 24–25.

Without such guardrails, the Fourteenth Amendment
would become self-defeating, promising a Nation based on
the equality ideal but yielding a quota- and caste-ridden so-
ciety steeped in race-based discrimination. Even *Grutter*
itself could not tolerate this outcome. It accordingly im-
posed a time limit for its race-based regime, observing that
"'a core purpose of the Fourteenth Amendment was to do
away with all governmentally imposed discrimination
based on race.'" 539 U. S., at 341–342 (quoting *Palmore* v.
*Sidoti*, 466 U. S. 429, 432 (1984); alterations omitted).

The Court today enforces those limits. And rightly so. As
noted above, both Harvard and UNC have a history of racial
discrimination. But, neither have even attempted to ex-
plain how their current racially discriminatory programs
are even remotely traceable to their past discriminatory
conduct. Nor could they; the current race-conscious admis-
sions programs take no account of ancestry and, at least for
Harvard, likely have the effect of discriminating against
some of the very same ethnic groups against which Harvard
previously discriminated (*i.e.*, Jews and those who are not
part of the white elite). All the while, Harvard and UNC
ask us to blind ourselves to the burdens imposed on the mil-
lions of innocent applicants denied admission because of

their membership in a currently disfavored race.

The Constitution neither commands nor permits such a result. "Purchased at the price of immeasurable human suffering," the Fourteenth Amendment recognizes that classifications based on race lead to ruinous consequences for individuals and the Nation. *Adarand Constructors, Inc.*, 515 U. S., at 240 (THOMAS, J., concurring in part and concurring in judgment). Consequently, "*all*" racial classifications are "inherently suspect," *id.*, at 223–224 (majority opinion) (emphasis added; internal quotation marks omitted), and must be subjected to the searching inquiry conducted by the Court, *ante*, at 21–34.

### III

Both experience and logic have vindicated the Constitution's colorblind rule and confirmed that the universities' new narrative cannot stand. Despite the Court's hope in *Grutter* that universities would voluntarily end their race-conscious programs and further the goal of racial equality, the opposite appears increasingly true. Harvard and UNC now forthrightly state that they racially discriminate when it comes to admitting students, arguing that such discrimination is consistent with this Court's precedents. And they, along with today's dissenters, defend that discrimination as *good*. More broadly, it is becoming increasingly clear that discrimination on the basis of race—often packaged as "affirmative action" or "equity" programs—are based on the benighted notion "that it is possible to tell when discrimination helps, rather than hurts, racial minorities." *Fisher I*, 570 U. S., at 328 (THOMAS, J., concurring).

We cannot be guided by those who would desire less in our Constitution, or by those who would desire more. "The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and

makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, 539 U. S., at 353 (opinion of Thomas, J.).

## A

The Constitution's colorblind rule reflects one of the core principles upon which our Nation was founded: that "all men are created equal." Those words featured prominently in our Declaration of Independence and were inspired by a rich tradition of political thinkers, from Locke to Montesquieu, who considered equality to be the foundation of a just government. See, *e.g.*, J. Locke, Second Treatise of Civil Government 48 (J. Gough ed. 1948); T. Hobbes, Leviathan 98 (M. Oakeshott ed. 1962); 1 B. Montesquieu, The Spirit of Laws 121 (T. Nugent transl., J. Prichard ed. 1914). Several Constitutions enacted by the newly independent States at the founding reflected this principle. For example, the Virginia Bill of Rights of 1776 explicitly affirmed "[t]hat all men are by nature equally free and independent, and have certain inherent rights." Ch. 1, §1. The State Constitutions of Massachusetts, Pennsylvania, and New Hampshire adopted similar language. Pa. Const., Art. I (1776), in 2 Federal and State Constitutions 1541 (P. Poore ed. 1877); Mass. Const., Art. I (1780), in 1 *id.*, at 957; N. H. Const., Art. I (1784), in 2 *id.*, at 1280.[5] And, prominent Founders

_____

[5] In fact, the Massachusetts Supreme Court in 1783 declared that slavery was abolished in Massachusetts by virtue of the newly enacted Constitution's provision of equality under the law. See *The Quock Walker Case*, in 1 H. Commager, Documents of American History 110 (9th ed. 1973) (Cushing, C. J.) ("[W]hatever sentiments have formerly prevailed in this particular or slid in upon us by the example of others, a different idea has taken place with the people of America, more favorable to the natural rights of mankind, and to that natural, innate desire of Liberty . . . . And upon this ground our Constitution of Government . . . sets out with declaring that all men are born free and equal . . . and in short is totally repugnant to the idea of being born slaves").

Thomas, J., concurring

publicly mused about the need for equality as the foundation for government. *E.g.*, 1 Cong. Register 430 (T. Lloyd ed. 1789) (Madison, J.); 1 Letters and Other Writings of James Madison 164 (J. Lippincott ed. 1867); N. Webster, The Revolution in France, in 2 Political Sermons of the Founding Era, 1730–1805, pp. 1236–1299 (1998). As Jefferson declared in his first inaugural address, "the minority possess their equal rights, which equal law must protect." First Inaugural Address (Mar. 4, 1801), in 8 The Writings of Thomas Jefferson 4 (Washington ed. 1854).

Our Nation did not initially live up to the equality principle. The institution of slavery persisted for nearly a century, and the United States Constitution itself included several provisions acknowledging the practice. The period leading up to our second founding brought these flaws into bold relief and encouraged the Nation to finally make good on the equality promise. As Lincoln recognized, the promise of equality extended to *all people*—including immigrants and blacks whose ancestors had taken no part in the original founding. See Speech at Chicago, Ill. (July 10, 1858), in 2 The Collected Works of Abraham Lincoln 488–489, 499 (R. Basler ed. 1953). Thus, in Lincoln's view, "'the natural rights enumerated in the Declaration of Independence'" extended to blacks as his "'equal,'" and "'the equal of every living man.'" The Lincoln-Douglas Debates 285 (H. Holzer ed. 1993).

As discussed above, the Fourteenth Amendment reflected that vision, affirming that equality and racial discrimination cannot coexist. Under that Amendment, the color of a person's skin is irrelevant to that individual's equal status as a citizen of this Nation. To treat him differently on the basis of such a legally irrelevant trait is therefore a deviation from the equality principle and a constitutional injury.

Of course, even the promise of the second founding took time to materialize. Seeking to perpetuate a segregationist

system in the wake of the Fourteenth Amendment's ratification, proponents urged a "separate but equal" regime. They met with initial success, ossifying the segregationist view for over a half century. As this Court said in *Plessy*:

> "A statute which implies merely a legal distinction between the white and colored races—a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color—has no tendency to destroy the legal equality of the two races, or reestablish a state of involuntary servitude." 163 U. S., at 543.

Such a statement, of course, is precisely antithetical to the notion that all men, regardless of the color of their skin, are born equal and must be treated equally under the law. Only one Member of the Court adhered to the equality principle; Justice Harlan, standing alone in dissent, wrote: "Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law." *Id.*, at 559. Though Justice Harlan rightly predicted that *Plessy* would, "in time, prove to be quite as pernicious as the decision made . . . in the *Dred Scott* case," the *Plessy* rule persisted for over a half century. *Ibid.* While it remained in force, Jim Crow laws prohibiting blacks from entering or utilizing public facilities such as schools, libraries, restaurants, and theaters sprang up across the South.

This Court rightly reversed course in *Brown* v. *Board of Education*. The *Brown* appellants—those challenging segregated schools—embraced the equality principle, arguing that "[a] racial criterion is a constitutional irrelevance, and is not saved from condemnation even though dictated by a sincere desire to avoid the possibility of violence or race friction." Brief for Appellants in *Brown* v. *Board of Education*,

O. T. 1952, No. 1, p. 7 (citation omitted).[6]  Embracing that
view, the Court held that "in the field of public education
the doctrine of 'separate but equal' has no place" and
"[s]eparate educational facilities are inherently unequal."
*Brown*, 347 U. S., at 493, 495.  Importantly, in reaching this
conclusion, *Brown* did not rely on the particular qualities of
the Kansas schools.  The mere separation of students on the
basis of race—the "*segregation* complained of," *id.*, at 495
(emphasis added)—constituted a constitutional injury.  See
*ante*, at 12 ("Separate cannot be equal").

Just a few years later, the Court's application of *Brown*
made explicit what was already forcefully implied: "[O]ur
decisions have foreclosed any possible contention that . . . a
statute or regulation" fostering segregation in public facili-
ties "may stand consistently with the Fourteenth Amend-
ment."  *Turner* v. *Memphis*, 369 U. S. 350, 353 (1962) (*per
curiam*); cf. A. Blaustein & C. Ferguson, Desegregation and
the Law: The Meaning and Effect of the School Segregation
Cases 145 (rev. 2d ed. 1962) (arguing that the Court in
*Brown* had "adopt[ed] a constitutional standard" declaring
"that all classification by race is unconstitutional *per se*").

Today, our precedents place this principle beyond ques-
tion.  In assessing racial segregation during a race-
motivated prison riot, for example, this Court applied strict
scrutiny without requiring an allegation of unequal treat-
ment among the segregated facilities.  *Johnson* v. *Califor-
nia*, 543 U. S. 499, 505–506 (2005).  The Court today reaf-
firms the rule, stating that, following *Brown*, "[t]he time for

---

[6]Briefing in a case consolidated with *Brown* stated the colorblind posi-
tion forthrightly: Classifications "[b]ased [s]olely on [r]ace or [c]olor" "can
never be" constitutional.  Juris. Statement in *Briggs* v. *Elliott*, O. T. 1951,
No. 273, pp. 20–21, 25, 29; see also Juris. Statement in *Davis* v. *County
School Bd. of Prince Edward Cty.*, O. T. 1952, No. 191, p. 8 ("Indeed, we
take the unqualified position that the Fourteenth Amendment has to-
tally stripped the state of power to make race and color the basis for gov-
ernmental action. . . .  For this reason alone, we submit, the state sepa-
rate school laws in this case must fall").

making distinctions based on race had passed." *Ante*, at 13. "What was wrong" when the Court decided *Brown* "in 1954 cannot be right today." *Parents Involved*, 551 U. S., at 778 (THOMAS, J., concurring). Rather, we must adhere to the promise of equality under the law declared by the Declaration of Independence and codified by the Fourteenth Amendment.

## B

Respondents and the dissents argue that the universities' race-conscious admissions programs ought to be permitted because they accomplish positive social goals. I would have thought that history had by now taught a "greater humility" when attempting to "distinguish good from harmful uses of racial criteria." *Id.*, at 742 (plurality opinion). From the Black Codes, to discriminatory and destructive social welfare programs, to discrimination by individual government actors, bigotry has reared its ugly head time and again. Anyone who today thinks that some form of racial discrimination will prove "helpful" should thus tread cautiously, lest racial discriminators succeed (as they once did) in using such language to disguise more invidious motives.

Arguments for the benefits of race-based solutions have proved pernicious in segregationist circles. Segregated universities once argued that race-based discrimination was needed "to preserve harmony and peace and at the same time furnish equal education to both groups." Brief for Respondents in *Sweatt* v. *Painter*, O. T. 1949, No. 44, p. 94; see also *id.*, at 79 ("'[T]he *mores* of racial relationships are such as to rule out, for the present at least, any possibility of admitting white persons and Negroes to the same institutions'"). And, parties consistently attempted to convince the Court that the time was not right to disrupt segregationist systems. See Brief for Appellees in *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, O. T. 1949, No. 34, p. 12 (claiming that a holding rejecting separate but equal

would "necessarily result . . . [i]n the *abandoning* of many
of the state's existing educational establishments" and the
"*crowding* of other such establishments"); Brief for State of
Kansas on Reargument in *Brown* v. *Board of Education*,
O. T. 1953, No. 1, p. 56 ("We grant that segregation may not
be the ethical or political ideal. At the same time we recog-
nize that practical considerations may prevent realization
of the ideal"); Tr. of Oral Arg. in *Davis* v. *School Bd. of
Prince Edward Cty.*, O. T. 1954, No. 3, p. 208 ("We are up
against the proposition: What does the Negro profit if he
procures an immediate detailed decree from this Court now
and then impairs or mars or destroys the public school sys-
tem in Prince Edward County"). Litigants have even gone
so far as to offer straight-faced arguments that segregation
has practical benefits. Brief for Respondents in *Sweatt* v.
*Painter*, at 77–78 (requesting deference to a state law, ob-
serving that "'the necessity for such separation [of the
races] still exists in the interest of public welfare, safety,
harmony, health, and recreation . . .'" and remarking on the
reasonableness of the position); Brief for Appellees in *Davis*
v. *County School Bd. of Prince Edward Cty.*, O. T. 1952, No.
3, p. 17 ("Virginia has established segregation in certain
fields as a part of her public policy to prevent violence and
reduce resentment. The result, in the view of an over-
whelming Virginia majority, has been to improve the rela-
tionship between the different races"); *id.*, at 25 ("If segre-
gation be stricken down, the general welfare will be
definitely harmed . . . there would be more friction devel-
oped" (internal quotation marks omitted)). In fact, slave-
holders once "argued that slavery was a 'positive good' that
civilized blacks and elevated them in every dimension of
life," and "segregationists similarly asserted that segrega-
tion was not only benign, but good for black students."
*Fisher I*, 570 U. S., at 328–329 (THOMAS, J., concurring).

"Indeed, if our history has taught us anything, it has

taught us to beware of elites bearing racial theories." *Parents Involved*, 551 U. S., at 780–781 (Thomas, J., concurring). We cannot now blink reality to pretend, as the dissents urge, that affirmative action should be legally permissible merely because the experts assure us that it is "good" for black students. Though I do not doubt the sincerity of my dissenting colleagues' beliefs, experts and elites have been wrong before—and they may prove to be wrong again. In part for this reason, the Fourteenth Amendment outlaws government-sanctioned racial discrimination of all types. The stakes are simply too high to gamble.[7] Then, as now, the views that motivated *Dred Scott* and *Plessy* have not been confined to the past, and we must remain ever vigilant against *all* forms of racial discrimination.

## C

Even taking the desire to help on its face, what initially seems like aid may in reality be a burden, including for the very people it seeks to assist. Take, for example, the college admissions policies here. "Affirmative action" policies do nothing to increase the overall number of blacks and Hispanics able to access a college education. Rather, those racial policies simply redistribute individuals among institutions of higher learning, placing some into more competitive institutions than they otherwise would have attended. See

---

[7] Indeed, the lawyers who litigated *Brown* were unwilling to take this bet, insisting on a colorblind legal rule. See, *e.g.*, Supp. Brief for Appellants on Reargument in Nos. 1, 2, and 4, and for Respondents in No. 10, in *Brown* v. *Board of Education*, O. T. 1953, p. 65 ("That the Constitution is color blind is our dedicated belief"); Brief for Appellants in *Brown* v. *Board of Education*, O. T. 1952, No. 1, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone"). In fact, Justice Marshall viewed Justice Harlan's *Plessy* dissent as "a 'Bible' to which he turned during his most depressed moments"; no opinion "buoyed Marshall more in his pre-*Brown* days." In Memoriam: Honorable Thurgood Marshall, Proceedings of the Bar and Officers of the Supreme Court of the United States, p. X (1993) (remarks of Judge Motley).

T. Sowell, Affirmative Action Around the World 145–146
(2004).  In doing so, those policies sort at least some blacks
and Hispanics into environments where they are less likely
to succeed academically relative to their peers.  *Ibid.*  The
resulting mismatch places "many blacks and Hispanics who
likely would have excelled at less elite schools . . . in a posi-
tion where underperformance is all but inevitable because
they are less academically prepared than the white and
Asian students with whom they must compete."  *Fisher I*,
570 U. S., at 332 (Thomas, J., concurring).

   It is self-evident why that is so.  As anyone who has
labored over an algebra textbook has undoubtedly discov-
ered, academic advancement results from hard work and
practice, not mere declaration.  Simply treating students as
though their grades put them at the top of their high school
classes does nothing to enhance the performance level of
those students or otherwise prepare them for competitive
college environments.  In fact, studies suggest that large
racial preferences for black and Hispanic applicants have
led to a disproportionately large share of those students re-
ceiving mediocre or poor grades once they arrive in compet-
itive collegiate environments.  See, *e.g.*, R. Sander, A Sys-
temic Analysis of Affirmative Action in American Law
Schools, 57 Stan. L. Rev. 367, 371–372 (2004); see also R.
Sander & R. Steinbuch, Mismatch and Bar Passage: A
School-Specific Analysis (Oct. 6, 2017), https://ssrn.com/
abstract=3054208.  Take science, technology, engineering,
and mathematics (STEM) fields, for example.  Those stu-
dents who receive a large admissions preference are more
likely to drop out of STEM fields than similarly situated
students who did not receive such a preference.  F. Smith &
J. McArdle, Ethnic and Gender Differences in Science
Graduation at Selective Colleges With Implications for Ad-
mission Policy and College Choice, 45 Research in Higher
Ed. 353 (2004).  "Even if most minority students are able to
meet the normal standards at the 'average' range of colleges

and universities, the systematic mismatching of minority students begun at the top can mean that such students are generally overmatched throughout all levels of higher education." T. Sowell, Race and Culture 176–177 (1994).[8]

These policies may harm even those who succeed academically. I have long believed that large racial preferences in college admissions "stamp [blacks and Hispanics] with a badge of inferiority." *Adarand*, 515 U. S., at 241 (opinion of THOMAS, J.). They thus "tain[t] the accomplishments of all those who are admitted as a result of racial discrimination" as well as "all those who are the same race as those admitted as a result of racial discrimination" because "no one can distinguish those students from the ones whose race played a role in their admission." *Fisher I*, 570 U. S., at 333 (opinion of THOMAS, J.). Consequently, "[w]hen blacks" and, now, Hispanics "take positions in the highest places of government, industry, or academia, it is an open question . . . whether their skin color played a part in their advancement." *Grutter*, 539 U. S., at 373 (THOMAS, J., concurring). "The question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those . . . who would succeed without discrimination." *Ibid.*

---

[8] JUSTICE SOTOMAYOR rejects this mismatch theory as "debunked long ago," citing an *amicus* brief. *Post*, at 56. But, in 2016, the Journal of Economic Literature published a review of mismatch literature—coauthored by a critic and a defender of affirmative action—which concluded that the evidence for mismatch was "fairly convincing." P. Arcidiacono & M. Lovenheim, Affirmative Action and the Quality-Fit Tradeoff, 54 J. Econ. Lit. 3, 20 (Arcidiacono & Lovenheim). And, of course, if universities wish to refute the mismatch theory, they need only release the data necessary to test its accuracy. See Brief for Richard Sander as *Amicus Curiae* 16–19 (noting that universities have been unwilling to provide the necessary data concerning student admissions and outcomes); accord, Arcidiacono & Lovenheim 20 ("Our hope is that better datasets soon will become available").

Yet, in the face of those problems, it seems increasingly clear that universities are focused on "aesthetic" solutions unlikely to help deserving members of minority groups. In fact, universities' affirmative action programs are a particularly poor use of such resources. To start, these programs are overinclusive, providing the same admissions bump to a wealthy black applicant given every advantage in life as to a black applicant from a poor family with seemingly insurmountable barriers to overcome. In doing so, the programs may wind up helping the most well-off members of minority races without meaningfully assisting those who struggle with real hardship. Simultaneously, the programs risk continuing to ignore the academic underperformance of "the purported 'beneficiaries'" of racial preferences and the racial stigma that those preferences generate. *Grutter*, 539 U. S., at 371 (opinion of THOMAS, J.). Rather than performing their academic mission, universities thus may "see[k] only a facade—it is sufficient that the class looks right, even if it does not perform right." *Id.*, at 372.

D

Finally, it is not even theoretically possible to "help" a certain racial group without causing harm to members of other racial groups. "It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others." *Adarand*, 515 U. S., at 241, n. * (opinion of THOMAS, J.). And, even purportedly benign race-based discrimination has secondary effects on members of other races. The antisubordination view thus has never guided the Court's analysis because "whether a law relying upon racial taxonomy is 'benign' or 'malign' either turns on 'whose ox is gored' or on distinctions found only in the eye of the beholder." *Ibid.* (citations and some internal quotation marks omitted). Courts are not suited to the impossible task of determining which racially discriminatory programs are helping which members of which races—and

THOMAS, J., concurring

whether those benefits outweigh the burdens thrust onto other racial groups.

As the Court's opinion today explains, the zero-sum nature of college admissions—where students compete for a finite number of seats in each school's entering class—aptly demonstrates the point. *Ante*, at 27.[9] Petitioner here represents Asian Americans who allege that, at the margins, Asian applicants were denied admission because of their race. Yet, Asian Americans can hardly be described as the beneficiaries of historical racial advantages. To the contrary, our Nation's first immigration ban targeted the Chinese, in part, based on "worker resentment of the low wage rates accepted by Chinese workers." U. S. Commission on Civil Rights, Civil Rights Issues Facing Asian Americans in the 1990s, p. 3 (1992) (Civil Rights Issues); Act of May 6, 1882, ch. 126, 22 Stat. 58–59.

In subsequent years, "strong anti-Asian sentiments in the Western States led to the adoption of many discriminatory laws at the State and local levels, similar to those aimed at blacks in the South," and "segregation in public facilities, including schools, was quite common until after the Second World War." Civil Rights Issues 7; see also S. Hinnershitz, A Different Shade of Justice: Asian American

───────────

[9] JUSTICE SOTOMAYOR apparently believes that race-conscious admission programs can somehow increase the chances that members of certain races (blacks and Hispanics) are admitted without decreasing the chances of admission for members of other races (Asians). See *post*, at 58–59. This simply defies mathematics. In a zero-sum game like college admissions, any sorting mechanism that takes race into account in any way, see *post*, at 27 (opinion of JACKSON, J.) (defending such a system), has discriminated based on race to the benefit of some races and the detriment of others. And, the universities here admit that race is determinative in at least some of their admissions decisions. See, *e.g.*, Tr. of Oral Arg. in No. 20–1199, at 67; 567 F. Supp. 3d 580, 633 (MDNC 2021); see also 397 F. Supp. 3d 126, 178 (Mass. 2019) (noting that, for Harvard, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants"); *ante*, at 5, n. 1 (describing the role that race plays in the universities' admissions processes).

Civil Rights in the South 21 (2017) (explaining that while both Asians and blacks have at times fought "against similar forms of discrimination," "[t]he issues of citizenship and immigrant status often defined Asian American battles for civil rights and separated them from African American legal battles"). Indeed, this Court even sanctioned this segregation—in the context of schools, no less. In *Gong Lum* v. *Rice*, 275 U. S. 78, 81–82, 85–87 (1927), the Court held that a 9-year-old Chinese-American girl could be denied entry to a "white" school because she was "a member of the Mongolian or yellow race."

Also, following the Japanese attack on the U. S. Navy base at Pearl Harbor, Japanese Americans in the American West were evacuated and interned in relocation camps. See Exec. Order No. 9066, 3 CFR 1092 (1943). Over 120,000 were removed to camps beginning in 1942, and the last camp that held Japanese Americans did not close until 1948. National Park Service, Japanese American Life During Internment, www.nps.gov/articles/japanese-american-internment-archeology.htm. In the interim, this Court endorsed the practice. *Korematsu* v. *United States*, 323 U. S. 214 (1944).

Given the history of discrimination against Asian Americans, especially their history with segregated schools, it seems particularly incongruous to suggest that a past history of segregationist policies toward blacks should be remedied at the expense of Asian American college applicants.[10] But this problem is not limited to Asian Americans; more

———————

[10] Even beyond Asian Americans, it is abundantly clear that the university respondents' racial categories are vastly oversimplistic, as the opinion of the Court and JUSTICE GORSUCH's concurrence make clear. See *ante*, at 24–25; *post*, at 5–7 (opinion of GORSUCH, J.). Their "affirmative action" programs do not help Jewish, Irish, Polish, or other "white" ethnic groups whose ancestors faced discrimination upon arrival in America, any more than they help the descendants of those Japanese-American citizens interned during World War II.

broadly, universities' discriminatory policies burden millions of applicants who are not responsible for the racial discrimination that sullied our Nation's past. That is why, "[i]n the absence of special circumstances, the remedy for *de jure* segregation ordinarily should not include educational programs for students who were not in school (or even alive) during the period of segregation." *Jenkins*, 515 U. S., at 137 (THOMAS, J., concurring). Today's 17-year-olds, after all, did not live through the Jim Crow era, enact or enforce segregation laws, or take any action to oppress or enslave the victims of the past. Whatever their skin color, today's youth simply are not responsible for instituting the segregation of the 20th century, and they do not shoulder the moral debts of their ancestors. Our Nation should not punish today's youth for the sins of the past.

IV

Far from advancing the cause of improved race relations in our Nation, affirmative action highlights our racial differences with pernicious effect. In fact, recent history reveals a disturbing pattern: Affirmative action policies appear to have prolonged the asserted need for racial discrimination. Parties and *amici* in these cases report that, in the nearly 50 years since *Bakke*, 438 U. S. 265, racial progress on campuses adopting affirmative action admissions policies has stagnated, including making no meaningful progress toward a colorblind goal since *Grutter*. See *ante*, at 21–22. Rather, the legacy of *Grutter* appears to be ever increasing and strident demands for *yet more* racially oriented solutions.

A

It has become clear that sorting by race does not stop at the admissions office. In his *Grutter* opinion, Justice Scalia criticized universities for "talk[ing] of multiculturalism and

46 STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
Thomas, J., concurring

racial diversity," but supporting "tribalism and racial seg-
regation on their campuses," including through "minority
only student organizations, separate minority housing op-
portunities, separate minority student centers, even sepa-
rate minority-only graduation ceremonies." 539 U. S., at
349 (opinion concurring in part and dissenting in part).
This trend has hardly abated with time, and today, such
programs are commonplace. See Brief for Gail Heriot et al.
as *Amici Curiae* 9. In fact, a recent study considering 173
schools found that 43% of colleges offered segregated hous-
ing to students of different races, 46% offered segregated
orientation programs, and 72% sponsored segregated grad-
uation ceremonies. D. Pierre & P. Wood, Neo-Segregation
at Yale 16–17 (2019); see also D. Pierre, Demands for Seg-
regated Housing at Williams College Are Not News, Nat.
Rev., May 8, 2019. In addition to contradicting the univer-
sities' claims regarding the need for interracial interaction,
see Brief for National Association of Scholars as *Amicus Cu-
riae* 4–12, these trends increasingly encourage our Nation's
youth to view racial differences as important and segrega-
tion as routine.

Meanwhile, these discriminatory policies risk creating
new prejudices and allowing old ones to fester. I previously
observed that "[t]here can be no doubt" that discriminatory
affirmative action policies "injur[e] white and Asian appli-
cants who are denied admission because of their race."
*Fisher I*, 570 U. S., at 331 (concurring opinion). Petitioner
here clearly demonstrates this fact. Moreover, "no social
science has disproved the notion that this discrimination
'engenders attitudes of superiority or, alternatively, pro-
vokes resentment among those who believe that they have
been wronged by the government's use of race.'" *Grutter*,
539 U. S., at 373 (opinion of Thomas, J.) (quoting *Adarand*,
515 U. S., at 241 (opinion of Thomas, J.) (alterations omit-
ted)). Applicants denied admission to certain colleges may

come to believe—accurately or not—that their race was responsible for their failure to attain a life-long dream. These individuals, and others who wished for their success, may resent members of what they perceive to be favored races, believing that the successes of those individuals are unearned.

What, then, would be the endpoint of these affirmative action policies? Not racial harmony, integration, or equality under the law. Rather, these policies appear to be leading to a world in which everyone is defined by their skin color, demanding ever-increasing entitlements and preferences on that basis. Not only is that *exactly* the kind of factionalism that the Constitution was meant to safeguard against, see The Federalist No. 10 (J. Madison), but it is a factionalism based on ever-shifting sands.

That is because race is a social construct; we may each identify as members of particular races for any number of reasons, having to do with our skin color, our heritage, or our cultural identity. And, over time, these ephemeral, socially constructed categories have often shifted. For example, whereas universities today would group all white applicants together, white elites previously sought to exclude Jews and other white immigrant groups from higher education. In fact, it is impossible to look at an individual and know definitively his or her race; some who would consider themselves black, for example, may be quite fair skinned. Yet, university admissions policies ask individuals to identify themselves as belonging to one of only a few reductionist racial groups. With boxes for only "black," "white," "Hispanic," "Asian," or the ambiguous "other," how is a Middle Eastern person to choose? Someone from the Philippines? See *post*, at 5–7 (GORSUCH, J., concurring). Whichever choice he makes (in the event he chooses to report a race at all), the form silos him into an artificial category. Worse, it sends a clear signal that the category matters.

But, under our Constitution, race is irrelevant, as the

Court acknowledges.  In fact, all racial categories are little more than stereotypes, suggesting that immutable characteristics somehow conclusively determine a person's ideology, beliefs, and abilities.  Of course, that is false.  See *ante*, at 28–30 (noting that the Court's Equal Protection Clause jurisprudence forbids such stereotyping).  Members of the same race do not all share the exact same experiences and viewpoints; far from it.  A black person from rural Alabama surely has different experiences than a black person from Manhattan or a black first-generation immigrant from Nigeria, in the same way that a white person from rural Vermont has a different perspective than a white person from Houston, Texas.  Yet, universities' racial policies suggest that racial identity "*alone constitutes the being* of the race or the man." J. Barzun, Race: A Study in Modern Superstition 114 (1937).  That is the same naked racism upon which segregation itself was built.  Small wonder, then, that these policies are leading to increasing racial polarization and friction.  This kind of reductionist logic leads directly to the "disregard for what does not jibe with preconceived theory," providing a "cloa[k] to conceal complexity, argumen[t] to the crown for praising or damning without the trouble of going into details"—such as details about an individual's ideas or unique background. *Ibid.*  Rather than forming a more pluralistic society, these policies thus strip us of our individuality and undermine the very diversity of thought that universities purport to seek.

The solution to our Nation's racial problems thus cannot come from policies grounded in affirmative action or some other conception of equity.  Racialism simply cannot be undone by different or more racialism.  Instead, the solution announced in the second founding is incorporated in our Constitution: that we are all equal, and should be treated equally before the law without regard to our race.  Only that promise can allow us to look past our differing skin colors

THOMAS, J., concurring

and identities and see each other for what we truly are: individuals with unique thoughts, perspectives, and goals, but with equal dignity and equal rights under the law.

## B

JUSTICE JACKSON has a different view. Rather than focusing on individuals as individuals, her dissent focuses on the historical subjugation of black Americans, invoking statistical racial gaps to argue in favor of defining and categorizing individuals by their race. As she sees things, we are all inexorably trapped in a fundamentally racist society, with the original sin of slavery and the historical subjugation of black Americans still determining our lives today. *Post*, at 1–26 (dissenting opinion). The panacea, she counsels, is to unquestioningly accede to the view of elite experts and reallocate society's riches by racial means as necessary to "level the playing field," all as judged by racial metrics. *Post*, at 26. I strongly disagree.

First, as stated above, any statistical gaps between the average wealth of black and white Americans is constitutionally irrelevant. I, of course, agree that our society is not, and has never been, colorblind. *Post*, at 2 (JACKSON, J., dissenting); see also *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting). People discriminate against one another for a whole host of reasons. But, under the Fourteenth Amendment, the law must disregard all racial distinctions:

> "[I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." *Ibid*.

With the passage of the Fourteenth Amendment, the people of our Nation proclaimed that the law may not sort citizens based on race.  It is this principle that the Framers of the Fourteenth Amendment adopted in the wake of the Civil War to fulfill the promise of equality under the law.  And it is this principle that has guaranteed a Nation of equal citizens the privileges or immunities of citizenship and the equal protection of the laws.  To now dismiss it as "two-dimensional flatness," *post*, at 25 (JACKSON, J., dissenting), is to abdicate a sacred trust to ensure that our "honored dead . . . shall not have died in vain."  A. Lincoln, Gettysburg Address (1863).

Yet, JUSTICE JACKSON would replace the second Founders' vision with an organizing principle based on race.  In fact, on her view, almost all of life's outcomes may be unhesitatingly ascribed to race.  *Post*, at 24–26.  This is so, she writes, because of statistical disparities among different racial groups.  See *post*, at 11–14.  Even if some whites have a lower household net worth than some blacks, what matters to JUSTICE JACKSON is that the *average* white household has more wealth than the *average* black household.  *Post*, at 11.

This lore is not and has never been true.  Even in the segregated South where I grew up, individuals were not the sum of their skin color.  Then as now, not all disparities are based on race; not all people are racist; and not all differences between individuals are ascribable to race.  Put simply, "the fate of abstract categories of wealth statistics is not the same as the fate of a given set of flesh-and-blood human beings."  T. Sowell, Wealth, Poverty and Politics 333 (2016).  Worse still, JUSTICE JACKSON uses her broad observations about statistical relationships between race and select measures of health, wealth, and well-being to label all blacks as victims.  Her desire to do so is unfathomable to me.  I cannot deny the great accomplishments of black Americans, including those who succeeded despite long

Thomas, J., concurring

odds.

Nor do JUSTICE JACKSON's statistics regarding a correlation between levels of health, wealth, and well-being between selected racial groups prove anything. Of course, none of those statistics are capable of drawing a direct causal link between race—rather than socioeconomic status or any other factor—and individual outcomes. So JUSTICE JACKSON supplies the link herself: the legacy of slavery and the nature of inherited wealth. This, she claims, locks blacks into a seemingly perpetual inferior caste. Such a view is irrational; it is an insult to individual achievement and cancerous to young minds seeking to push through barriers, rather than consign themselves to permanent victimhood. If an applicant has less financial means (because of generational inheritance or otherwise), then surely a university may take that into account. If an applicant has medical struggles or a family member with medical concerns, a university may consider that too. What it cannot do is use the applicant's skin color as a heuristic, assuming that because the applicant checks the box for "black" he therefore conforms to the university's monolithic and reductionist view of an abstract, average black person.

Accordingly, JUSTICE JACKSON's race-infused world view falls flat at each step. Individuals are the sum of their unique experiences, challenges, and accomplishments. What matters is not the barriers they face, but how they choose to confront them. And their race is not to blame for everything—good or bad—that happens in their lives. A contrary, myopic world view based on individuals' skin color to the total exclusion of their personal choices is nothing short of racial determinism.

JUSTICE JACKSON then builds from her faulty premise to call for action, arguing that courts should defer to "experts" and allow institutions to discriminate on the basis of race. Make no mistake: Her dissent is not a vanguard of the in-

nocent and helpless. It is instead a call to empower privileged elites, who will "tell us [what] is required to level the playing field" among castes and classifications that they alone can divine. *Post*, at 26; see also *post*, at 5–7 (GORSUCH, J., concurring) (explaining the arbitrariness of these classifications). Then, after siloing us all into racial castes and pitting those castes against each other, the dissent somehow believes that we will be able—at some undefined point—to "march forward together" into some utopian vision. *Post*, at 26 (opinion of JACKSON, J.). Social movements that invoke these sorts of rallying cries, historically, have ended disastrously.

Unsurprisingly, this tried-and-failed system defies both law and reason. Start with the obvious: If social reorganization in the name of equality may be justified by the mere fact of statistical disparities among racial groups, then that reorganization must continue until these disparities are fully eliminated, regardless of the reasons for the disparities and the cost of their elimination. If blacks fail a test at higher rates than their white counterparts (regardless of whether the reason for the disparity has anything at all to do with race), the only solution will be race-focused measures. If those measures were to result in blacks failing at yet higher rates, the only solution would be to double down. In fact, there would seem to be no logical limit to what the government may do to level the racial playing field—outright wealth transfers, quota systems, and racial preferences would all seem permissible. In such a system, it would not matter how many innocents suffer race-based injuries; all that would matter is reaching the race-based goal.

Worse, the classifications that JUSTICE JACKSON draws are themselves race-based stereotypes. She focuses on two hypothetical applicants, John and James, competing for admission to UNC. John is a white, seventh-generation legacy at the school, while James is black and would be the

first in his family to attend UNC. *Post*, at 3. JUSTICE JACKSON argues that race-conscious admission programs are necessary to adequately compare the two applicants. As an initial matter, it is not clear why James's race is the only factor that could encourage UNC to admit him; his status as a first-generation college applicant seems to contextualize his application. But, setting that aside, why is it that John should be judged based on the actions of his great-great-great-grandparents? And what would JUSTICE JACKSON say to John when deeming him not as worthy of admission: Some statistically significant number of white people had advantages in college admissions seven generations ago, and you have inherited their incurable sin?

Nor should we accept that John or James represent all members of their respective races. All racial groups are heterogeneous, and blacks are no exception—encompassing northerners and southerners, rich and poor, and recent immigrants and descendants of slaves. See, *e.g.*, T. Sowell, Ethnic America 220 (1981) (noting that the great success of West Indian immigrants to the United States—disproportionate among blacks more broadly—"seriously undermines the proposition that color is a fatal handicap in the American economy"). Eschewing the complexity that comes with individuality may make for an uncomplicated narrative, but lumping people together and judging them based on assumed inherited or ancestral traits is nothing but stereotyping.[11]

To further illustrate, let's expand the applicant pool beyond John and James. Consider Jack, a black applicant and the son of a multimillionaire industrialist. In a world of race-based preferences, James' seat could very well go to

_____

[11] Again, universities may offer admissions preferences to students from disadvantaged backgrounds, and they need not withhold those preferences from students who happen to be members of racial minorities. Universities may not, however, assume that all members of certain racial minorities are disadvantaged.

Jack rather than John—both are black, after all. And what about members of the numerous other racial and ethnic groups in our Nation? What about Anne, the child of Chinese immigrants? Jacob, the grandchild of Holocaust survivors who escaped to this Nation with nothing and faced discrimination upon arrival? Or Thomas, the great-grandchild of Irish immigrants escaping famine? While articulating her black and white world (literally), JUSTICE JACKSON ignores the experiences of other immigrant groups (like Asians, see *supra*, at 43–44) and white communities that have faced historic barriers.

Though JUSTICE JACKSON seems to think that her race-based theory can somehow benefit everyone, it is an immutable fact that "every time the government uses racial criteria to 'bring the races together,' someone gets excluded, and the person excluded suffers an injury solely because of his or her race." *Parents Involved*, 551 U. S., at 759 (THOMAS, J., concurring) (citation omitted). Indeed, JUSTICE JACKSON seems to have no response—no explanation at all—for the people who will shoulder that burden. How, for example, would JUSTICE JACKSON explain the need for race-based preferences to the Chinese student who has worked hard his whole life, only to be denied college admission in part because of his skin color? If such a burden would seem difficult to impose on a bright-eyed young person, that's because it should be. History has taught us to abhor theories that call for elites to pick racial winners and losers in the name of sociological experimentation.

Nor is it clear what another few generations of race-conscious college admissions may be expected to accomplish. Even today, affirmative action programs that offer an admissions boost to black and Hispanic students discriminate against those who identify themselves as members of other races that do not receive such preferential treatment. Must others in the future make sacrifices to re-

THOMAS, J., concurring

level the playing field for this new phase of racial subordination?  And then, out of whose lives should the debt owed to those further victims be repaid?  This vision of meeting social racism with government-imposed racism is thus self-defeating, resulting in a never-ending cycle of victimization.  There is no reason to continue down that path.  In the wake of the Civil War, the Framers of the Fourteenth Amendment charted a way out: a colorblind Constitution that requires the government to, at long last, put aside its citizens' skin color and focus on their individual achievements.

## C

Universities' recent experiences confirm the efficacy of a colorblind rule.  To start, universities prohibited from engaging in racial discrimination by state law continue to enroll racially diverse classes by race-neutral means.  For example, the University of California purportedly recently admitted its "most diverse undergraduate class ever," despite California's ban on racial preferences.  T. Watanabe, UC Admits Largest, Most Diverse Class Ever, But It Was Harder To Get Accepted, L. A. Times, July 20, 2021, p. A1.  Similarly, the University of Michigan's 2021 incoming class was "among the university's most racially and ethnically diverse classes, with 37% of first-year students identifying as persons of color."  S. Dodge, Largest Ever Student Body at University of Michigan This Fall, Officials Say, MLive.com (Oct. 22, 2021), https://www.mlive.com/news/ann-arbor/ 2021/10/largest-ever-student-body-at-university-of-michigan-this-fall-officials-say.html.  In fact, at least one set of studies suggests that, "when we consider the higher education system as a whole, it is clear that the vast majority of schools would be as racially integrated, or more racially integrated, under a system of no preferences than under a system of large preferences."  Brief for Richard Sander as *Amicus Curiae* 26.  Race-neutral policies may thus achieve the same benefits of racial harmony and equality without

any of the burdens and strife generated by affirmative action policies.

In fact, meritocratic systems have long refuted bigoted misperceptions of what black students can accomplish. I have always viewed "higher education's purpose as imparting knowledge and skills to students, rather than a communal, rubber-stamp, credentialing process." *Grutter*, 539 U. S., at 371–372 (opinion concurring in part and dissenting in part). And, I continue to strongly believe (and have never doubted) that "blacks can achieve in every avenue of American life without the meddling of university administrators." *Id.*, at 350. Meritocratic systems, with objective grading scales, are critical to that belief. Such scales have always been a great equalizer—offering a metric for achievement that bigotry could not alter. Racial preferences take away this benefit, eliminating the very metric by which those who have the most to prove can clearly demonstrate their accomplishments—both to themselves and to others.

Schools' successes, like students' grades, also provide objective proof of ability. Historically Black Colleges and Universities (HBCUs) do not have a large amount of racial diversity, but they demonstrate a marked ability to improve the lives of their students. To this day, they have proved "to be extremely effective in educating Black students, particularly in STEM," where "HBCUs represent seven of the top eight institutions that graduate the highest number of Black undergraduate students who go on to earn [science and engineering] doctorates." W. Wondwossen, The Science Behind HBCU Success, Nat. Science Foundation (Sept. 24, 2020), https://beta.nsf.gov/science-matters/science-behind-hbcu-success. "HBCUs have produced 40% of all Black engineers." Presidential Proclamation No. 10451, 87 Fed. Reg. 57567 (2022). And, they "account for 80% of Black judges, 50% of Black doctors, and 50% of Black lawyers."

M. Hammond, L. Owens, & B. Gulko, Social Mobility Out-
comes for HBCU Alumni, United Negro College Fund 4
(2021) (Hammond), https://cdn.uncf.org/wp-content/uploads/
Social-Mobility-Report-FINAL.pdf; see also 87 Fed. Reg.
57567 (placing the percentage of black doctors even higher,
at 70%).  In fact, Xavier University, an HBCU with only a
small percentage of white students, has had better success
at helping its low-income students move into the middle
class than Harvard has.  See Hammond 14; see also Brief
for Oklahoma et al. as *Amici Curiae* 18.  And, each of the
top 10 HBCUs have a success rate above the national aver-
age.  Hammond 14.[12]

Why, then, would this Court need to allow other univer-
sities to racially discriminate?  Not for the betterment of
those black students, it would seem.  The hard work of
HBCUs and their students demonstrate that "black schools
can function as the center and symbol of black communities,
and provide examples of independent black leadership, suc-
cess, and achievement."  *Jenkins*, 515 U. S., at 122

————————

[12] Such black achievement in "racially isolated" environments is nei-
ther new nor isolated to higher education.  See T. Sowell, Education: As-
sumptions Versus History 7–38 (1986).  As I have previously observed,
in the years preceding *Brown*, the "most prominent example of an exem-
plary black school was Dunbar High School," America's first public high
school for black students.  *Parents Involved in Community Schools* v. *Se-
attle School Dist. No. 1*, 551 U. S. 701, 763 (2007) (concurring opinion).
Known for its academics, the school attracted black students from across
the Washington, D. C., area.  "[I]n the period 1918–1923, Dunbar gradu-
ates earned fifteen degrees from Ivy League colleges, and ten degrees
from Amherst, Williams, and Wesleyan."  Sowell, Education: Assump-
tions Versus History, at 29.  Dunbar produced the first black General in
the U. S. Army, the first black Federal Court Judge, and the first black
Presidential Cabinet member.  A. Stewart, First Class: The Legacy of
Dunbar 2 (2013).  Indeed, efforts towards racial integration ultimately
precipitated the school's decline.  When the D. C. schools moved to a
neighborhood-based admissions model, Dunbar was no longer able to
maintain its prior admissions policies—and "[m]ore than 80 years of
quality education came to an abrupt end."  T. Sowell, Wealth, Poverty
and Politics 194 (2016).

58   STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

Thomas, J., concurring

(Thomas, J., concurring) (citing *Fordice*, 505 U. S., at 748 (Thomas, J., concurring)).  And, because race-conscious college admissions are plainly not necessary to serve even the interests of blacks, there is no justification to compel such programs more broadly.  See *Parents Involved*, 551 U. S., at 765 (Thomas, J., concurring).

\*     \*     \*

The great failure of this country was slavery and its progeny.  And, the tragic failure of this Court was its misinterpretation of the Reconstruction Amendments, as Justice Harlan predicted in *Plessy*.  We should not repeat this mistake merely because we think, as our predecessors thought, that the present arrangements are superior to the Constitution.

The Court's opinion rightly makes clear that *Grutter* is, for all intents and purposes, overruled.  And, it sees the universities' admissions policies for what they are: rudderless, race-based preferences designed to ensure a particular racial mix in their entering classes.  Those policies fly in the face of our colorblind Constitution and our Nation's equality ideal.  In short, they are plainly—and boldly—unconstitutional.  See *Brown II*, 349 U. S., at 298 (noting that the *Brown* case one year earlier had "declare[d] the fundamental principle that racial discrimination in public education is unconstitutional").

While I am painfully aware of the social and economic ravages which have befallen my race and all who suffer discrimination, I hold out enduring hope that this country will live up to its principles so clearly enunciated in the Declaration of Independence and the Constitution of the United States: that all men are created equal, are equal citizens, and must be treated equally before the law.

Cite as: 600 U. S. ____ (2023)　　　　1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 20–1199 and 21–707

———————

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

20–1199　　　　　　　　　　*v.*

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

21–707　　　　　　　　　　*v.*

UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

For many students, an acceptance letter from Harvard or the University of North Carolina is a ticket to a brighter future. Tens of thousands of applicants compete for a small number of coveted spots. For some time, both universities have decided which applicants to admit or reject based in part on race. Today, the Court holds that the Equal Protection Clause of the Fourteenth Amendment does not tolerate this practice. I write to emphasize that Title VI of the Civil Rights Act of 1964 does not either.

I

"[F]ew pieces of federal legislation rank in significance

with the Civil Rights Act of 1964." *Bostock* v. *Clayton County*, 590 U. S. ___, ___ (2020) (slip op., at 2). Title VI of that law contains terms as powerful as they are easy to understand: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. §2000d. The message for these cases is unmistakable. Students for Fair Admissions (SFFA) brought claims against Harvard and UNC under Title VI. That law applies to both institutions, as they elect to receive millions of dollars of federal assistance annually. And the trial records reveal that both schools routinely discriminate on the basis of race when choosing new students—exactly what the law forbids.

A

When a party seeks relief under a statute, our task is to apply the law's terms as a reasonable reader would have understood them at the time Congress enacted them. "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 590 U. S., at ___ (slip op., at 4).

The key phrases in Title VI at issue here are "subjected to discrimination" and "on the ground of." Begin with the first. To "discriminate" against a person meant in 1964 what it means today: to "trea[t] that individual worse than others who are similarly situated." *Id.*, at ___ (slip op., at 7); see also Webster's New International Dictionary 745 (2d ed. 1954) ("[t]o make a distinction" or "[t]o make a difference in treatment or favor (of one as compared with others)"); Webster's Third New International Dictionary 648 (1961) ("to make a difference in treatment or favor on a class or categorical basis"). The provision of Title VI before us, this Court has also held, "prohibits only intentional discrimination." *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001).

GORSUCH, J., concurring

From this, we can safely say that Title VI forbids a recipient of federal funds from intentionally treating one person worse than another similarly situated person on the ground of race, color, or national origin.

What does the statute's second critical phrase—"on the ground of"—mean? Again, the answer is uncomplicated: It means "because of." See, *e.g.,* Webster's New World Dictionary 640 (1960) ("because of"); Webster's Third New International Dictionary, at 1002 (defining "grounds" as "a logical condition, physical cause, or metaphysical basis"). "Because of" is a familiar phrase in the law, one we often apply in cases arising under the Civil Rights Act of 1964, and one that we usually understand to invoke "the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U. S., at ___ (slip op., at 5) (quoting *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 346, 360 (2013); some internal quotation marks omitted). The but-for-causation standard is a "sweeping" one too. *Bostock*, 590 U. S., at ___ (slip op., at 5). A defendant's actions need not be the primary or proximate cause of the plaintiff's injury to qualify. Nor may a defendant avoid liability "just by citing some *other* factor that contributed to" the plaintiff's loss. *Id.*, at ___ (slip op., at 6). All that matters is that the plaintiff's injury would not have happened *but for* the defendant's conduct. *Ibid.*

Now put these pieces back together and a clear rule emerges. Title VI prohibits a recipient of federal funds from intentionally treating one person worse than another similarly situated person because of his race, color, or national origin. It does not matter if the recipient can point to "some other . . . factor" that contributed to its decision to disfavor that individual. *Id.,* at ___–___ (slip op., at 14–15). It does not matter if the recipient discriminates in order to advance some further benign "intention" or "motivation." *Id.,* at ___ (slip op., at 13); see also *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187, 199 (1991) ("the absence of a

malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect" or "alter [its] intentionally discriminatory character"). Nor does it matter if the recipient discriminates against an individual member of a protected class with the idea that doing so might "favor" the interests of that "class" as a whole or otherwise "promot[e] equality at the group level." *Bostock*, 590 U. S., at ___, ___ (slip op., at 13, 15). Title VI prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert. Without question, Congress in 1964 could have taken the law in various directions. But to safeguard the civil rights of all Americans, Congress chose a simple and profound rule. One holding that a recipient of federal funds may never discriminate based on race, color, or national origin—period.

If this exposition of Title VI sounds familiar, it should. Just next door, in Title VII, Congress made it "unlawful . . . for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." §2000e–2(a)(1). Appreciating the breadth of this provision, just three years ago this Court read its essentially identical terms the same way. See *Bostock*, 590 U. S., at ___–___ (slip op., at 4–9). This Court has long recognized, too, that when Congress uses the same terms in the same statute, we should presume they "have the same meaning." *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34 (2005). And that presumption surely makes sense here, for as Justice Stevens recognized years ago, "[b]oth Title VI and Title VII" codify a categorical rule of "individual equality, without regard to race." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 416, n. 19 (1978) (opinion concurring in judgment in part and dissenting in part) (emphasis deleted).

### B

Applying Title VI to the cases now before us, the result is plain. The parties debate certain details of Harvard's and UNC's admissions practices. But no one disputes that both universities operate "program[s] or activit[ies] receiving Federal financial assistance." §2000d. No one questions that both institutions consult race when making their admissions decisions. And no one can doubt that both schools intentionally treat some applicants worse than others at least in part because of their race.

### 1

Start with how Harvard and UNC use race. Like many colleges and universities, those schools invite interested students to complete the Common Application. As part of that process, the trial records show, applicants are prompted to tick one or more boxes to explain "how you identify yourself." 4 App. in No. 21–707, p. 1732. The available choices are American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander; Hispanic or Latino; or White. Applicants can write in further details if they choose. *Ibid.*; see also 397 F. Supp. 3d 126, 137 (Mass. 2019); 567 F. Supp. 3d 580, 596 (MDNC 2021).

Where do these boxes come from? Bureaucrats. A federal interagency commission devised this scheme of classifications in the 1970s to facilitate data collection. See D. Bernstein, The Modern American Law of Race, 94 S. Cal. L. Rev. 171, 196–202 (2021); see also 43 Fed. Reg. 19269 (1978). That commission acted "without any input from anthropologists, sociologists, ethnologists, or other experts." Brief for David E. Bernstein as *Amicus Curiae* 3 (Bernstein *Amicus* Brief ). Recognizing the limitations of their work, federal regulators cautioned that their classifications "should not be interpreted as being scientific or anthropological in nature, *nor should they be viewed as determinants of eligibility*

*for participation in any Federal program*.” 43 Fed. Reg. 19269 (emphasis added). Despite that warning, others eventually used this classification system for that very purpose—to “sor[t] out winners and losers in a process that, by the end of the century, would grant preference[s] in jobs . . . and university admissions.” H. Graham, The Origins of Official Minority Designation, in The New Race Question: How the Census Counts Multiracial Individuals 289 (J. Perlmann & M. Waters eds. 2002).

These classifications rest on incoherent stereotypes. Take the “Asian” category. It sweeps into one pile East Asians (*e.g.,* Chinese, Korean, Japanese) and South Asians (*e.g.,* Indian, Pakistani, Bangladeshi), even though together they constitute about 60% of the world’s population. Bernstein *Amicus* Brief 2, 5. This agglomeration of so many peoples paves over countless differences in “language,” “culture,” and historical experience. *Id.*, at 5–6. It does so even though few would suggest that all such persons share “similar backgrounds and similar ideas and experiences.” *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 414 (2016) (ALITO, J., dissenting). Consider, as well, the development of a separate category for “Native Hawaiian or Other Pacific Islander.” It seems federal officials disaggregated these groups from the “Asian” category only in the 1990s and only “in response to political lobbying.” Bernstein *Amicus* Brief 9–10. And even that category contains its curiosities. It appears, for example, that Filipino Americans remain classified as “Asian” rather than “Other Pacific Islander.” See 4 App. in No. 21–707, at 1732.

The remaining classifications depend just as much on irrational stereotypes. The “Hispanic” category covers those whose ancestral language is Spanish, Basque, or Catalan—but it also covers individuals of Mayan, Mixtec, or Zapotec descent who do not speak any of those languages and whose ancestry does not trace to the Iberian Peninsula but bears deep ties to the Americas. See Bernstein *Amicus* Brief 10–

11. The "White" category sweeps in anyone from "Europe, Asia west of India, and North Africa." *Id.*, at 14. That includes those of Welsh, Norwegian, Greek, Italian, Moroccan, Lebanese, Turkish, or Iranian descent. It embraces an Iraqi or Ukrainian refugee as much as a member of the British royal family. Meanwhile, "Black or African American" covers everyone from a descendant of enslaved persons who grew up poor in the rural South, to a first-generation child of wealthy Nigerian immigrants, to a Black-identifying applicant with multiracial ancestry whose family lives in a typical American suburb. See *id.,* at 15–16.

If anything, attempts to divide us all up into a handful of groups have become only more incoherent with time. American families have become increasingly multicultural, a fact that has led to unseemly disputes about whether someone is *really* a member of a certain racial or ethnic group. There are decisions denying Hispanic status to someone of Italian-Argentine descent, *Marinelli Constr. Corp.* v. *New York*, 200 App. Div. 2d 294, 296–297, 613 N. Y. S. 2d 1000, 1002 (1994), as well as someone with one Mexican grandparent, *Major Concrete Constr., Inc.* v. *Erie County*, 134 App. Div. 2d 872, 873, 521 N. Y. S. 2d 959, 960 (1987). Yet there are also decisions granting Hispanic status to a Sephardic Jew whose ancestors fled Spain centuries ago, *In re Rothschild-Lynn Legal & Fin. Servs.*, SBA No. 499, 1995 WL 542398, *2–*4 (Apr. 12, 1995), and bestowing a "sort of Hispanic" status on a person with one Cuban grandparent, Bernstein, 94 S. Cal. L. Rev., at 232 (discussing *In re Kist Corp.*, 99 F. C. C. 2d 173, 193 (1984)).

Given all this, is it any surprise that members of certain groups sometimes try to conceal their race or ethnicity? Or that a cottage industry has sprung up to help college applicants do so? We are told, for example, that one effect of lumping so many people of so many disparate backgrounds into the "Asian" category is that many colleges consider "Asians" to be "overrepresented" in their admission pools.

Brief for Asian American Coalition for Education et al. as
*Amici Curiae* 12–14, 18–19.  Paid advisors, in turn, tell high
school students of Asian descent to downplay their heritage
to maximize their odds of admission.  "'We will make them
appear less Asian when they apply,'" one promises.  *Id.,* at
16.  "'If you're given an option, don't attach a photograph to
your application,'" another instructs.  *Ibid.*[1]  It is difficult
to imagine those who receive this advice would find comfort
in a bald (and mistaken) assurance that "race-conscious ad-
missions benefit . . . the Asian American community," *post*,
at 60 (SOTOMAYOR, J., dissenting).  See 397 F. Supp. 3d, at
178 (district court finding that "overall" Harvard's race-con-
scious admissions policy "results in fewer Asian Ameri-
can[s]" being admitted).  And it is hard not to wonder
whether those left paying the steepest price are those least
able to afford it—children of families with no chance of hir-
ing the kind of consultants who know how to play this
game.[2]

2

Just as there is no question Harvard and UNC consider
race in their admissions processes, there is no question both
schools intentionally treat some applicants worse than oth-
ers because of their race.  Both schools frequently choose to

---

[1] See also A. Qin, Aiming for an Ivy and Trying to Seem 'Less Asian,'
N. Y. Times, Dec. 3, 2022, p. A18, col. 1 ("[T]he rumor that students can
appear 'too Asian' has hardened into a kind of received wisdom within
many Asian American communities," and "college admissions consult-
ants [have] spoke[n] about trying to steer their Asian American clients
away from so-called typically Asian activities such as Chinese language
school, piano and Indian classical instruments.").

[2] Though the matter did not receive much attention in the proceedings
below, it appears that the Common Application has evolved in recent
years to allow applicants to choose among more options to describe their
backgrounds.  The decisions below do not disclose how much Harvard or
UNC made use of this further information (or whether they make use of
it now).  But neither does it make a difference.  Title VI no more tolerates
discrimination based on 60 racial categories than it does 6.

GORSUCH, J., concurring

award a "tip" or a "plus" to applicants from certain racial groups but not others. These tips or plusses are just what they sound like—"factors that might tip an applicant into [an] admitted class." 980 F. 3d 157, 170 (CA1 2020). And in a process where applicants compete for a limited pool of spots, "[a] tip for one race" necessarily works as "a penalty against other races." Brief for Economists as *Amici Curiae* 20. As the trial court in the Harvard case put it: "Race conscious admissions will always penalize to some extent the groups that are not being advantaged by the process." 397 F. Supp. 3d, at 202–203.

Consider how this plays out at Harvard. In a given year, the university's undergraduate program may receive 60,000 applications for roughly 1,600 spots. Tr. of Oral Arg. in No. 20–1199, p. 60. Admissions officers read each application and rate students across several categories: academic, extracurricular, athletic, school support, personal, and overall. 980 F. 3d, at 167. Harvard says its admissions officers "should not" consider race or ethnicity when assigning the "personal" rating. *Id.,* at 169 (internal quotation marks omitted). But Harvard did not make this instruction explicit until *after* SFFA filed this suit. *Ibid.* And, in any event, Harvard concedes that its admissions officers "*can* and *do* take an applicant's race into account when assigning an *overall* rating." *Ibid.* (emphasis added). At that stage, the lower courts found, applicants of certain races may receive a "tip" in their favor. *Ibid.*

The next step in the process is committee review. Regional subcommittees may consider an applicant's race when deciding whether to recommend admission. *Id.*, at 169–170. So, too, may the full admissions committee. *Ibid.* As the Court explains, that latter committee "discusses the relative breakdown of applicants by race." *Ante*, at 2–3. And "if at some point in the admissions process it appears that a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the [committee]

may decide to give additional attention to applications from students within that group." 397 F. Supp. 3d, at 146.

The last step is "lopping," where the admissions committee trims the list of "prospective admits" before settling on a final class. *Id.,* at 144 (internal quotation marks omitted). At this stage, again, the committee considers the "characteristics of the admitted class," including its "racial composition." *Ibid.* Once more, too, the committee may consider each applicant's race in deciding whom to "lop off." *Ibid.*

All told, the district court made a number of findings about Harvard's use of race-based tips. For example: "[T]he tip[s] given for race impac[t] who among the highly-qualified students in the applicant pool will be selected for admission." *Id.,* at 178. "At least 10% of Harvard's admitted class . . . would most likely not be admitted in the absence of Harvard's race-conscious admissions process." *Ibid.* Race-based tips are "determinative" in securing favorable decisions for a significant percentage of "African American and Hispanic applicants," the "primary beneficiaries" of this system. *Ibid.* There are clear losers too. "[W]hite and Asian American applicants are unlikely to receive a meaningful race-based tip," *id.,* at 190, n. 56, and "overall" the school's race-based practices "resul[t] in fewer Asian American and white students being admitted," *id.,* at 178. For these reasons and others still, the district court concluded that "Harvard's admissions process is not facially neutral" with respect to race. *Id.,* at 189–190; see also *id.,* at 190, n. 56 ("The policy cannot . . . be considered facially neutral from a Title VI perspective.").

Things work similarly at UNC. In a typical year, about 44,000 applicants vie for 4,200 spots. 567 F. Supp. 3d, at 595. Admissions officers read each application and rate prospective students along eight dimensions: academic programming, academic performance, standardized tests, extracurriculars, special talents, essays, background, and personal. *Id.,* at 600. The district court found that "UNC's

admissions policies mandate that race is taken into consideration" in this process as a "'plus' facto[r]." *Id.,* at 594–595. It is a plus that is "sometimes" awarded to "underrepresented minority" or "URM" candidates—a group UNC defines to include "'those students identifying themselves as African American or [B]lack; American Indian or Alaska Native; or Hispanic, Latino, or Latina,'" but not Asian or white students. *Id.*, at 591–592, n. 7, 601.

At UNC, the admissions officers' decisions to admit or deny are "'provisionally final.'" *Ante*, at 4 (opinion for the Court). The decisions become truly final only after a committee approves or rejects them. 567 F. Supp. 3d, at 599. That committee may consider an applicant's race too. *Id.*, at 607. In the end, the district court found that "race plays a role"—perhaps even "a determinative role"—in the decision to admit or deny some "URM students." *Id.*, at 634; see also *id.,* at 662 ("race may tip the scale"). Nor is this an accident. As at Harvard, officials at UNC have made a "deliberate decision" to employ race-conscious admissions practices. *Id.,* at 588–589.

While the district courts' findings tell the full story, one can also get a glimpse from aggregate statistics. Consider the chart in the Court's opinion collecting Harvard's data for the period 2009 to 2018. *Ante,* at 31. The racial composition of each incoming class remained steady over that time—remarkably so. The proportion of African Americans hovered between 10% and 12%; the proportion of Hispanics between 8% and 12%; and the proportion of Asian Americans between 17% and 20%. *Ibid.* Might this merely reflect the demographics of the school's applicant pool? Cf. *post*, at 35 (opinion of SOTOMAYOR, J.). Perhaps—at least assuming the applicant pool looks much the same each year and the school rather mechanically admits applicants based on objective criteria. But the possibility that it instead betrays the school's persistent focus on numbers of this race and numbers of that race is entirely consistent with the findings

12   STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

GORSUCH, J., concurring

recounted above. See, *e.g.,* 397 F. Supp. 3d, at 146 ("if at
some point in the admissions process it appears that a
group is notably underrepresented or has suffered a dra-
matic drop off relative to the prior year, the [committee]
may decide to give additional attention to applications from
students within that group"); cf. *ante,* at 31–32, n. 7 (opin-
ion for the Court).

C

Throughout this litigation, the parties have spent less
time contesting these facts than debating other matters.

For example, the parties debate *how much* of a role race
plays in admissions at Harvard and UNC. Both schools in-
sist that they consider race as just one of many factors when
making admissions decisions in their self-described "holis-
tic" review of each applicant. SFFA responds with trial ev-
idence showing that, whatever label the universities use to
describe their processes, they intentionally consult race
and, by design, their race-based tips and plusses benefit ap-
plicants of certain groups to the detriment of others. See
Brief for Petitioner 20–35, 40–45.

The parties also debate the *reasons* both schools consult
race. SFFA observes that, in the 1920s, Harvard began
moving away from "test scores" and toward "plac[ing]
greater emphasis on character, fitness, and other subjective
criteria." *Id.,* at 12–13 (internal quotation marks omitted).
Harvard made this move, SFFA asserts, because President
A. Lawrence Lowell and other university leaders had be-
come "alarmed by the growing number of Jewish students
who were testing in," and they sought some way to cap the
number of Jewish students without "'stat[ing] frankly'"
that they were "'directly excluding all [Jews] beyond a cer-
tain percentage.'" *Id.,* at 12; see also 3 App. in No. 20–1199,
pp. 1131–1133. SFFA contends that Harvard's current "ho-
listic" approach to admissions works similarly to disguise

GORSUCH, J., concurring

the school's efforts to assemble classes with a particular racial composition—and, in particular, to limit the number of Asian Americans it admits. Brief for Petitioner 12–14, 25–32. For its part, Harvard expresses regret for its past practices while denying that they resemble its current ones. Tr. of Oral Arg. in No. 20–1199, at 51. And both schools insist that their student bodies would lack sufficient diversity without race-conscious admissions. Brief for Respondent in No. 20–1199, pp. 52–54; Brief for University Respondents in No. 21–707, pp. 54–59.

When it comes to defining and measuring diversity, the parties spar too. SFFA observes that the racial categories the universities employ in the name of diversity do not begin to reflect the differences that exist within each group. See Part I–B–1, *supra*. Instead, they lump together white and Asian students from privileged backgrounds with "Jewish, Irish, Polish, or other 'white' ethnic groups whose ancestors faced discrimination" and "descendants of those Japanese-American citizens interned during World War II." *Ante*, at 45, n. 10 (THOMAS, J., concurring). Even putting all that aside, SFFA stresses that neither Harvard nor UNC is willing to quantify how much racial and ethnic diversity they think sufficient. And, SFFA contends, the universities may not wish to do so because their stated goal implies a desire to admit some fixed number (or quota) of students from each racial group. See Brief for Petitioner 77, 80; Tr. of Oral Arg. in No. 21–707, p. 180. Besides, SFFA asks, if it is diversity the schools are after, why do they exhibit so little interest in other (non-racial) markers of it? See Brief for Petitioner 78, 83–86. While Harvard professes interest in socioeconomic diversity, for example, SFFA points to trial testimony that there are "23 times as many rich kids on campus as poor kids." 2 App. in No. 20–1199,

14    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

GORSUCH, J., concurring

p. 756.[3]

Even beyond all this, the parties debate the availability of alternatives. SFFA contends that both Harvard and UNC could obtain significant racial diversity without resorting to race-based admissions practices. Many other universities across the country, SFFA points out, have sought to do just that by reducing legacy preferences, increasing financial aid, and the like. Brief for Petitioner 85–86; see also Brief for Oklahoma et al. as *Amici Curiae* 9–19.[4] As part of its affirmative case, SFFA also submitted evidence that Harvard could nearly replicate the current racial composition of its student body without resorting to race-based practices if it: (1) provided socioeconomically

———————

[3] See also E. Bazelon, Why Is Affirmative Action in Peril? One Man's Decision, N. Y. Times Magazine, Feb. 15, 2023, p. 41 ("In the Ivy League, children whose parents are in the top 1 percent of the income distribution are 77 times as likely to attend as those whose parents are in the bottom 20 percent of the income bracket."); *ibid.* ("[A] common critique . . . is that schools have made a bargain with economic elites of all races, with the exception of Asian Americans, who are underrepresented compared with their level of academic achievement.").

[4] The principal dissent chides me for "reach[ing] beyond the factfinding below" by acknowledging SFFA's argument that other universities have employed various race-neutral tools. *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.). Contrary to the dissent's suggestion, however, I do not purport to find facts about those practices; all I do here is recount what SFFA has argued every step of the way. See, *e.g.,* Brief for Petitioner 55, 66–67; 1 App. in No. 20–1199, pp. 415–416, 440; 2 App. in No. 21–707, pp. 551–552. Nor, of course, is it somehow remarkable to acknowledge the parties' arguments. The principal dissent itself recites SFFA's arguments about Harvard's and other universities' practices too. See, *e.g., post,* at 30–31, 50 (opinion of SOTOMAYOR, J.). In truth, it is the dissent that reaches beyond the factfinding below when it argues from studies recited in a dissenting opinion in a different case decided almost a decade ago. *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.); see also *post,* at 18–21 (opinion of SOTOMAYOR, J.) (further venturing beyond the trial records to discuss data about employment, income, wealth, home ownership, and healthcare).

disadvantaged applicants just *half* of the tip it gives recruited athletes; and (2) eliminated tips for the children of donors, alumni, and faculty. Brief for Petitioner 33–34, 81; see 2 App. in No. 20–1199, at 763–765, 774–775. Doing these two things would barely affect the academic credentials of each incoming class. Brief for Petitioner 33–34. And it would not require Harvard to end tips for recruited athletes, who as a group are much weaker academically than non-athletes.[5]

At trial, however, Harvard resisted this proposal. Its preferences for the children of donors, alumni, and faculty are no help to applicants who cannot boast of their parents' good fortune or trips to the alumni tent all their lives. While race-neutral on their face, too, these preferences undoubtedly benefit white and wealthy applicants the most. See 980 F. 3d, at 171. Still, Harvard stands by them. See Brief for Respondent in No. 20–1199, at 52–54; Tr. of Oral Arg. in No. 21–1199, at 48–49. As a result, athletes and the children of donors, alumni, and faculty—groups that together "make up less than 5% of applicants to Harvard"— constitute "around 30% of the applicants admitted each year." 980 F. 3d, at 171.

To be sure, the parties' debates raise some hard-to-answer questions. Just how many admissions decisions turn on race? And what really motivates the universities' race-conscious admissions policies and their refusal to modify other preferential practices? Fortunately, Title VI does not require an answer to any of these questions. It does not ask

——————

[5] See Brief for Defense of Freedom Institute for Policy Studies as *Amicus Curiae* 11 (recruited athletes make up less than 1% of Harvard's applicant pool but represent more than 10% of the admitted class); P. Arcidiacono, J. Kinsler, & T. Ransom, Legacy and Athlete Preferences at Harvard, 40 J. Lab. Econ. 133, 141, n. 17 (2021) (recruited athletes were the only applicants admitted with the lowest possible academic rating and 79% of recruited athletes with the next lowest rating were admitted compared to 0.02% of other applicants with the same rating).

how much a recipient of federal funds discriminates. It does not scrutinize a recipient's reasons or motives for discriminating. Instead, the law prohibits covered institutions from intentionally treating *any* individual worse even *in part* because of race. So yes, of course, the universities consider many non-racial factors in their admissions processes too. And perhaps they mean well when they favor certain candidates over others based on the color of their skin. But even if all that is true, their conduct violates Title VI just the same. See Part I–A, *supra*; see also *Bostock*, 590 U. S., at ___, ___–___ (slip op., at 6, 12–15).

## D

The principal dissent contends that this understanding of Title VI is contrary to precedent. *Post*, at 26–27, n. 21 (opinion of SOTOMAYOR, J.). But the dissent does not dispute that everything said here about the meaning of Title VI tracks this Court's precedent in *Bostock* interpreting materially identical language in Title VII. That raises two questions: Do the dissenters think *Bostock* wrongly decided? Or do they read the same words in neighboring provisions of the same statute—enacted at the same time by the same Congress—to mean different things? Apparently, the federal government takes the latter view. The Solicitor General insists that there is "ambiguity in the term 'discrimination'" in Title VI but no ambiguity in the term "discriminate" in Title VII. Tr. of Oral Arg. in No. 21–707, at 164. Respectfully, I do not see it. The words of the Civil Rights Act of 1964 are not like mood rings; they do not change their message from one moment to the next.

Rather than engage with the statutory text or our precedent in *Bostock*, the principal dissent seeks to sow confusion about the facts. It insists that all applicants to Harvard and UNC are "eligible" to receive a race-based tip. *Post*, at 32, n. 27 (opinion of SOTOMAYOR, J.); cf. *post*, at 17 (JACKSON, J., dissenting). But the question in these cases

is not who could *hypothetically* receive a race-based tip. It is who *actually* receives one. And on that score the lower courts left no doubt. The district court in the Harvard case found that the school's admissions policy "cannot . . . be considered facially neutral from a Title VI perspective given that admissions officers provide [race-based] tips to African American and Hispanic applicants, while white and Asian American applicants are unlikely to receive a meaningful race-based tip." 397 F. Supp. 3d, at 190, n. 56; see also *id.,* at 189–190 ("Harvard's admissions process is not facially neutral."). Likewise, the district court in the UNC case found that admissions officers "sometimes" award race-based plusses to URM candidates—a category that excludes Asian American and white students. 567 F. Supp. 3d, at 591–592, n. 7, 601.[6]

Nor could anyone doubt that these cases are about intentional discrimination just because Harvard in particular "'does not *explicitly* prioritize any particular racial group over any other.'" *Post,* at 32, n. 27 (opinion of SOTOMAYOR, J.) (emphasis added). Forget for a moment the universities' concessions about how they deliberately consult race when deciding whom to admit. See *supra,* at 12–13.[7] Look past

_____

[6]The principal dissent suggests "some Asian American applicants are actually advantaged by Harvard's use of race." *Post,* at 60 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted). What is the dissent's basis for that claim? The district court's finding that "considering applicants' race *may* improve the admission chances of *some* Asian Americans *who connect their racial identities with particularly compelling narratives.*" 397 F. Supp. 3d, at 178 (emphasis added). The dissent neglects to mention those key qualifications. Worse, it ignores completely the district court's further finding that "*overall*" Harvard's race-conscious admissions policy "results in fewer Asian American[s] . . . being admitted." *Ibid.* (emphasis added). So much for affording the district court's "careful factfinding" the "deference it [is] owe[d]." *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.).

[7]See also, *e.g.,* Tr. of Oral Arg. in No. 20–1199, at 67, 84, 91; Tr. of Oral Arg. in No. 21–707, at 70–71, 81, 84, 91–92, 110.

the lower courts' findings recounted above about how the
universities intentionally give tips to students of some races
and not others. See *supra,* at 8–12, 16–17. Put to the side
telling evidence that came out in discovery.[8]  Ignore, too,
our many precedents holding that it does not matter how a
defendant "label[s]" its practices, *Bostock*, 590 U. S., at ___
(slip op., at 14); that intentional discrimination between in-
dividuals is unlawful whether "motivated by a wish to
achieve classwide equality" or any other purpose, *id.*, at ___
(slip op., at 13); and that "the absence of a malevolent mo-
tive does not convert a facially discriminatory policy into a
neutral policy with a [merely] discriminatory effect," *John-
son Controls*, 499 U. S., at 199. Consider just the dissents
in these cases. From start to finish and over the course of
nearly 100 pages, they defend the universities' purposeful
discrimination between applicants based on race. "[N]eu-
trality," they insist, is not enough. *Post,* at 12, 68 (opinion
of SOTOMAYOR, J.); cf. *post*, at 21 (opinion of JACKSON, J.).
"[T]he use of race," they stress, "is critical." *Post,* at 59–60
(opinion of SOTOMAYOR, J.); see *id.,* at 2, 33, 39, 43–45; cf.
*post,* at 2, 26 (opinion of JACKSON, J.). Plainly, Harvard and
UNC choose to treat some students worse than others in
part because of race. To suggest otherwise—or to cling to
the fact that the schools do not always say the quiet part
aloud—is to deny reality.[9]

---

[8]Messages among UNC admissions officers included statements such
as these: "[P]erfect 2400 SAT All 5 on AP one B in 11th [grade]."
"Brown?!" "Heck no. Asian." "Of course.  Still impressive."; "If it[']s
brown and above a 1300 [SAT] put them in for [the] merit/Excel [schol-
arship].";  "I just opened a brown girl who's an 810 [SAT]."; "I'm going
through this trouble because this is a bi-racial (black/white) male.";
"[S]tellar academics for a Native Amer[ican]/African Amer[ican] kid."  3
App. in No. 21–707, pp. 1242–1251.

[9]Left with no reply on the statute or its application to the facts, the
principal dissent suggests that it violates "principles of party presenta-
tion" and abandons "judicial restraint" even to look at the text of Title VI.

GORSUCH, J., concurring

## II

So far, we have seen that Title VI prohibits a recipient of federal funds from discriminating against individuals even in part because of race. We have seen, too, that Harvard and UNC do just what the law forbids. One might wonder, then, why the parties have devoted years and fortunes litigating other matters, like how much the universities discriminate and why they do so. The answer lies in *Bakke*.

### A

*Bakke* concerned admissions to the medical school at the University of California, Davis. That school set aside a certain number of spots in each class for minority applicants. See 438 U. S., at 272–276 (opinion of Powell, J.). Allan Bakke argued that the school's policy violated Title VI and the Equal Protection Clause of the Fourteenth Amendment. *Id.,* at 270. The Court agreed with Mr. Bakke. In a fractured decision that yielded six opinions, a majority of the Court held that the school's set-aside system went too far. At the same time, however, a different coalition of five Justices ventured beyond the facts of the case to suggest that, in other circumstances not at issue, universities may sometimes permissibly use race in their admissions processes. See *ante,* at 16–19 (opinion for the Court).

As important as these conclusions were some of the interpretive moves made along the way. Justice Powell (writing only for himself) and Justice Brennan (writing for himself

_____

*Post,* at 26–27, n. 21 (opinion of SOTOMAYOR, J.). It is a bewildering suggestion. SFFA sued Harvard and UNC under Title VI. And when a party seeks relief under a statute, our task is to apply the law's terms as a reasonable reader would have understood them when Congress enacted them. *Bostock* v. *Clayton County,* 590 U. S. ___, ___ (2020) (slip op., at 4). To be sure, parties are free to frame their arguments. But they are not free to stipulate to a statute's meaning and no party may "waiv[e]" the proper interpretation of the law by "fail[ing] to invoke it." *EEOC* v. *FLRA,* 476 U. S. 19, 23 (1986) (*per curiam*) (internal quotation marks omitted); see also *Young* v. *United States,* 315 U. S. 257, 258–259 (1942).

and three others) argued that Title VI is coterminous with
the Equal Protection Clause. Put differently, they read Ti-
tle VI to prohibit recipients of federal funds from doing
whatever the Equal Protection Clause prohibits States from
doing. Justice Powell and Justice Brennan then proceeded
to evaluate racial preferences in higher education directly
under the Equal Protection Clause. From there, however,
their paths diverged. Justice Powell thought some racial
preferences might be permissible but that the admissions
program at issue violated the promise of equal protection.
438 U. S., at 315–320. Justice Brennan would have given a
wider berth to racial preferences and allowed the chal-
lenged program to proceed. *Id.*, at 355–379.

Justice Stevens (also writing for himself and three oth-
ers) took an altogether different approach. He began by
noting the Court's "settled practice" of "avoid[ing] the deci-
sion of a constitutional issue if a case can be fairly decided
on a statutory ground." *Id.,* at 411. He then turned to the
"broad prohibition" of Title VI, *id.,* at 413, and summarized
his views this way: "The University . . . excluded Bakke
from participation in its program of medical education be-
cause of his race. The University also acknowledges that it
was, and still is, receiving federal financial assistance. The
plain language of the statute therefore requires" finding a
Title VI violation. *Id.,* at 412 (footnote omitted).

In the years following *Bakke*, this Court hewed to Justice
Powell's and Justice Brennan's shared premise that Title
VI and the Equal Protection Clause mean the same thing.
See *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23 (2003);
*Grutter* v. *Bollinger*, 539 U. S. 306, 343 (2003). Justice Ste-
vens's statute-focused approach receded from view. As a
result, for over four decades, every case about racial prefer-
ences in school admissions under Title VI has turned into a
case about the meaning of the Fourteenth Amendment.

And what a confused body of constitutional law followed.
For years, this Court has said that the Equal Protection

GORSUCH, J., concurring

Clause requires any consideration of race to satisfy "strict scrutiny," meaning it must be "narrowly tailored to further compelling governmental interests." *Grutter*, 539 U. S., at 326 (internal quotation marks omitted). Outside the context of higher education, "our precedents have identified only two" interests that meet this demanding standard: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and "avoiding imminent and serious risks to human safety in prisons." *Ante,* at 15 (opinion for the Court).

Within higher education, however, an entirely distinct set of rules emerged. Following *Bakke*, this Court declared that judges may simply "defer" to a school's assertion that "diversity is essential" to its "educational mission." *Grutter*, 539 U. S., at 328. Not all schools, though—elementary and secondary schools apparently do not qualify for this deference. See *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 724–725 (2007). Only colleges and universities, the Court explained, "occupy a special niche in our constitutional tradition." *Grutter*, 539 U. S., at 329. Yet even they (wielding their "special niche" authority) cannot simply assert an interest in diversity and discriminate as they please. *Fisher*, 579 U. S., at 381. Instead, they may consider race only as a "plus" factor for the purpose of "attaining a critical mass of underrepresented minority students" or "a diverse student body." *Grutter*, 539 U. S., at 335–336 (internal quotation marks omitted). At the same time, the Court cautioned, this practice "must have a logical end point." *Id.,* at 342. And in the meantime, "outright racial balancing" and "quota system[s]" remain "patently unconstitutional." *Id.*, at 330, 334. Nor may a college or university ever provide "mechanical, predetermined diversity bonuses." *Id.*, at 337 (internal quotation marks omitted). Only a "tip" or "plus" is constitutionally tolerable, and only for a limited time. *Id.*, at 338–339, 341.

If you cannot follow all these twists and turns, you are

not alone.  See, *e.g., Fisher*, 579 U. S., at 401–437 (ALITO, J., dissenting); *Grutter*, 539 U. S., at 346–349 (Scalia, J., joined by THOMAS, J., concurring in part and dissenting in part); 1 App. in No. 21–707, pp. 401–402 (testimony from UNC administrator: "[M]y understanding of the term 'critical mass' is that it's a . . . I'm trying to decide if it's an analogy or a metaphor[.]  I think it's an analogy. . . .  I'm not even sure we would know what it is."); 3 App. in No. 20–1199, at 1137–1138 (similar testimony from a Harvard administrator).  If the Court's post-*Bakke* higher-education precedents ever made sense, they are by now incoherent.

Recognizing as much, the Court today cuts through the kudzu.  It ends university exceptionalism and returns this Court to the traditional rule that the Equal Protection Clause forbids the use of race in distinguishing between persons unless strict scrutiny's demanding standards can be met.  In that way, today's decision wakes the echoes of Justice John Marshall Harlan:  "The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved."  *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (dissenting opinion).

### B

If *Bakke* led to errors in interpreting the Equal Protection Clause, its first mistake was to take us there.  These cases arise under Title VI and that statute is "more than a simple paraphrasing" of the Equal Protection Clause.  438 U. S., at 416 (opinion of Stevens, J.).  Title VI has "independent force, with language and emphasis in addition to that found in the Constitution."  *Ibid.*  That law deserves our respect and its terms provide us with all the direction we need.

Put the two provisions side by side.  Title VI says:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial
assistance." §2000d. The Equal Protection Clause reads:
"No State shall . . . deny to any person within its jurisdic-
tion the equal protection of the laws." Amdt. 14, §1. That
such differently worded provisions should mean the same
thing is implausible on its face.

Consider just some of the obvious differences. The Equal
Protection Clause operates on States. It does not purport
to regulate the conduct of private parties. By contrast, Title
VI applies to recipients of federal funds—covering not just
many state actors, but many private actors too. In this way,
Title VI reaches entities and organizations that the Equal
Protection Clause does not.

In other respects, however, the relative scope of the two
provisions is inverted. The Equal Protection Clause ad-
dresses all manner of distinctions between persons and this
Court has held that it implies different degrees of judicial
scrutiny for different kinds of classifications. So, for exam-
ple, courts apply strict scrutiny for classifications based on
race, color, and national origin; intermediate scrutiny for
classifications based on sex; and rational-basis review for
classifications based on more prosaic grounds. See, *e.g.*,
*Fisher*, 579 U. S., at 376; *Richmond* v. *J. A. Croson Co.*, 488
U. S. 469, 493–495 (1989) (plurality opinion); *United States*
v. *Virginia*, 518 U. S. 515, 555–556 (1996); *Board of Trus-
tees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 366–367
(2001). By contrast, Title VI targets only certain classifica-
tions—those based on race, color, or national origin. And
that law does not direct courts to subject these classifica-
tions to one degree of scrutiny or another. Instead, as we
have seen, its rule is as uncomplicated as it is momentous.
Under Title VI, it is *always* unlawful to discriminate among
persons even in part because of race, color, or national
origin.

In truth, neither Justice Powell's nor Justice Brennan's
opinion in *Bakke* focused on the text of Title VI. Instead,

both leapt almost immediately to its "voluminous legislative history," from which they proceeded to divine an implicit "congressional intent" to link the statute with the Equal Protection Clause. 438 U. S., at 284–285 (opinion of Powell, J.); *id.,* at 328–336 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ.). Along the way, as Justice Stevens documented, both opinions did more than a little cherry-picking from the legislative record. See *id.*, at 413–417. Justice Brennan went so far as to declare that "any claim that the use of racial criteria is barred by the plain language of the statute must fail in light of the remedial purpose of Title VI and its legislative history." *Id.,* at 340. And once liberated from the statute's firm rule against discrimination based on race, both opinions proceeded to devise their own and very different arrangements in the name of the Equal Protection Clause.

The moves made in *Bakke* were not statutory interpretation. They were judicial improvisation. Under our Constitution, judges have never been entitled to disregard the plain terms of a valid congressional enactment based on surmise about unenacted legislative intentions. Instead, it has always been this Court's duty "to give effect, if possible, to every clause and word of a statute," *Montclair* v. *Ramsdell*, 107 U. S. 147, 152 (1883), and of the Constitution itself, see *Knowlton* v. *Moore*, 178 U. S. 41, 87 (1900). In this country, "[o]nly the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U. S., at ___ (slip op., at 2). When judges disregard these principles and enforce rules "inspired only by extratextual sources and [their] own imaginations," they usurp a lawmaking function "reserved for the people's representatives." *Id.*, at ___ (slip op., at 4).

Today, the Court corrects course in its reading of the Equal Protection Clause. With that, courts should now also correct course in their treatment of Title VI. For years, they

GORSUCH, J., concurring

have read a solo opinion in *Bakke* like a statute while reading Title VI as a mere suggestion. A proper respect for the law demands the opposite. Title VI bears independent force beyond the Equal Protection Clause. Nothing in it grants special deference to university administrators. Nothing in it endorses racial discrimination to any degree or for any purpose. Title VI is more consequential than that.

\*

In the aftermath of the Civil War, Congress took vital steps toward realizing the promise of equality under the law. As important as those initial efforts were, much work remained to be done—and much remains today. But by any measure, the Civil Rights Act of 1964 stands as a landmark on this journey and one of the Nation's great triumphs. We have no right to make a blank sheet of any of its provisions. And when we look to the clear and powerful command Congress set forth in that law, these cases all but resolve themselves. Under Title VI, it is never permissible "'to say "yes" to one person . . . but to say "no" to another person'" even in part "'because of the color of his skin.'" *Bakke*, 438 U. S., at 418 (opinion of Stevens, J.).

# SUPREME COURT OF THE UNITED STATES

————

Nos. 20–1199 and 21–707

————

### STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

20–1199    *v.*

### PRESIDENT AND FELLOWS OF HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT


### STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

21–707    *v.*

### UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. I add this concurring opinion to further explain why the Court's decision today is consistent with and follows from the Court's equal protection precedents, including the Court's precedents on race-based affirmative action in higher education.

Ratified in 1868 in the wake of the Civil War, the Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, §1. In accord with the Fourteenth Amendment's text and history, this Court considers all racial classifications to be constitutionally suspect. See *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003); *Strauder* v. *West Virginia*, 100 U. S. 303,

306–308 (1880). As a result, the Court has long held that racial classifications by the government, including race-based affirmative action programs, are subject to strict judicial scrutiny.

Under strict scrutiny, racial classifications are constitutionally prohibited unless they are narrowly tailored to further a compelling governmental interest. *Grutter*, 539 U. S., at 326–327. Narrow tailoring requires courts to examine, among other things, whether a racial classification is "necessary"—in other words, whether race-neutral alternatives could adequately achieve the governmental interest. *Id.,* at 327, 339–340; *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 507 (1989).

Importantly, even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest, a "deviation from the norm of equal treatment of all racial and ethnic groups" must be "a temporary matter"—or stated otherwise, must be "limited in time." *Id.,* at 510 (plurality opinion of O'Connor, J.); *Grutter*, 539 U. S., at 342.

In 1978, five Members of this Court held that race-based affirmative action in higher education did not violate the Equal Protection Clause or Title VI of the Civil Rights Act, so long as universities used race only as a factor in admissions decisions and did not employ quotas. See *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 325–326 (1978) (joint opinion of Brennan, White, Marshall, and Blackmun, JJ.); *id.,* at 287, 315–320 (opinion of Powell, J.). One Member of the Court's five-Justice majority, Justice Blackmun, added that race-based affirmative action should exist only as a temporary measure. He expressed hope that such programs would be "unnecessary" and a "relic of the past" by 1988—within 10 years "at the most," in his words—although he doubted that the goal could be achieved by then. *Id.,* at 403 (opinion of Blackmun, J.).

In 2003, 25 years after *Bakke*, five Members of this Court

KAVANAUGH, J., concurring

again held that race-based affirmative action in higher education did not violate the Equal Protection Clause or Title VI. *Grutter*, 539 U. S., at 343.  This time, however, the Court also specifically indicated—despite the reservations of Justice Ginsburg and Justice Breyer—that race-based affirmative action in higher education would *not* be constitutionally justified after another 25 years, at least absent something not "expect[ed]."  *Ibid.*  And various Members of the Court wrote separate opinions explicitly referencing the Court's 25-year limit.

- Justice O'Connor's opinion for the Court stated:  "We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today."  *Ibid.*

- JUSTICE THOMAS expressly concurred in "the Court's holding that racial discrimination in higher education admissions will be illegal in 25 years."  *Id.,* at 351 (opinion concurring in part and dissenting in part).

- JUSTICE THOMAS, joined here by Justice Scalia, reiterated "the Court's holding" that race-based affirmative action in higher education "will be unconstitutional in 25 years" and "that in 25 years the practices of the Law School will be illegal," while also stating that "they are, for the reasons I have given, illegal now."  *Id.,* at 375–376.

- Justice Kennedy referred to "the Court's pronouncement that race-conscious admissions programs will be unnecessary 25 years from now."  *Id.,* at 394 (dissenting opinion).

- Justice Ginsburg, joined by Justice Breyer, acknowledged the Court's 25-year limit but questioned it, writing that "one may hope, but not firmly forecast, that over the next generation's span, progress toward nondiscrimination and genuinely

KAVANAUGH, J., concurring

equal opportunity will make it safe to sunset affirmative action." *Id.,* at 346 (concurring opinion).

In allowing race-based affirmative action in higher education for another generation—and only for another generation—the Court in *Grutter* took into account competing considerations. The Court recognized the barriers that some minority applicants to universities still faced as of 2003, notwithstanding the progress made since *Bakke.* See *Grutter*, 539 U. S., at 343. The Court stressed, however, that "there are serious problems of justice connected with the idea of preference itself." *Id.,* at 341 (internal quotation marks omitted). And the Court added that a "core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race." *Ibid.* (internal quotation marks omitted).

The *Grutter* Court also emphasized the equal protection principle that racial classifications, even when otherwise permissible, must be a "'temporary matter,'" and "must be limited in time." *Id.,* at 342 (quoting *Croson*, 488 U. S., at 510 (plurality opinion of O'Connor, J.)). The requirement of a time limit "reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle." *Grutter*, 539 U. S., at 342.

Importantly, the *Grutter* Court saw "no reason to exempt race-conscious admissions programs from the requirement that all governmental use of race must have a logical end point." *Ibid.* The Court reasoned that the "requirement that all race-conscious admissions programs have a termination point assures all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." *Ibid.* (internal

KAVANAUGH, J., concurring

quotation marks and alteration omitted). The Court therefore concluded that race-based affirmative action programs in higher education, like other racial classifications, must be "limited in time." *Ibid.*

The *Grutter* Court's conclusion that race-based affirmative action in higher education must be limited in time followed not only from fundamental equal protection principles, but also from this Court's equal protection precedents applying those principles. Under those precedents, racial classifications may not continue indefinitely. For example, in the elementary and secondary school context after *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the Court authorized race-based student assignments for several decades—but not indefinitely into the future. See, *e.g., Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 247–248 (1991); *Pasadena City Bd. of Ed.* v. *Spangler*, 427 U. S. 424, 433–434, 436 (1976); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 31–32 (1971); cf. *McDaniel* v. *Barresi*, 402 U. S. 39, 41 (1971).

In those decisions, this Court ruled that the race-based "injunctions entered in school desegregation cases" could not "operate in perpetuity." *Dowell*, 498 U. S., at 248. Consistent with those decisions, the *Grutter* Court ruled that race-based affirmative action in higher education likewise could not operate in perpetuity.

As of 2003, when *Grutter* was decided, many race-based affirmative action programs in higher education had been operating for about 25 to 35 years. Pointing to the Court's precedents requiring that racial classifications be "temporary," *Croson*, 488 U. S., at 510 (plurality opinion of O'Connor, J.), the petitioner in *Grutter*, joined by the United States, argued that race-based affirmative action in higher education could continue no longer. See Brief for Petitioner 21–22, 30–31, 33, 42, Brief for United States 26–27, in *Grutter* v. *Bollinger*, O. T. 2002, No. 02–241.

The *Grutter* Court rejected those arguments for ending race-based affirmative action in higher education in 2003. But in doing so, the Court struck a careful balance. The Court ruled that narrowly tailored race-based affirmative action in higher education could continue for another generation. But the Court also explicitly rejected any "permanent justification for racial preferences," and therefore ruled that race-based affirmative action in higher education could continue *only* for another generation. 539 U. S., at 342–343.

Harvard and North Carolina would prefer that the Court now ignore or discard *Grutter*'s 25-year limit on race-based affirmative action in higher education, or treat it as a mere aspiration. But the 25-year limit constituted an important part of Justice O'Connor's nuanced opinion for the Court in *Grutter*. Indeed, four of the separate opinions in *Grutter* discussed the majority opinion's 25-year limit, which belies any suggestion that the Court's reference to it was insignificant or not carefully considered.

In short, the Court in *Grutter* expressly recognized the serious issues raised by racial classifications—particularly permanent or long-term racial classifications. And the Court "assure[d] all citizens" throughout America that "the deviation from the norm of equal treatment" in higher education could continue for another generation, and only for another generation. *Ibid.* (internal quotation marks omitted).

A generation has now passed since *Grutter*, and about 50 years have gone by since the era of *Bakke* and *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974), when race-based affirmative action programs in higher education largely began. In light of the Constitution's text, history, and precedent, the Court's decision today appropriately respects and abides by *Grutter*'s explicit temporal limit on the use of race-based affirmative action in higher

KAVANAUGH, J., concurring

education.[1]

JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON disagree with the Court's decision. I respect their views. They thoroughly recount the horrific history of slavery and Jim Crow in America, cf. *Bakke*, 438 U. S., at 395–402 (opinion of Marshall, J.), as well as the continuing effects of that history on African Americans today. And they are of course correct that for the last five decades, *Bakke* and *Grutter* have allowed narrowly tailored race-based affirmative action in higher education.

But I respectfully part ways with my dissenting colleagues on the question of whether, under this Court's precedents, race-based affirmative action in higher education may extend indefinitely into the future. The dissents suggest that the answer is yes. But this Court's precedents make clear that the answer is no. See *Grutter*, 539 U. S., at 342–343; *Dowell*, 498 U. S., at 247–248; *Croson*, 488 U. S., at 510 (plurality opinion of O'Connor, J.).

To reiterate: For about 50 years, many institutions of higher education have employed race-based affirmative action programs. In the abstract, it might have been debatable how long those race-based admissions programs could continue under the "temporary matter"/"limited in time" equal protection principle recognized and applied by this Court. *Grutter*, 539 U. S., at 342 (internal quotation marks omitted); cf. *Dowell*, 498 U. S., at 247–248. But in 2003, the *Grutter* Court applied that temporal equal

---

[1] The Court's decision will first apply to the admissions process for the college class of 2028, which is the next class to be admitted. Some might have debated how to calculate *Grutter*'s 25-year period—whether it ends with admissions for the college class of 2028 or instead for the college class of 2032. But neither Harvard nor North Carolina argued that *Grutter*'s 25-year period ends with the class of 2032 rather than the class of 2028. Indeed, notwithstanding the 25-year limit set forth in *Grutter*, neither university embraced *any* temporal limit on race-based affirmative action in higher education, or identified any end date for its continued use of race in admissions. *Ante,* at 30–34.

protection principle and resolved the debate: The Court declared that race-based affirmative action in higher education could continue for another generation, and only for another generation, at least absent something unexpected. *Grutter*, 539 U. S., at 343. As I have explained, the Court's pronouncement of a 25-year period—as both an extension of *and* an outer limit to race-based affirmative action in higher education—formed an important part of the carefully constructed *Grutter* decision. I would abide by that temporal limit rather than discarding it, as today's dissents would do.

To be clear, although progress has been made since *Bakke* and *Grutter*, racial discrimination still occurs and the effects of past racial discrimination still persist. Federal and state civil rights laws serve to deter and provide remedies for current acts of racial discrimination. And governments and universities still "can, of course, act to undo the effects of past discrimination in many permissible ways that do not involve classification by race." *Croson*, 488 U. S., at 526 (Scalia, J., concurring in judgment) (internal quotation marks omitted); see *id.,* at 509 (plurality opinion of O'Connor, J.) ("the city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races"); *ante,* at 39–40; Brief for Petitioner 80–86; Reply Brief in No. 20–1199, pp. 25–26; Reply Brief in No. 21–707, pp. 23–26.

In sum, the Court's opinion today is consistent with and follows from the Court's equal protection precedents, and I join the Court's opinion in full.

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 20–1199 and 21–707

_____

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

20–1199            *v.*

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT


STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

21–707            *v.*

UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and
JUSTICE JACKSON join,\* dissenting.

The Equal Protection Clause of the Fourteenth Amend-
ment enshrines a guarantee of racial equality. The Court
long ago concluded that this guarantee can be enforced
through race-conscious means in a society that is not, and
has never been, colorblind. In *Brown* v. *Board of Education*,
347 U. S. 483 (1954), the Court recognized the constitu-
tional necessity of racially integrated schools in light of the

_____

\*JUSTICE JACKSON did not participate in the consideration or decision
of the case in No. 20–1199 and joins this opinion only as it applies to the
case in No. 21–707.

harm inflicted by segregation and the "importance of education to our democratic society." *Id.*, at 492–495. For 45 years, the Court extended *Brown*'s transformative legacy to the context of higher education, allowing colleges and universities to consider race in a limited way and for the limited purpose of promoting the important benefits of racial diversity. This limited use of race has helped equalize educational opportunities for all students of every race and background and has improved racial diversity on college campuses. Although progress has been slow and imperfect, race-conscious college admissions policies have advanced the Constitution's guarantee of equality and have promoted *Brown*'s vision of a Nation with more inclusive schools.

Today, this Court stands in the way and rolls back decades of precedent and momentous progress. It holds that race can no longer be used in a limited way in college admissions to achieve such critical benefits. In so holding, the Court cements a superficial rule of colorblindness as a constitutional principle in an endemically segregated society where race has always mattered and continues to matter. The Court subverts the constitutional guarantee of equal protection by further entrenching racial inequality in education, the very foundation of our democratic government and pluralistic society. Because the Court's opinion is not grounded in law or fact and contravenes the vision of equality embodied in the Fourteenth Amendment, I dissent.

## I

## A

Equal educational opportunity is a prerequisite to achieving racial equality in our Nation. From its founding, the United States was a new experiment in a republican form of government where democratic participation and the capacity to engage in self-rule were vital. At the same time, American society was structured around the profitable institution that was slavery, which the original Constitution

protected. The Constitution initially limited the power of Congress to restrict the slave trade, Art. I, §9, cl. 1, accorded Southern States additional electoral power by counting three-fifths of their enslaved population in apportioning congressional seats, §2, cl. 3, and gave enslavers the right to retrieve enslaved people who escaped to free States, Art. IV, §2, cl. 3. Because a foundational pillar of slavery was the racist notion that Black people are a subordinate class with intellectual inferiority, Southern States sought to ensure slavery's longevity by prohibiting the education of Black people, whether enslaved or free. See H. Williams, Self-Taught: African American Education in Slavery and Freedom 7, 203–213 (2005) (Self-Taught). Thus, from this Nation's birth, the freedom to learn was neither colorblind nor equal.

With time, and at the tremendous cost of the Civil War, abolition came. More than two centuries after the first African enslaved persons were forcibly brought to our shores, Congress adopted the Thirteenth Amendment to the Constitution, which abolished "slavery" and "involuntary servitude, except as a punishment for crime." §1. "Like all great historical transformations," emancipation was a movement, "not a single event" owed to any single individual, institution, or political party. E. Foner, The Second Founding 21, 51–54 (2019) (The Second Founding).

The fight for equal educational opportunity, however, was a key driver. Literacy was an "instrument of resistance and liberation." Self-Taught 8. Education "provided the means to write a pass to freedom" and "to learn of abolitionist activities." *Id.*, at 7. It allowed enslaved Black people "to disturb the power relations between master and slave," which "fused their desire for literacy with their desire for freedom." *Ibid.* Put simply, "[t]he very feeling of inferiority which slavery forced upon [Black people] fathered an intense desire to rise out of their condition by means of education." W. E. B. Du Bois, Black Reconstruction in America

1860–1880, p. 638 (1935); see J. Anderson, The Education of Blacks in the South 1860–1935, p. 7 (1988). Black Americans thus insisted, in the words of Frederick Douglass, "that in a country governed by the people, like ours, education of the youth of all classes is vital to its welfare, prosperity, and to its existence." Address to the People of the United States (1883), in 4 P. Foner, The Life and Writings of Frederick Douglass 386 (1955). Black people's yearning for freedom of thought, and for a more perfect Union with educational opportunity for all, played a crucial role during the Reconstruction era.

Yet emancipation marked the beginning, not the end, of that era. Abolition alone could not repair centuries of racial subjugation. Following the Thirteenth Amendment's ratification, the Southern States replaced slavery with "a system of 'laws which imposed upon [Black people] onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value.'" *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 390 (1978) (opinion of Marshall, J.) (quoting *Slaughter-House Cases*, 16 Wall. 36, 70 (1873)). Those so-called "Black Codes" discriminated against Black people on the basis of race, regardless of whether they had been previously enslaved. See, *e.g.*, 1866 N. C. Sess. Laws pp. 99, 102.

Moreover, the criminal punishment exception in the Thirteenth Amendment facilitated the creation of a new system of forced labor in the South. Southern States expanded their criminal laws, which in turn "permitted involuntary servitude as a punishment" for convicted Black persons. D. Blackmon, Slavery by Another Name: The Re-Enslavement of Black Americans From the Civil War to World War II, pp. 7, 53 (2009) (Slavery by Another Name). States required, for example, that Black people "sign a labor contract to work for a white employer or face prosecution for vagrancy." The Second Founding 48. State laws

SOTOMAYOR, J., dissenting

then forced Black convicted persons to labor in "plantations, mines, and industries in the South." *Id.*, at 50. This system of free forced labor provided tremendous benefits to Southern whites and was designed to intimidate, subjugate, and control newly emancipated Black people. See Slavery by Another Name 5–6, 53. The Thirteenth Amendment, without more, failed to equalize society.

Congress thus went further and embarked on months of deliberation about additional Reconstruction laws. Those efforts included the appointment of a Committee, the Joint Committee on Reconstruction, "to inquire into the condition of the Confederate States." Report of the Joint Committee on Reconstruction, S. Rep. No. 112, 39th Cong., 1st Sess., 1 (1866) (hereinafter Joint Comm. Rep.). Among other things, the Committee's Report to Congress documented the "deep-seated prejudice" against emancipated Black people in the Southern States and the lack of a "general disposition to place the colored race, constituting at least two-fifths of the population, upon terms even of civil equality." *Id.*, at 11. In light of its findings, the Committee proposed amending the Constitution to secure the equality of "rights, civil and political." *Id.*, at 7.

Congress acted on that recommendation and adopted the Fourteenth Amendment. Proponents of the Amendment declared that one of its key goals was to "protec[t] the black man in his fundamental rights as a citizen with the same shield which it throws over the white man." Cong. Globe, 39th Cong., 1st Sess., 2766 (1866) (Cong. Globe) (statement of Sen. Howard). That is, the Amendment sought "to secure to a race recently emancipated, a race that through many generations [was] held in slavery, all the civil rights that the superior race enjoy." *Plessy* v. *Ferguson*, 163 U. S. 537, 555–556 (1896) (Harlan, J., dissenting) (internal quotation marks omitted).

To promote this goal, Congress enshrined a broad guarantee of equality in the Equal Protection Clause of the

Amendment.  That Clause commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  Amdt. 14, §1.  Congress chose its words carefully, opting for expansive language that focused on equal protection and rejecting "proposals that would have made the Constitution explicitly color-blind."  A. Kull, The Color-Blind Constitution 69 (1992); see also, *e.g.*, Cong. Globe 1287 (rejecting proposed language providing that "no State . . . shall . . . recognize any distinction between citizens . . . on account of race or color").  This choice makes it clear that the Fourteenth Amendment does not impose a blanket ban on race-conscious policies.

Simultaneously with the passage of the Fourteenth Amendment, Congress enacted a number of race-conscious laws to fulfill the Amendment's promise of equality, leaving no doubt that the Equal Protection Clause permits consideration of race to achieve its goal.  One such law was the Freedmen's Bureau Act, enacted in 1865 and then expanded in 1866, which established a federal agency to provide certain benefits to refugees and newly emancipated freedmen.  See Act of Mar. 3, 1865, ch. 90, 13 Stat. 507; Act of July 16, 1866, ch. 200, 14 Stat. 173.  For the Bureau, education "was the foundation upon which all efforts to assist the freedmen rested."  E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, p. 144 (1988).  Consistent with that view, the Bureau provided essential "funding for black education during Reconstruction."  *Id.*, at 97.

Black people were the targeted beneficiaries of the Bureau's programs, especially when it came to investments in education in the wake of the Civil War.  Each year surrounding the passage of the Fourteenth Amendment, the Bureau "educated approximately 100,000 students, nearly all of them black," and regardless of "degree of past disadvantage."  E. Schnapper, Affirmative Action and the Legislative History of the Fourteenth Amendment, 71 Va. L. Rev.

753, 781 (1985). The Bureau also provided land and funding to establish some of our Nation's Historically Black Colleges and Universities (HBCUs). *Ibid.*; see also Brief for HBCU Leaders et al. as *Amici Curiae* 13 (HBCU Brief). In 1867, for example, the Bureau provided Howard University tens of thousands of dollars to buy property and construct its campus in our Nation's capital. 2 O. Howard, Autobiography 397–401 (1907). Howard University was designed to provide "special opportunities for a higher education to the newly enfranchised of the south," but it was available to all Black people, "whatever may have been their previous condition." Bureau Refugees, Freedmen and Abandoned Lands, Sixth Semi-Annual Report on Schools for Freedmen 60 (July 1, 1868).[1] The Bureau also "expended a total of $407,752.21 on black colleges, and only $3,000 on white colleges" from 1867 to 1870. Schnapper, 71 Va. L. Rev., at 798, n. 149.

Indeed, contemporaries understood that the Freedmen's Bureau Act benefited Black people. Supporters defended the law by stressing its race-conscious approach. See, *e.g.*, Cong. Globe 632 (statement of Rep. Moulton) ("[T]he true object of this bill is the amelioration of the condition of the colored people"); Joint Comm. Rep. 11 (reporting that "the Union men of the south" declared "with one voice" that the Bureau's efforts "protect[ed] the colored people"). Opponents argued that the Act created harmful racial classifications that favored Black people and disfavored white Americans. See, *e.g.*, Cong. Globe 397 (statement of Sen. Willey) (the Act makes "a distinction on account of color between the two races"), 544 (statement of Rep. Taylor) (the Act is

---

[1] As JUSTICE THOMAS acknowledges, the HBCUs, including Howard University, account for a high proportion of Black college graduates. *Ante*, at 56–57 (concurring opinion). That reality cannot be divorced from the history of anti-Black discrimination that gave rise to the HBCUs and the targeted work of the Freedmen's Bureau to help Black people obtain a higher education. See HBCU Brief 13–15.

"legislation for a particular class of the blacks to the exclusion of all whites"), App. to Cong. Globe, 39th Cong., 1st Sess., 69–70 (statement of Rep. Rousseau) ("You raise a spirit of antagonism between the black race and the white race in our country, and the law-abiding will be powerless to control it"). President Andrew Johnson vetoed the bill on the basis that it provided benefits "to a particular class of citizens," 6 Messages and Papers of the Presidents 1789–1897, p. 425 (J. Richardson ed. 1897) (Messages & Papers) (A. Johnson to House of Rep. July 16, 1866), but Congress overrode his veto. Cong. Globe 3849–3850. Thus, rejecting those opponents' objections, the same Reconstruction Congress that passed the Fourteenth Amendment eschewed the concept of colorblindness as sufficient to remedy inequality in education.

Congress also debated and passed the Civil Rights Act of 1866 contemporaneously with the Fourteenth Amendment. The goal of that Act was to eradicate the Black Codes enacted by Southern States following ratification of the Thirteenth Amendment. See *id.*, at 474. Because the Black Codes focused on race, not just slavery-related status, the Civil Rights Act explicitly recognized that white citizens enjoyed certain rights that non-white citizens did not. Section 1 of the Act provided that all persons "of every race and color . . . shall have the same right[s]" as those "enjoyed by white citizens." Act of Apr. 9, 1866, 14 Stat. 27. Similarly, Section 2 established criminal penalties for subjecting racial minorities to "different punishment . . . by reason of . . . color or race, than is prescribed for the punishment of white persons." *Ibid.* In other words, the Act was not colorblind. By using white citizens as a benchmark, the law classified by race and took account of the privileges enjoyed only by white people. As he did with the Freedmen's Bureau Act, President Johnson vetoed the Civil Rights Act in part because he viewed it as providing Black citizens with special treatment. See Messages and Papers 408, 413 (the Act is

designed "to afford discriminating protection to colored persons," and its "distinction of race and color . . . operate[s] in favor of the colored and against the white race"). Again, Congress overrode his veto. Cong. Globe 1861. In fact, Congress reenacted race-conscious language in the Civil Rights Act of 1870, two years after ratification of the Fourteenth Amendment, see Act of May 31, 1870, §16, 16 Stat. 144, where it remains today, see 42 U. S. C. §§1981(a) and 1982 (Rev. Stat. §§1972, 1978).

Congress similarly appropriated federal dollars explicitly and solely for the benefit of racial minorities. For example, it appropriated money for "'the relief of destitute colored women and children,'" without regard to prior enslavement. Act of July 28, 1866, 14 Stat. 317. Several times during and after the passage of the Fourteenth Amendment, Congress also made special appropriations and adopted special protections for the bounty and prize money owed to "colored soldiers and sailors" of the Union Army. 14 Stat. 357, Res. No. 46, June 15, 1866; Act of Mar. 3, 1869, ch. 122, 15 Stat. 301; Act of Mar. 3, 1873, 17 Stat. 528. In doing so, it rebuffed objections to these measures as "class legislation" "applicable to colored people and not . . . to the white people." Cong. Globe, 40th Cong., 1st Sess., 79 (1867) (statement of Sen. Grimes). This history makes it "inconceivable" that race-conscious college admissions are unconstitutional. *Bakke*, 438 U. S., at 398 (opinion of Marshall, J.).[2]

––––––––––
[2] By the time the Fourteenth Amendment was ratified by the States in 1868, "education had become a right of state citizenship in the constitution of every readmitted state," including in North Carolina. D. Black, The Fundamental Right to Education, 94 Notre Dame L. Rev. 1059, 1089 (2019); see also Brief for Black Women Scholars as *Amici Curiae* 9 ("The herculean efforts of Black reformers, activists, and lawmakers during the Reconstruction Era forever transformed State constitutional law; today, thanks to the impact of their work, every State constitution contains language guaranteeing the right to public education").

B

The Reconstruction era marked a transformational point in the history of American democracy. Its vision of equal opportunity leading to an equal society "was short-lived," however, "with the assistance of this Court." *Id.*, at 391. In a series of decisions, the Court "sharply curtailed" the "substantive protections" of the Reconstruction Amendments and the Civil Rights Acts. *Id.*, at 391–392 (collecting cases). That endeavor culminated with the Court's shameful decision in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), which established that "equality of treatment" exists "when the races are provided substantially equal facilities, even though these facilities be separate." *Brown*, 347 U. S., at 488. Therefore, with this Court's approval, government-enforced segregation and its concomitant destruction of equal opportunity became the constitutional norm and infected every sector of our society, from bathrooms to military units and, crucially, schools. See *Bakke*, 438 U. S., at 393–394 (opinion of Marshall, J.); see also generally R. Rothstein, The Color of Law 17–176 (2017) (discussing various federal policies that promoted racial segregation).

In a powerful dissent, Justice Harlan explained in *Plessy* that the Louisiana law at issue, which authorized segregation in railway carriages, perpetuated a "caste" system. 163 U. S., at 559–560. Although the State argued that the law "prescribe[d] a rule applicable alike to white and colored citizens," all knew that the law's purpose was not "to exclude white persons from railroad cars occupied by blacks," but "to exclude colored people from coaches occupied by or assigned to white persons." *Id.*, at 557. That is, the law "proceed[ed] on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens." *Id.*, at 560. Although "[t]he white race deems itself to be the dominant race . . . in prestige, in achievements, in education, in wealth, and in power," Justice Harlan explained, there is "no superior,

SOTOMAYOR, J., dissenting

dominant, ruling class of citizens" in the eyes of the law.
*Id.*, at 559. In that context, Justice Harlan thus announced
his view that "[o]ur constitution is color-blind." *Ibid.*

It was not until half a century later, in *Brown*, that the
Court honored the guarantee of equality in the Equal Pro-
tection Clause and Justice Harlan's vision of a Constitution
that "neither knows nor tolerates classes among citizens."
*Ibid.* Considering the "effect[s] of segregation" and the role
of education "in the light of its full development and its pre-
sent place in American life throughout the Nation," *Brown*
overruled *Plessy*. 347 U. S., at 492–495. The *Brown* Court
held that "[s]eparate educational facilities are inherently
unequal," and that such racial segregation deprives Black
students "of the equal protection of the laws guaranteed by
the Fourteenth Amendment." *Id.*, at 494–495. The Court
thus ordered segregated schools to transition to a racially
integrated system of public education "with all deliberate
speed," "ordering the immediate admission of [Black chil-
dren] to schools previously attended only by white chil-
dren." *Brown* v. *Board of Education*, 349 U. S. 294, 301
(1955).

*Brown* was a race-conscious decision that emphasized the
importance of education in our society. Central to the
Court's holding was the recognition that, as Justice Harlan
emphasized in *Plessy*, segregation perpetuates a caste sys-
tem wherein Black children receive inferior educational op-
portunities "solely because of their race," denoting "inferi-
ority as to their status in the community." 347 U. S., at 494,
and n. 10. Moreover, because education is "the very foun-
dation of good citizenship," segregation in public education
harms "our democratic society" more broadly as well. *Id.*,
at 493. In light of the harmful effects of entrenched racial
subordination on racial minorities and American democ-
racy, *Brown* recognized the constitutional necessity of a ra-
cially integrated system of schools where education is
"available to all on equal terms." *Ibid.*

The desegregation cases that followed *Brown* confirm that the ultimate goal of that seminal decision was to achieve a system of integrated schools that ensured racial equality of opportunity, not to impose a formalistic rule of race-blindness. In *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430 (1968), for example, the Court held that the New Kent County School Board's "freedom of choice" plan, which allegedly allowed "every student, regardless of race, . . . 'freely' [to] choose the school he [would] attend," was insufficient to effectuate "the command of [*Brown*]." *Id.*, at 437, 441–442. That command, the Court explained, was that schools dismantle "well-entrenched dual systems" and transition "to a unitary, nonracial system of public education." *Id.*, at 435–436. That the board "opened the doors of the former 'white' school to [Black] children and the ['Black'] school to white children" on a race-blind basis was not enough. *Id.*, at 437. Passively eliminating race classifications did not suffice when *de facto* segregation persisted. *Id.*, at 440–442 (noting that 85% of Black children in the school system were still attending an all-Black school). Instead, the board was "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.*, at 437–438. Affirmative steps, this Court held, are constitutionally necessary when mere formal neutrality cannot achieve *Brown*'s promise of racial equality. See *Green*, 391 U. S., at 440–442; see also *North Carolina Bd. of Ed.* v. *Swann*, 402 U. S. 43, 45–46 (1971) (holding that North Carolina statute that forbade the use of race in school busing "exploits an apparently neutral form to control school assignment plans by directing that they be 'colorblind'; that requirement, against the background of segregation, would render illusory the promise of *Brown*"); *Dayton Bd. of Ed.* v. *Brinkman*, 443 U. S. 526, 538 (1979) (school board "had to do more than abandon

SOTOMAYOR, J., dissenting

its prior discriminatory purpose"; it "had an affirmative responsibility" to integrate); *Keyes* v. *School Dist. No. 1, Denver*, 413 U. S. 189, 200 (1973) ("[T]he State automatically assumes an affirmative duty" under *Brown* to eliminate the vestiges of segregation).[3]

In so holding, this Court's post-*Brown* decisions rejected arguments advanced by opponents of integration suggesting that "restor[ing] race as a criterion in the operation of the public schools" was at odds with "the *Brown* decisions." Brief for Respondents in *Green* v. *School Bd. of New Kent Cty.*, O. T. 1967, No. 695, p. 6 (*Green* Brief). Those opponents argued that *Brown* only required the admission of Black students "to public schools on a racially nondiscriminatory basis." *Id.*, at 11 (emphasis deleted). Relying on Justice Harlan's dissent in *Plessy*, they argued that the use of race "is improper" because the "'Constitution is colorblind.'" *Green* Brief 6, n. 6 (quoting *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting)). They also incorrectly claimed that their views aligned with those of the *Brown* litigators, arguing that the *Brown* plaintiffs "understood" that *Brown*'s "mandate" was colorblindness. *Green* Brief 17. This Court rejected that characterization of "the thrust of *Brown*." *Green*, 391 U. S., at 437. It made clear that indifference to race "is not an end in itself" under that watershed decision. *Id.*, at 440. The ultimate goal is racial equality of opportunity.

Those rejected arguments mirror the Court's opinion today. The Court claims that *Brown* requires that students

---

[3]The majority suggests that "it required a Second Founding to undo" programs that help ensure racial integration and therefore greater equality in education. *Ante*, at 38. At the risk of stating the blindingly obvious, and as *Brown* recognized, the Fourteenth Amendment was intended to undo the effects of a world where laws systematically subordinated Black people and created a racial caste system. Cf. *Dred Scott* v. *Sandford*, 19 How. 393, 405 (1857). *Brown* and its progeny recognized the need to take affirmative, race-conscious steps to eliminate that system.

14    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

SOTOMAYOR, J., dissenting

be admitted "'on a racially nondiscriminatory basis.'" *Ante*,
at 13. It distorts the dissent in *Plessy* to advance a color-
blindness theory. *Ante*, at 38–39; see also *ante*, at 22
(GORSUCH, J., concurring) ("[T]oday's decision wakes the
echoes of Justice John Marshall Harlan [in *Plessy*]"); *ante*,
at 3 (THOMAS, J., concurring) (same). The Court also in-
vokes the *Brown* litigators, relying on what the *Brown*
"plaintiffs had argued." *Ante*, at 12; *ante*, at 35–36, 39, n. 7
(opinion of THOMAS, J.).

If there was a Member of this Court who understood the
*Brown* litigation, it was Justice Thurgood Marshall, who
"led the litigation campaign" to dismantle segregation as a
civil rights lawyer and "rejected the hollow, race-ignorant
conception of equal protection" endorsed by the Court's rul-
ing today. Brief for NAACP Legal Defense and Educational
Fund, Inc., et al. as *Amici Curiae* 9. Justice Marshall joined
the *Bakke* plurality and "applaud[ed] the judgment of the
Court that a university may consider race in its admissions
process." 438 U. S., at 400. In fact, Justice Marshall's view
was that *Bakke*'s holding should have been even more pro-
tective of race-conscious college admissions programs in
light of the remedial purpose of the Fourteenth Amendment
and the legacy of racial inequality in our society. See *id.*, at
396–402 (arguing that "a class-based remedy" should be
constitutionally permissible in light of the hundreds of
"years of class-based discrimination against [Black Ameri-
cans]"). The Court's recharacterization of *Brown* is nothing
but revisionist history and an affront to the legendary life
of Justice Marshall, a great jurist who was a champion of
true equal opportunity, not rhetorical flourishes about
colorblindness.

## C

Two decades after *Brown*, in *Bakke*, a plurality of the
Court held that "the attainment of a diverse student body"
is a "compelling" and "constitutionally permissible goal for

an institution of higher education." 438 U. S., at 311–315. Race could be considered in the college admissions process in pursuit of this goal, the plurality explained, if it is one factor of many in an applicant's file, and each applicant receives individualized review as part of a holistic admissions process. *Id.*, at 316–318.

Since *Bakke*, the Court has reaffirmed numerous times the constitutionality of limited race-conscious college admissions. First, in *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), a majority of the Court endorsed the *Bakke* plurality's "view that student body diversity is a compelling state interest that can justify the use of race in university admissions," 539 U. S., at 325, and held that race may be used in a narrowly tailored manner to achieve this interest, *id.*, at 333–344; see also *Gratz* v. *Bollinger*, 539 U. S. 244, 268 (2003) ("for the reasons set forth [the same day] in *Grutter*," rejecting petitioners' arguments that race can only be considered in college admissions "to remedy identified discrimination" and that diversity is "'too open-ended, ill-defined, and indefinite to constitute a compelling interest'").

Later, in the *Fisher* litigation, the Court twice reaffirmed that a limited use of race in college admissions is constitutionally permissible if it satisfies strict scrutiny. In *Fisher* v. *University of Texas at Austin*, 570 U. S. 297 (2013) (*Fisher I*), seven Members of the Court concluded that the use of race in college admissions comports with the Fourteenth Amendment if it "is narrowly tailored to obtain the educational benefits of diversity." *Id.*, at 314, 337. Several years later, in *Fisher* v. *University of Texas at Austin*, 579 U. S. 365, 376 (2016) (*Fisher II*), the Court upheld the admissions program at the University of Texas under this framework. *Id.*, at 380–388.

*Bakke*, *Grutter*, and *Fisher* are an extension of *Brown*'s legacy. Those decisions recognize that "'experience lend[s] support to the view that the contribution of diversity is substantial.'" *Grutter*, 539 U. S., at 324 (quoting *Bakke*, 438

U. S., at 313). Racially integrated schools improve cross-racial understanding, "break down racial stereotypes," and ensure that students obtain "the skills needed in today's increasingly global marketplace . . . through exposure to widely diverse people, cultures, ideas, and viewpoints." 539 U. S., at 330. More broadly, inclusive institutions that are "visibly open to talented and qualified individuals of every race and ethnicity" instill public confidence in the "legitimacy" and "integrity" of those institutions and the diverse set of graduates that they cultivate. *Id.*, at 332. That is particularly true in the context of higher education, where colleges and universities play a critical role in "maintaining the fabric of society" and serve as "the training ground for a large number of our Nation's leaders." *Id.*, at 331–332. It is thus an objective of the highest order, a "compelling interest" indeed, that universities pursue the benefits of racial diversity and ensure that "the diffusion of knowledge and opportunity" is available to students of all races. *Id.*, at 328–333.

This compelling interest in student body diversity is grounded not only in the Court's equal protection jurisprudence but also in principles of "academic freedom," which "'long [have] been viewed as a special concern of the First Amendment.'" *Id.*, at 324 (quoting *Bakke*, 438 U. S., at 312). In light of "the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment," this Court's precedents recognize the imperative nature of diverse student bodies on American college campuses. 539 U. S., at 329. Consistent with the First Amendment, student body diversity allows universities to promote "th[e] robust exchange of ideas which discovers truth out of a multitude of tongues [rather] than through any kind of authoritative selection." *Bakke*, 438 U. S., at 312 (internal quotation marks omitted). Indeed, as the Court recently reaffirmed in another

school case, "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society'" under our constitutional tradition. *Kennedy* v. *Bremerton School Dist.*, 597 U. S. ___, ___ (2022) (slip op., at 29); cf. *Khorrami* v. *Arizona*, 598 U. S. ___, ___ (2022) (GORSUCH, J., dissenting from denial of certiorari) (slip op., at 8) (collecting research showing that larger juries are more likely to be racially diverse and "deliberate longer, recall information better, and pay greater attention to dissenting voices").

In short, for more than four decades, it has been this Court's settled law that the Equal Protection Clause of the Fourteenth Amendment authorizes a limited use of race in college admissions in service of the educational benefits that flow from a diverse student body. From *Brown* to *Fisher*, this Court's cases have sought to equalize educational opportunity in a society structured by racial segregation and to advance the Fourteenth Amendment's vision of an America where racially integrated schools guarantee students of all races the equal protection of the laws.

### D

Today, the Court concludes that indifference to race is the only constitutionally permissible means to achieve racial equality in college admissions. That interpretation of the Fourteenth Amendment is not only contrary to precedent and the entire teachings of our history, see *supra*, at 2–17, but is also grounded in the illusion that racial inequality was a problem of a different generation. Entrenched racial inequality remains a reality today. That is true for society writ large and, more specifically, for Harvard and the University of North Carolina (UNC), two institutions with a long history of racial exclusion. Ignoring race will not equalize a society that is racially unequal. What was true in the 1860s, and again in 1954, is true today: Equality requires acknowledgment of inequality.

18      STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

SOTOMAYOR, J., dissenting

1

After more than a century of government policies enforcing racial segregation by law, society remains highly segregated. About half of all Latino and Black students attend a racially homogeneous school with at least 75% minority student enrollment.[4] The share of intensely segregated minority schools (*i.e.*, schools that enroll 90% to 100% racial minorities) has sharply increased.[5] To this day, the U. S. Department of Justice continues to enter into desegregation decrees with schools that have failed to "eliminat[e] the vestiges of *de jure* segregation."[6]

Moreover, underrepresented minority students are more likely to live in poverty and attend schools with a high concentration of poverty.[7] When combined with residential segregation and school funding systems that rely heavily on local property taxes, this leads to racial minority students attending schools with fewer resources. See *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 72–86 (1973) (Marshall, J., dissenting) (noting school funding disparities that result from local property taxation).[8] In

––––––––

[4] See GAO, Report to the Chairman, Committee on Education and Labor, House of Representatives, K–12 Education: Student Population Has Significantly Diversified, but Many Schools Remain Divided Along Racial, Ethnic, and Economic Lines 13 (GAO–22–104737, June 2022) (hereinafter GAO Report).

[5] G. Orfield, E. Frankenberg, & J. Ayscue, Harming Our Common Future: America's Segregated Schools 65 Years After *Brown* 21 (2019).

[6] *E.g.*, *Bennett* v. *Madison Cty. Bd. of Ed.*, No. 5:63–CV–613 (ND Ala., July 5, 2022), ECF Doc. 199, p. 19; *id.*, at 6 (requiring school district to ensure "the participation of black students" in advanced courses).

[7] GAO Report 6, 13 (noting that 80% of predominantly Black and Latino schools have at least 75% of their students eligible for free or reduced-price lunch—a proxy for poverty).

[8] See also L. Clark, Barbed Wire Fences: The Structural Violence of Education Law, 89 U. Chi. L. Rev. 499, 502, 512–517 (2022); Albert Shanker Institute, B. Baker, M. DiCarlo, & P. Greene, Segregation and

SOTOMAYOR, J., dissenting

turn, underrepresented minorities are more likely to attend schools with less qualified teachers, less challenging curricula, lower standardized test scores, and fewer extracurricular activities and advanced placement courses.[9]  It is thus unsurprising that there are achievement gaps along racial lines, even after controlling for income differences.[10]

Systemic inequities disadvantaging underrepresented racial minorities exist beyond school resources.  Students of color, particularly Black students, are disproportionately disciplined or suspended, interrupting their academic progress and increasing their risk of involvement with the criminal justice system.[11]  Underrepresented minorities are less likely to have parents with a postsecondary education who may be familiar with the college application process.[12]  Further, low-income children of color are less likely to attend preschool and other early childhood education programs that increase educational attainment.[13]  All of these

––––––––––

School Funding: How Housing Discrimination Reproduces Unequal Opportunity 17–19 (Apr. 2022).

   [9] See Brief for 25 Harvard Student and Alumni Organizations as *Amici Curiae* 6–15 (collecting sources).

   [10] GAO Report 7; see also Brief for Council of the Great City Schools as *Amicus Curiae* 11–14 (collecting sources).

   [11] See J. Okonofua & J. Eberhardt, Two Strikes: Race and the Disciplining of Young Students, 26 Psychol. Sci. 617 (2015) (a national survey showed that "Black students are more than three times as likely to be suspended or expelled as their White peers"); Brief for Youth Advocates and Experts on Educational Access as *Amici Curiae* 14–15 (describing investigation in North Carolina of a public school district, which found that Black students were 6.1 times more likely to be suspended than white students).

   [12] See, *e.g.*, Dept. of Education, National Center for Education Statistics, Digest of Education Statistics (2021) (Table 104.70) (showing that 59% of white students and 78% of Asian students have a parent with a bachelor's degree or higher, while the same is true for only 25% of Latino students and 33% of Black students).

   [13] R. Crosnoe, K. Purtell, P. Davis-Kean, A. Ansari, & A. Benner, The Selection of Children From Low-Income Families into Preschool, 52 J.

interlocked factors place underrepresented minorities multiple steps behind the starting line in the race for college admissions.

In North Carolina, the home of UNC, racial inequality is deeply entrenched in K–12 education. State courts have consistently found that the State does not provide underrepresented racial minorities equal access to educational opportunities, and that racial disparities in public schooling have increased in recent years, in violation of the State Constitution. See, *e.g.*, *Hoke Cty. Bd. of Ed.* v. *State*, 2020 WL 13310241, *6, *13 (N. C. Super. Ct., Jan. 21, 2020); *Hoke Cty. Bd. of Ed.* v. *State*, 382 N. C. 386, 388–390, 879 S. E. 2d 193, 197–198 (2022).

These opportunity gaps "result in fewer students from underrepresented backgrounds even applying to" college, particularly elite universities. Brief for Massachusetts Institute of Technology et al. as *Amici Curiae* 32. "Because talent lives everywhere, but opportunity does not, there are undoubtedly talented students with great academic potential who have simply not had the opportunity to attain the traditional indicia of merit that provide a competitive edge in the admissions process." Brief for Harvard Student and Alumni Organizations as *Amici Curiae* 16. Consistent with this reality, Latino and Black students are less likely to enroll in institutions of higher education than their white peers.[14]

Given the central role that education plays in breaking the cycle of racial inequality, these structural barriers reinforce other forms of inequality in communities of color. See E. Wilson, Monopolizing Whiteness, 134 Harv. L. Rev.

––––––––––

Developmental Psychology 11 (2016); A. Kenly & A. Klein, Early Childhood Experiences of Black Children in a Diverse Midwestern Suburb, 24 J. African American Studies 130, 136 (2020).

[14] Dept. of Education, National Center for Education, Institute of Educational Science, The Condition of Education 2022, p. 24 (2020) (fig. 16).

SOTOMAYOR, J., dissenting

2382, 2416 (2021) ("[E]ducational opportunities . . . allow for social mobility, better life outcomes, and the ability to participate equally in the social and economic life of the democracy"). Stark racial disparities exist, for example, in unemployment rates,[15] income levels,[16] wealth and home-ownership,[17] and healthcare access.[18] See also *Schuette* v. *BAMN*, 572 U. S. 291, 380–381 (2014) (SOTOMAYOR, J., dissenting) (noting the "persistent racial inequality in society"); *Gratz*, 539 U. S., at 299–301 (Ginsburg, J., dissenting) (cataloging racial disparities in employment, poverty, healthcare, housing, consumer transactions, and education).

Put simply, society remains "inherently unequal." *Brown*, 347 U. S., at 495. Racial inequality runs deep to this very day. That is particularly true in education, the "'most vital civic institution for the preservation of a democratic system of government.'" *Plyler* v. *Doe*, 457 U. S. 202, 221, 223 (1982). As I have explained before, only with eyes open to this reality can the Court "carry out the guarantee of equal protection." *Schuette*, 572 U. S., at 381 (dissenting opinion).

2

Both UNC and Harvard have sordid legacies of racial exclusion. Because "[c]ontext matters" when reviewing race-conscious college admissions programs, *Grutter*, 539 U. S.,

---

[15] ProQuest Statistical Abstract of the United States: 2023, p. 402 (Table 622) (noting Black and Latino adults are more likely to be unemployed).

[16] *Id.*, at 173 (Table 259).

[17] A. McCargo & J. Choi, Closing the Gaps: Building Black Wealth Through Homeownership (2020) (fig. 1).

[18] Dept. of Commerce, Census Bureau, Health Insurance Coverage in the United States: 2021, p. 9 (fig. 5); *id.*, at 29 (Table C–1), https://www.census.gov/library/publications/2022/demo/p60-278.html (noting racial minorities, particularly Latinos, are less likely to have health insurance coverage).

at 327, this reality informs the exigency of respondents' current admissions policies and their racial diversity goals.

i

For much of its history, UNC was a bastion of white supremacy. Its leadership included "slaveholders, the leaders of the Ku Klux Klan, the central figures in the white supremacy campaigns of 1898 and 1900, and many of the State's most ardent defenders of Jim Crow and race-based Social Darwinism in the twentieth century." 3 App. 1680. The university excluded all people of color from its faculty and student body, glorified the institution of slavery, enforced its own Jim Crow regulations, and punished any dissent from racial orthodoxy. *Id.*, at 1681–1683. It resisted racial integration after this Court's decision in *Brown*, and was forced to integrate by court order in 1955. 3 App. 1685. It took almost 10 more years for the first Black woman to enroll at the university in 1963. See Karen L. Parker Collection, 1963–1966, UNC Wilson Special Collections Library. Even then, the university admitted only a handful of underrepresented racial minorities, and those students suffered constant harassment, humiliation, and isolation. 3 App. 1685. UNC officials openly resisted racial integration well into the 1980s, years after the youngest Member of this Court was born.[19] *Id.*, at 1688–1690. During that period,

––––––––––

[19] In 1979, prompted by lawsuits filed by civil rights lawyers under Title VI, the U. S. Department of Health, Education, and Welfare "revoked UNC's federal funding for its continued noncompliance" with *Brown*. 3 App. 1688; see *Adams* v. *Richardson*, 351 F. Supp. 636, 637 (DC 1972); *Adams* v. *Califano*, 430 F. Supp. 118, 121 (DC 1977). North Carolina sued the Federal Government in response, and North Carolina Senator Jesse Helms introduced legislation to block federal desegregation efforts. 3 App. 1688. UNC praised those actions by North Carolina public officials. *Ibid.* The litigation ended in 1981, after the Reagan administration settled with the State. See *North Carolina* v. *Department of Education*, No. 79–217–CIV–5 (EDNC, July 17, 1981) (Consent Decree).

SOTOMAYOR, J., dissenting

Black students faced racial epithets and stereotypes, received hate mail, and encountered Ku Klux Klan rallies on campus.  2 *id.*, at 781–784; 3 *id.*, at 1689.

To this day, UNC's deep-seated legacy of racial subjugation continues to manifest itself in student life.  Buildings on campus still bear the names of members of the Ku Klux Klan and other white supremacist leaders.  *Id.*, at 1683.  Students of color also continue to experience racial harassment, isolation, and tokenism.[20]  Plus, the student body remains predominantly white: approximately 72% of UNC students identify as white, while only 8% identify as Black.  *Id.*, at 1647.  These numbers do not reflect the diversity of the State, particularly Black North Carolinians, who make up 22% of the population.  *Id.*, at 1648.

ii

UNC is not alone.  Harvard, like other Ivy League universities in our country, "stood beside church and state as the third pillar of a civilization built on bondage."  C. Wilder, Ebony & Ivy: Race, Slavery, and the Troubled History of America's Universities 11 (2013).  From Harvard's founding, slavery and racial subordination were integral parts of the institution's funding, intellectual production, and campus life.  Harvard and its donors had extensive financial ties to, and profited from, the slave trade, the labor of enslaved people, and slavery-related investments.  As Harvard now recognizes, the accumulation of this wealth was "vital to the University's growth" and establishment as an

––––––––––

[20]See 1 App. 20–21 (campus climate survey showing *inter alia* that "91 percent of students heard insensitive or disparaging racial remarks made by other students"); 2 *id.*, at 1037 (Black student testifying that a white student called him "the N word" and, on a separate occasion at a fraternity party, he was "told that no slaves were allowed in"); *id.*, at 955 (student testifying that he was "the only African American student in the class," which discouraged him from speaking up about racially salient issues); *id.*, at 762–763 (student describing that being "the only Latina" made it "hard to speak up" and made her feel "foreign" and "an outsider").

elite, national institution. Harvard & the Legacy of Slavery, Report by the President and Fellows of Harvard College 7 (2022) (Harvard Report). Harvard suppressed antislavery views, and enslaved persons "served Harvard presidents and professors and fed and cared for Harvard students" on campus. *Id.*, at 7, 15.

Exclusion and discrimination continued to be a part of campus life well into the 20th century. Harvard's leadership and prominent professors openly promoted "'race science,'" racist eugenics, and other theories rooted in racial hierarchy. *Id.*, at 11. Activities to advance these theories "took place on campus," including "intrusive physical examinations" and "photographing of unclothed" students. *Ibid.* The university also "prized the admission of academically able Anglo-Saxon students from elite backgrounds—including wealthy white sons of the South." *Id.*, at 44. By contrast, an average of three Black students enrolled at Harvard each year during the five decades between 1890 and 1940. *Id.*, at 45. Those Black students who managed to enroll at Harvard "excelled academically, earning equal or better academic records than most white students," but faced the challenges of the deeply rooted legacy of slavery and racism on campus. *Ibid.* Meanwhile, a few women of color attended Radcliffe College, a separate and overwhelmingly white "women's annex" where racial minorities were denied campus housing and scholarships. *Id.*, at 51. Women of color at Radcliffe were taught by Harvard professors, but "women did not receive Harvard degrees until 1963." *Ibid.*; see also S. Bradley, Upending the Ivory Tower: Civil Rights, Black Power, and the Ivy League 17 (2018) (noting that the historical discussion of racial integration at the Ivy League "is necessarily male-centric," given the historical exclusion of women of color from these institutions).

Today, benefactors with ties to slavery and white supremacy continue to be memorialized across campus through "statues, buildings, professorships, student houses, and the

like." Harvard Report 11. Black and Latino applicants account for only 20% of domestic applicants to Harvard each year. App. to Pet. for Cert. in No. 20–1199, p. 112. "Even those students of color who beat the odds and earn an offer of admission" continue to experience isolation and alienation on campus. Brief for 25 Harvard Student and Alumni Organizations as *Amici Curiae* 30–31; 2 App. 823, 961. For years, the university has reported that inequities on campus remain. See, *e.g.*, 4 App. 1564–1601. For example, Harvard has reported that "far too many black students at Harvard experience feelings of isolation and marginalization," 3 *id.*, at 1308, and that "student survey data show[ed] that only half of Harvard undergraduates believe that the housing system fosters exchanges between students of different backgrounds," *id.*, at 1309.

\*   \*   \*

These may be uncomfortable truths to some, but they are truths nonetheless. "Institutions can and do change," however, as societal and legal changes force them "to live up to [their] highest ideals." Harvard Report 56. It is against this historical backdrop that Harvard and UNC have reckoned with their past and its lingering effects. Acknowledging the reality that race has always mattered and continues to matter, these universities have established institutional goals of diversity and inclusion. Consistent with equal protection principles and this Court's settled law, their policies use race in a limited way with the goal of recruiting, admitting, and enrolling underrepresented racial minorities to pursue the well-documented benefits of racial integration in education.

## II

The Court today stands in the way of respondents' commendable undertaking and entrenches racial inequality in higher education. The majority opinion does so by turning

a blind eye to these truths and overruling decades of precedent, "content for now to disguise" its ruling as an application of "established law and move on." *Kennedy*, 597 U. S., at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 29). As JUSTICE THOMAS puts it, "*Grutter* is, for all intents and purposes, overruled." *Ante*, at 58.

It is a disturbing feature of today's decision that the Court does not even attempt to make the extraordinary showing required by *stare decisis*. The Court simply moves the goalposts, upsetting settled expectations and throwing admissions programs nationwide into turmoil. In the end, however, it is clear why the Court is forced to change the rules of the game to reach its desired outcome: Under a faithful application of the Court's settled legal framework, Harvard and UNC's admissions programs are constitutional and comply with Title VI of the Civil Rights Act of 1964, 42 U. S. C. §2000d *et seq*.[21]

---

[21] The same standard that applies under the Equal Protection Clause guides the Court's review under Title VI, as the majority correctly recognizes. See *ante*, at 6, n. 2; see also *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 325 (1978) (Brennan, J., concurring). JUSTICE GORSUCH argues that "Title VI bears independent force" and holds universities to an even higher standard than the Equal Protection Clause. *Ante*, at 25. Because no party advances JUSTICE GORSUCH's argument, see *ante*, at 6, n. 2, the Court properly declines to address it under basic principles of party presentation. See *United States* v. *Sineneng-Smith*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 3). Indeed, JUSTICE GORSUCH's approach calls for even more judicial restraint. If petitioner could prevail under JUSTICE GORSUCH's statutory analysis, there would be no reason for this Court to reach the constitutional question. See *Escambia County* v. *McMillan*, 466 U. S. 48, 51 (1984) (*per curiam*). In a statutory case, moreover, *stare decisis* carries "enhanced force," as it would be up to Congress to "correct any mistake it sees" with "our interpretive decisions." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015). JUSTICE GORSUCH wonders why the dissent, like the majority, does not "engage" with his statutory arguments. *Ante*, at 16. The answer is simple: This Court plays "the role of neutral arbiter of matters the parties present." *Greenlaw* v. *United States*, 554 U. S. 237, 243 (2008). Petitioner made a

Cite as: 600 U. S. ____ (2023)          27

SOTOMAYOR, J., dissenting

A

Answering the question whether Harvard's and UNC's policies survive strict scrutiny under settled law is straightforward, both because of the procedural posture of these cases and because of the narrow scope of the issues presented by petitioner Students for Fair Admissions, Inc. (SFFA).[22]

These cases arrived at this Court after two lengthy trials. Harvard and UNC introduced dozens of fact witnesses, expert testimony, and documentary evidence in support of their admissions programs. Brief for Petitioner 20, 40. SFFA, by contrast, did not introduce a single fact witness and relied on the testimony of two experts. *Ibid.*

After making detailed findings of fact and conclusions of law, the District Courts entered judgment in favor of Harvard and UNC. See 397 F. Supp. 3d 126, 133–206 (Mass. 2019) (*Harvard I*); 567 F. Supp. 3d 580, 588–667 (MDNC 2021) (*UNC*). The First Circuit affirmed in the *Harvard* case, finding "no error" in the District Court's thorough opinion. 980 F. 3d 157, 204 (2020) (*Harvard II*). SFFA then filed petitions for a writ of certiorari in both cases, which the Court granted. 595 U. S. ___ (2022).[23]

The Court granted certiorari on three questions: (1) whether the Court should overrule *Bakke*, *Grutter*, and

_____

strategic litigation choice, and in our adversarial system, it is not up to this Court to come up with "wrongs to right" on behalf of litigants. *Id.*, at 244 (internal quotation marks omitted).

[22] SFFA is a 501(c)(3) nonprofit organization founded after this Court's decision in *Fisher I*, 570 U. S. 297 (2013). App. to Pet. for Cert. in No. 20–1199, p. 10. Its original board of directors had three self-appointed members: Edward Blum, Abigail Fisher (the plaintiff in *Fisher*), and Richard Fisher. See *ibid.*

[23] Bypassing the Fourth Circuit's opportunity to review the District Court's opinion in the *UNC* case, SFFA sought certiorari before judgment, urging that, "[p]aired with *Harvard*," the *UNC* case would "allow the Court to resolve the ongoing validity of race-based admissions under both Title VI and the Constitution." Pet. for Cert. in No. 21–707, p. 27.

*Fisher*; or, alternatively, (2) whether UNC's admissions program is narrowly tailored, and (3) whether Harvard's admissions program is narrowly tailored. See Brief for Petitioner in No. 20–1199, p. i; Brief for Respondent in No. 20–1199, p. i; Brief for University Respondents in No. 21–707, p. i. Answering the last two questions, which call for application of settled law to the facts of these cases, is simple: Deferring to the lower courts' careful findings of fact and credibility determinations, Harvard's and UNC's policies are narrowly tailored.

### B
### 1

As to narrow tailoring, the only issue SFFA raises in the *UNC* case is that the university cannot use race in its admissions process because race-neutral alternatives would promote UNC's diversity objectives. That issue is so easily resolved in favor of UNC that SFFA devoted only three pages to it at the end of its 87-page brief. Brief for Petitioner 83–86.

The use of race is narrowly tailored unless "workable" and "available" race-neutral approaches exist, meaning race-neutral alternatives promote the institution's diversity goals and do so at "'tolerable administrative expense.'" *Fisher I*, 570 U. S., at 312 (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 280, n. 6 (1986) (plurality opinion)). Narrow tailoring does not mean perfect tailoring. The Court's precedents make clear that "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Grutter*, 539 U. S., at 339. "Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Ibid.*

As the District Court found after considering extensive expert testimony, SFFA's proposed race-neutral alternatives do not meet those criteria. *UNC*, 567 F. Supp. 3d,

at 648. All of SFFA's proposals are methodologically flawed because they rest on "'terribly unrealistic'" assumptions about the applicant pools. *Id.*, at 643–645, 647. For example, as to one set of proposals, SFFA's expert "unrealistically assumed" that "all of the top students in the candidate pools he use[d] would apply, be admitted, and enroll." *Id.*, at 647. In addition, some of SFFA's proposals force UNC to "abandon its holistic approach" to college admissions, *id.*, at 643–645, n. 43, a result "in deep tension with the goal of educational diversity as this Court's cases have defined it," *Fisher II*, 579 U. S., at 386–387. Others are "largely impractical—not to mention unprecedented—in higher education." 567 F. Supp. 3d, at 647. SFFA's proposed top percentage plans,[24] for example, are based on a made-up and complicated admissions index that requires UNC to "access . . . real-time data for all high school students." *Ibid.* UNC is then supposed to use that index, which "would change every time any student took a standardized test," to rank students based on grades and test scores. *Ibid.* One of SFFA's top percentage plans would even "nearly erase the Native American incoming class" at UNC. *Id.*, at 646. The courts below correctly concluded that UNC is not required to adopt SFFA's unrealistic proposals to satisfy strict scrutiny.[25]

_____

[24] Generally speaking, top percentage plans seek to enroll a percentage of the graduating high school students with the highest academic credentials. See, *e.g.*, *Fisher II*, 579 U. S., at 373 (describing the University of Texas' Top Ten Percent Plan).

[25] SFFA and JUSTICE GORSUCH reach beyond the factfinding below and argue that universities in States that have banned the use of race in college admissions have achieved racial diversity through efforts such as increasing socioeconomic preferences, so UNC could do the same. Brief for Petitioner 85–86; *ante*, at 14. Data from those States disprove that theory. Institutions in those States experienced "'an immediate and precipitous decline in the rates at which underrepresented-minority students applied . . . were admitted . . . and enrolled.'" *Schuette* v. *BAMN*,

SOTOMAYOR, J., dissenting

2

Harvard's admissions program is also narrowly tailored under settled law. SFFA argues that Harvard's program is not narrowly tailored because the university "has workable race-neutral alternatives," "does not use race as a mere plus," and "engages in racial balancing." Brief for Petitioner 75–83. As the First Circuit concluded, there was "no error" in the District Court's findings on any of these issues. *Harvard II*, 980 F. 3d, at 204.[26]

Like UNC, Harvard has already implemented many of SFFA's proposals, such as increasing recruitment efforts and financial aid for low-income students. *Id.*, at 193. Also like UNC, Harvard "carefully considered" other race-neutral ways to achieve its diversity goals, but none of them are "workable." *Id.*, at 193–194. SFFA's argument before this Court is that Harvard should adopt a plan designed by SFFA's expert for purposes of trial, which increases preferences for low-income applicants and eliminates the use of race and legacy preferences. *Id.*, at 193; Brief for Petitioner

––––––––––

572 U. S. 291, 384–390 (2014) (SOTOMAYOR, J., dissenting); see *infra*, at 63–64. In addition, UNC "already engages" in race-neutral efforts focused on socioeconomic status, including providing "exceptional levels of financial aid" and "increased and targeted recruiting." *UNC*, 567 F. Supp. 3d, at 665.

JUSTICE GORSUCH argues that he is simply "recount[ing] what SFFA has argued." *Ante*, at 14, n. 4. That is precisely the point: SFFA's arguments were not credited by the court below. "[W]e are a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). JUSTICE GORSUCH also suggests it is inappropriate for the dissent to respond to the majority by relying on materials beyond the findings of fact below. *Ante*, at 14, n. 4. There would be no need for the dissent to do that if the majority stuck to reviewing the District Court's careful fact-finding with the deference it owes to the trial court. Because the majority has made a different choice, the dissent responds.

[26] SFFA also argues that Harvard discriminates against Asian American students. Brief for Petitioner 72–75. As explained below, this claim does not fit under *Grutter*'s strict scrutiny framework, and the courts below did not err in rejecting that claim. See *infra*, at 59–60.

SOTOMAYOR, J., dissenting

81. Under SFFA's model, however, Black representation
would plummet by about 32%, and the admitted share of
applicants with high academic ratings would decrease, as
would the share with high extracurricular and athletic rat-
ings. 980 F. 3d, at 194. SFFA's proposal, echoed by
JUSTICE GORSUCH, *ante*, at 14–15, requires Harvard to
"make sacrifices on almost every dimension important to its
admissions process," 980 F. 3d, at 194, and forces it "to
choose between a diverse student body and a reputation for
academic excellence," *Fisher II*, 579 U. S., at 385. Neither
this Court's precedents nor common sense impose that type
of burden on colleges and universities.

The courts below also properly rejected SFFA's argument
that Harvard does not use race in the limited way this
Court's precedents allow. The Court has explained that a
university can consider a student's race in its admissions
process so long as that use is "contextual and does not op-
erate as a mechanical plus factor." *Id*., at 375. The Court
has also repeatedly held that race, when considered as one
factor of many in the context of holistic review, "can make
a difference to whether an application is accepted or re-
jected." *Ibid*. After all, race-conscious admissions seek to
improve racial diversity. Race cannot, however, be "'deci-
sive' for virtually every minimally qualified underrepresented
minority applicant." *Gratz*, 539 U. S., at 272 (quoting
*Bakke*, 438 U. S., at 317).

That is precisely how Harvard's program operates. In re-
cent years, Harvard has received about 35,000 applications
for a class with about 1,600 seats. 980 F. 3d, at 165. The
admissions process is exceedingly competitive; it involves
six different application components. Those components in-
clude interviews with alumni and admissions officers, as
well as consideration of a whole range of information, such
as grades, test scores, recommendation letters, and per-
sonal essays, by several committees. *Id*., at 165–166. Con-
sistent with that "individualized, holistic review process,"

admissions officers may, but need not, consider a student's self-reported racial identity when assigning overall ratings. *Id.*, at 166, 169, 180. Even after so many layers of competitive review, Harvard typically ends up with about 2,000 tentative admits, more students than the 1,600 or so that the university can admit. *Id.*, at 170. To choose among those highly qualified candidates, Harvard considers "plus factors," which can help "tip an applicant into Harvard's admitted class." *Id.*, at 170, 191. To diversify its class, Harvard awards "tips" for a variety of reasons, including geographic factors, socioeconomic status, ethnicity, and race. *Ibid.*

There is "no evidence of any mechanical use of tips." *Id.*, at 180. Consistent with the Court's precedents, Harvard properly "considers race as part of a holistic review process," "values all types of diversity," "does not consider race exclusively," and "does not award a fixed amount of points to applicants because of their race." *Id.*, at 190.[27] Indeed, Harvard's admissions process is so competitive and the use of race is so limited and flexible that, as "SFFA's own expert's analysis" showed, "Harvard rejects more than two-thirds of Hispanic applicants and slightly less than half of all African-American applicants who are among the top 10% most academically promising applicants." *Id.*, at 191.

The courts below correctly rejected SFFA's view that Harvard's use of race is unconstitutional because it impacts overall Hispanic and Black student representation by 45%. See Brief for Petitioner 79. That 45% figure shows that

---

[27] JUSTICE GORSUCH suggests that only "applicants of certain races may receive a 'tip' in their favor." *Ante*, at 9. To the extent JUSTICE GORSUCH means that some races are not eligible to receive a tip based on their race, there is no evidence in the record to support this statement. Harvard "does not explicitly prioritize any particular racial group over any other and permits its admissions officers to evaluate the racial and ethnic identity of every student in the context of his or her background and circumstances." *Harvard I*, 397 F. Supp. 3d 126, 190, n. 56 (Mass. 2019).

SOTOMAYOR, J., dissenting

eliminating the use of race in admissions "would reduce African American representation . . . from 14% to 6% and Hispanic representation from 14% to 9%." *Harvard II*, 980 F. 3d, at 180, 191. Such impact of Harvard's limited use of race on the makeup of the class is less than this Court has previously upheld as narrowly tailored. In *Grutter*, for example, eliminating the use of race would have reduced the underrepresented minority population by 72%, a much greater effect. 539 U. S., at 320. And in *Fisher II*, the use of race helped increase Hispanic representation from 11% to 16.9% (a 54% increase) and African-American representation from 3.5% to 6.8% (a 94% increase). 579 U. S., at 384.[28]

_____

[28] Relying on a single footnote in the First Circuit's opinion, the Court claims that Harvard's program is unconstitutional because it "has led to an 11.1% decrease in the number of Asian-Americans admitted to Harvard." *Ante*, at 27. The Court of Appeals, however, merely noted that the United States, at the time represented by a different administration, argued that "absent the consideration of race, [Asian American] representation would increase from 24% to 27%," an 11% increase. *Harvard II*, 980 F. 3d, at 191, n. 29. Taking those calculations as correct, the Court of Appeals recognized that such an impact from the use of race on the overall makeup of the class is consistent with the impact that this Court's precedents have tolerated. *Ibid.*

The Court also notes that "race is determinative for at least some—if not many—of the students" admitted at UNC. *Ante*, at 27. The District Court in the *UNC* case found that "race plays a role in a very small percentage of decisions: 1.2% for in-state students and 5.1% for out-of-state students." 567 F. Supp. 3d 580, 634 (MDNC 2021). The limited use of race at UNC thus has a smaller effect than at Harvard and is also consistent with the Court's precedents. In addition, contrary to the majority's suggestion, such effect does not prove that "race alone . . . explains the admissions decisions for hundreds if not thousands of applicants to UNC each year." *Ante,* at 28, n. 6. As the District Court found, UNC (like Harvard) "engages a highly individualized, holistic review of each applicant's file, which considers race flexibly as a 'plus factor' as one among many factors in its individualized consideration of each and every applicant." 567 F. Supp. 3d, at 662; see *id.,* at 658 (finding that UNC "rewards different kinds of diversity, and evaluates a candidate within

Finally, the courts below correctly concluded that Harvard complies with this Court's repeated admonition that colleges and universities cannot define their diversity interest "as 'some specified percentage of a particular group merely because of its race or ethnic origin.'" *Fisher I*, 570 U. S., at 311 (quoting *Bakke*, 438 U. S., at 307). Harvard does not specify its diversity objectives in terms of racial quotas, and "SFFA did not offer expert testimony to support its racial balancing claim." *Harvard II*, 980 F. 3d, at 180, 186–187. Harvard's statistical evidence, by contrast, showed that the admitted classes across racial groups varied considerably year to year, a pattern "inconsistent with the imposition of a racial quota or racial balancing." *Harvard I*, 397 F. Supp. 3d, at 176–177; see *Harvard II*, 980 F. 3d, at 180, 188–189.

Similarly, Harvard's use of "one-pagers" containing "a snapshot of various demographic characteristics of Harvard's applicant pool" during the admissions review process is perfectly consistent with this Court's precedents. *Id.*, at 170–171, 189. Consultation of these reports, with no "specific number firmly in mind," "does not transform [Harvard's] program into a quota." *Grutter*, 539 U. S., at 335–336. Rather, Harvard's ongoing review complies with the Court's command that universities periodically review the necessity of the use of race in their admissions programs. *Id.*, at 342; *Fisher II*, 579 U. S., at 388.

The Court ignores these careful findings and concludes that Harvard engages in racial balancing because its "focus on numbers is obvious." *Ante*, at 31. Because SFFA failed to offer an expert and to prove its claim below, the majority

---

the context of their lived experience"); *id.,* at 659 ("The parties stipulated, and the evidence shows, that readers evaluate applicants by taking into consideration dozens of criteria," and even SFFA's expert "concede[d] that the University's admissions process is individualized and holistic"). Stated simply, race is not "a defining feature of any individual application." *Id.,* at 662; see also *infra*, at 48.

is forced to reconstruct the record and conduct its own factual analysis. It thus relies on a single chart from SFFA's brief that truncates relevant data in the record. Compare *ibid.* (citing Brief for Petitioner in No. 20–1199, p. 23) with 4 App. in No. 20–1199, p. 1770. That chart cannot displace the careful factfinding by the District Court, which the First Circuit upheld on appeal under clear error review. See *Harvard II*, 980 F. 3d, at 180–182, 188–189.

In any event, the chart is misleading and ignores "the broader context" of the underlying data that it purports to summarize. *Id.*, at 188. As the First Circuit concluded, what the data actually show is that admissions have increased for all racial minorities, including Asian American students, whose admissions numbers have "increased roughly five-fold since 1980 and roughly two-fold since 1990." *Id.*, at 180, 188. The data also show that the racial shares of admitted applicants fluctuate more than the corresponding racial shares of total applicants, which is "the opposite of what one would expect if Harvard imposed a quota." *Id.*, at 188. Even looking at the Court's truncated period for the classes of 2009 to 2018, "the same pattern holds." *Ibid.* The fact that Harvard's racial shares of admitted applicants "varies relatively little in absolute terms for [those classes] is unsurprising and reflects the fact that the racial makeup of Harvard's applicant pool also varies very little over this period." *Id.*, at 188–189. Thus, properly understood, the data show that Harvard "does not utilize quotas and does not engage in racial balancing." *Id.*, at 189.[29]

—————

[29]The majority does not dispute that it has handpicked data from a truncated period, ignoring the broader context of that data and what the data reflect. Instead, the majority insists that its selected data prove that Harvard's "precise racial preferences" "operate like clockwork." *Ante*, at 31–32, n. 7. The Court's conclusion that such racial preferences must be responsible for an "unyielding demographic composition of [the]

### III

The Court concludes that Harvard's and UNC's policies are unconstitutional because they serve objectives that are insufficiently measurable, employ racial categories that are imprecise and overbroad, rely on racial stereotypes and disadvantage nonminority groups, and do not have an end point. *Ante*, at 21–34, 39. In reaching this conclusion, the Court claims those supposed issues with respondents' programs render the programs insufficiently "narrow" under the strict scrutiny framework that the Court's precedents command. *Ante*, at 22. In reality, however, "the Court today cuts through the kudzu" and overrules its "higher-education precedents" following *Bakke*. *Ante*, at 22 (GORSUCH, J., concurring).

There is no better evidence that the Court is overruling the Court's precedents than those precedents themselves. "Every one of the arguments made by the majority can be found in the dissenting opinions filed in [the] cases" the majority now overrules. *Payne* v. *Tennessee*, 501 U. S. 808, 846 (1991) (Marshall, J., dissenting); see, *e.g.*, *Grutter*, 539 U. S., at 354 (THOMAS, J., concurring in part and dissenting in part) ("Unlike the majority, I seek to define with precision the interest being asserted"); *Fisher II*, 579 U. S., at 389 (THOMAS, J., dissenting) (race-conscious admissions

---

class," *ibid.*, misunderstands basic principles of statistics. A number of factors (most notably, the demographic composition of the applicant pool) affect the demographic composition of the entering class. Assume, for example, that Harvard admitted students based solely on standardized test scores. If test scores followed a normal distribution (even with different averages by race) and were relatively constant over time, and if the racial shares of total applicants were also relatively constant over time, one would expect the same "unyielding demographic composition of [the] class." *Ibid.* That would be true even though, under that hypothetical scenario, Harvard does not consider race in admissions at all. In other words, the Court's inference that precise racial preferences must be the cause of relatively constant racial shares of admitted students is specious.

SOTOMAYOR, J., dissenting

programs "res[t] on pernicious assumptions about race"); *id.*, at 403 (ALITO, J., joined by ROBERTS, C. J., and THOMAS, J., dissenting) (diversity interests "are laudable goals, but they are not concrete or precise"); *id.*, at 413 (race-conscious college admissions plan "discriminates against Asian-American students"); *id.*, at 414 (race-conscious admissions plan is unconstitutional because it "does not specify what it means to be 'African-American,' 'Hispanic,' 'Asian American,' 'Native American,' or 'White'"); *id.*, at 419 (race-conscious college admissions policies rest on "pernicious stereotype[s]").

Lost arguments are not grounds to overrule a case. When proponents of those arguments, greater now in number on the Court, return to fight old battles anew, it betrays an unrestrained disregard for precedent. It fosters the People's suspicions that "bedrock principles are founded . . . in the proclivities of individuals" on this Court, not in the law, and it degrades "the integrity of our constitutional system of government." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). Nowhere is the damage greater than in cases like these that touch upon matters of representation and institutional legitimacy.

The Court offers no justification, much less "a 'special justification,'" for its costly endeavor. *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. ___, ___ (2022) (joint opinion of BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (slip op., at 31) (quoting *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (slip op., at 11)). Nor could it. There is no basis for overruling *Bakke*, *Grutter*, and *Fisher*. The Court's precedents were correctly decided, the opinion today is not workable and creates serious equal protection problems, important reliance interests favor respondents, and there are no legal or factual developments favoring the Court's reckless course. See 597 U. S., at ___ (joint opinion of BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (slip op., at 31); *id.*, at ___–___ (KAVANAUGH, J., concurring) (slip

op., at 6–7). At bottom, the six unelected members of today's majority upend the status quo based on their policy preferences about what race in America should be like, but is not, and their preferences for a veneer of colorblindness in a society where race has always mattered and continues to matter in fact and in law.

A

1

A limited use of race in college admissions is consistent with the Fourteenth Amendment and this Court's broader equal protection jurisprudence. The text and history of the Fourteenth Amendment make clear that the Equal Protection Clause permits race-conscious measures. See *supra*, at 2–9. Consistent with that view, the Court has explicitly held that "race-based action" is sometimes "within constitutional constraints." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 237 (1995). The Court has thus upheld the use of race in a variety of contexts. See, *e.g.*, *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 737 (2007) ("[T]he obligation to disestablish a school system segregated by law can include race-conscious remedies—whether or not a court had issued an order to that effect"); *Johnson* v. *California*, 543 U. S. 499, 512 (2005) (use of race permissible to further prison's interest in "'security'" and "'discipline'"); *Cooper* v. *Harris*, 581 U. S. 285, 291–293 (2017) (use of race permissible when drawing voting districts in some circumstances).[30]

Tellingly, in sharp contrast with today's decision, the Court has allowed the use of race when that use burdens minority populations. In *United States* v. *Brignoni-Ponce*,

––––––––––

[30] In the context of policies that "benefit rather than burden the minority," the Court has adhered to a strict scrutiny framework despite multiple Members of this Court urging that "the mandate of the Equal Protection Clause" favors applying a less exacting standard of review. *Schuette*, 572 U. S., at 373–374 (SOTOMAYOR, J., dissenting) (collecting cases).

422 U. S. 873 (1975), for example, the Court held that it is unconstitutional for border patrol agents to rely on a person's skin color as "a single factor" to justify a traffic stop based on reasonable suspicion, but it remarked that "Mexican appearance" could be "a relevant factor" out of many to justify such a stop "at the border and its functional equivalents." *Id.*, at 884–887; see also *id.*, at 882 (recognizing that "the border" includes entire metropolitan areas such as San Diego, El Paso, and the South Texas Rio Grande Valley).[31] The Court thus facilitated racial profiling of Latinos as a law enforcement tool and did not adopt a race-blind rule. The Court later extended this reasoning to border patrol agents selectively referring motorists for secondary inspection at a checkpoint, concluding that "even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry, [there is] no constitutional violation." *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 562–563 (1976) (footnote omitted).

The result of today's decision is that a person's skin color may play a role in assessing individualized suspicion, but it cannot play a role in assessing that person's individualized contributions to a diverse learning environment. That indefensible reading of the Constitution is not grounded in law and subverts the Fourteenth Amendment's guarantee of equal protection.

### 2

The majority does not dispute that some uses of race are constitutionally permissible. See *ante*, at 15. Indeed, it agrees that a limited use of race is permissible in some college admissions programs. In a footnote, the Court exempts military academies from its ruling in light of "the potentially distinct interests" they may present. *Ante*, at 22, n. 4.

---

[31] The Court's "dictum" that Mexican appearance can be one of many factors rested on now-outdated quantitative premises. *United States* v. *Montero-Camargo*, 208 F. 3d 1122, 1132 (CA9 2000).

To the extent the Court suggests national security interests are "distinct," those interests cannot explain the Court's narrow exemption, as national security interests are also implicated at civilian universities. See *infra*, at 64–65. The Court also attempts to justify its carveout based on the fact that "[n]o military academy is a party to these cases." *Ante*, at 22, n. 4. Yet the same can be said of many other institutions that are not parties here, including the religious universities supporting respondents, which the Court does not similarly exempt from its sweeping opinion. See Brief for Georgetown University et al. as *Amici Curiae* 18–29 (Georgetown Brief) (Catholic colleges and universities noting that they rely on the use of race in their holistic admissions to further not just their academic goals, but also their religious missions); see also *Harvard II*, 980 F. 3d, at 187, n. 24 ("[S]chools that consider race are diverse on numerous dimensions, including in terms of religious affiliation, location, size, and courses of study offered"). The Court's carveout only highlights the arbitrariness of its decision and further proves that the Fourteenth Amendment does not categorically prohibit the use of race in college admissions.

The concurring opinions also agree that the Constitution tolerates some racial classifications. JUSTICE GORSUCH agrees with the majority's conclusion that racial classifications are constitutionally permissible if they advance a compelling interest in a narrowly tailored way. *Ante*, at 23. JUSTICE KAVANAUGH, too, agrees that the Constitution permits the use of race if it survives strict scrutiny. *Ante*, at 2.[32] JUSTICE THOMAS offers an "originalist defense of the

——————

[32] JUSTICE KAVANAUGH agrees that the effects from the legacy of slavery and Jim Crow continue today, citing Justice Marshall's opinion in *Bakke*. *Ante*, at 7 (citing 438 U. S., at 395–402). As explained above, Justice Marshall's view was that *Bakke* covered only a portion of the Fourteenth Amendment's sweeping reach, such that the Court's higher education precedents must be expanded, not constricted. See 438 U. S.,

SOTOMAYOR, J., dissenting

colorblind Constitution," but his historical analysis leads to the inevitable conclusion that the Constitution is not, in fact, colorblind. *Ante*, at 2. Like the majority opinion, JUSTICE THOMAS agrees that race can be used to remedy past discrimination and "to equalize treatment against a concrete baseline of government-imposed inequality." *Ante*, at 18–21. He also argues that race can be used if it satisfies strict scrutiny more broadly, and he considers compelling interests those that prevent anarchy, curb violence, and segregate prisoners. *Ante*, at 26. Thus, although JUSTICE THOMAS at times suggests that the Constitution only permits "directly remedial" measures that benefit "identified victims of discrimination," *ante*, at 20, he agrees that the Constitution tolerates a much wider range of race-conscious measures.

In the end, when the Court speaks of a "colorblind" Constitution, it cannot really mean it, for it is faced with a body of law that recognizes that race-conscious measures are permissible under the Equal Protection Clause. Instead, what the Court actually lands on is an understanding of the Constitution that is "colorblind" *sometimes*, when the Court so chooses. Behind those choices lie the Court's own value judgments about what type of interests are sufficiently compelling to justify race-conscious measures.

Overruling decades of precedent, today's newly constituted Court singles out the limited use of race in holistic college admissions. It strikes at the heart of *Bakke*, *Grutter*, and *Fisher* by holding that racial diversity is an "inescapably imponderable" objective that cannot justify race-conscious affirmative action, *ante*, at 24, even though respondents' objectives simply "mirror the 'compelling interest' this Court

––––––––––

at 395–402 (opinion dissenting in part). Justice Marshall's reading of the Fourteenth Amendment does not support JUSTICE KAVANAUGH'S and the majority's opinions.

42   STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

SOTOMAYOR, J., dissenting

has approved" many times in the past. *Fisher II*, 579 U. S.,
at 382; see, *e.g.*, *UNC*, 567 F. Supp. 3d, at 598 ("the [university's admissions policy] repeatedly cites Supreme Court
precedent as guideposts").[33]   At bottom, without any new
factual or legal justification, the Court overrides its
longstanding holding that diversity in higher education is
of compelling value.

To avoid public accountability for its choice, the Court
seeks cover behind a unique measurability requirement of
its own creation.  None of this Court's precedents, however,
requires that a compelling interest meet some threshold
level of precision to be deemed sufficiently compelling.  In
fact, this Court has recognized as compelling plenty of interests that are equally or more amorphous, including the
"intangible" interest in preserving "public confidence in judicial integrity," an interest that "does not easily reduce to
precise definition."  *Williams-Yulee* v. *Florida Bar*, 575
U. S. 433, 447, 454 (2015) (ROBERTS, C. J., for the Court);
see also, *e.g.*, *Ramirez* v. *Collier*, 595 U. S. ___, ___ (2022)
(ROBERTS, C. J., for the Court) (slip op., at 18) ("[M]aintaining solemnity and decorum in the execution chamber" is a
"compelling" interest); *United States* v. *Alvarez*, 567 U. S.
709, 725 (2012) (plurality opinion) ("[P]rotecting the integrity of the Medal of Honor" is a "compelling interes[t]"); *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126
(1989) ("[P]rotecting the physical and psychological well-being of minors" is a "compelling interest").  Thus, although

---

[33]There is no dispute that respondents' compelling diversity objectives
are "substantial, long-standing, and well documented."  *UNC*, 567
F. Supp. 3d, at 655; *Harvard II*, 980 F. 3d, at 186–187.  SFFA did not
dispute below that respondents have a compelling interest in diversity.
See *id.*, at 185; *Harvard I*, 397 F. Supp. 3d, at 133; Tr. of Oral Arg. in No.
21–707, p. 121.  And its expert agreed that valuable educational benefits
flow from diversity, including richer and deeper learning, reduced bias,
and more creative problem solving.  2 App. in No. 21–707, p. 546.  SFFA's
counsel also emphatically disclaimed the issue at trial.  2 App. in No. 20–
1199, p. 548 ("Diversity and its benefits are not on trial here").

the Members of this majority pay lip service to respondents' "commendable" and "worthy" racial diversity goals, *ante*, at 23–24, they make a clear value judgment today: Racial integration in higher education is not sufficiently important to them. "Today, the proclivities of individuals rule." *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 6).

The majority offers no response to any of this. Instead, it attacks a straw man, arguing that the Court's cases recognize that remedying the effects of "societal discrimination" does not constitute a compelling interest. *Ante*, at 34–35. Yet as the majority acknowledges, while *Bakke* rejected that interest as insufficiently compelling, it upheld a limited use of race in college admissions to promote the educational benefits that flow from diversity. 438 U. S., at 311–315. It is that narrower interest, which the Court has reaffirmed numerous times since *Bakke* and as recently as 2016 in *Fisher II*, see *supra*, at 14–15, that the Court overrules today.

### B

The Court's precedents authorizing a limited use of race in college admissions are not just workable—they have been working. Lower courts have consistently applied them without issue, as exemplified by the opinions below and SFFA's and the Court's inability to identify any split of authority. Today, the Court replaces this settled framework with a set of novel restraints that create troubling equal protection problems and share one common purpose: to make it impossible to use race in a holistic way in college admissions, where it is much needed.

#### 1

The Court argues that Harvard's and UNC's programs must end because they unfairly disadvantage some racial groups. According to the Court, college admissions are a "zero-sum" game and respondents' use of race unfairly "ad-

vantages" underrepresented minority students "at the expense of" other students. *Ante*, at 27.

That is not the role race plays in holistic admissions. Consistent with the Court's precedents, respondents' holistic review policies consider race in a very limited way. Race is only one factor out of many. That type of system allows Harvard and UNC to assemble a diverse class on a multitude of dimensions. Respondents' policies allow them to select students with various unique attributes, including talented athletes, artists, scientists, and musicians. They also allow respondents to assemble a class with diverse viewpoints, including students who have different political ideologies and academic interests, who have struggled with different types of disabilities, who are from various socioeconomic backgrounds, who understand different ways of life in various parts of the country, and—yes—students who self-identify with various racial backgrounds and who can offer different perspectives because of that identity.

That type of multidimensional system benefits all students. In fact, racial groups that are not underrepresented tend to benefit disproportionately from such a system. Harvard's holistic system, for example, provides points to applicants who qualify as "ALDC," meaning "athletes, legacy applicants, applicants on the Dean's Interest List [primarily relatives of donors], and children of faculty or staff." *Harvard II*, 980 F. 3d, at 171 (noting also that "SFFA does not challenge the admission of this large group"). ALDC applicants are predominantly white: Around 67.8% are white, 11.4% are Asian American, 6% are Black, and 5.6% are Latino. *Ibid.* By contrast, only 40.3% of non-ALDC applicants are white, 28.3% are Asian American, 11% are Black, and 12.6% are Latino. *Ibid.* Although "ALDC applicants make up less than 5% of applicants to Harvard," they constitute "around 30% of the applicants admitted each year." *Ibid.* Similarly, because of achievement gaps that result from entrenched racial inequality in K–12 education, see *infra*, at

SOTOMAYOR, J., dissenting

18–21, a heavy emphasis on grades and standardized test scores disproportionately disadvantages underrepresented racial minorities. Stated simply, race is one small piece of a much larger admissions puzzle where most of the pieces disfavor underrepresented racial minorities. That is precisely why underrepresented racial minorities remain *under*represented. The Court's suggestion that an already advantaged racial group is "disadvantaged" because of a limited use of race is a myth.

The majority's true objection appears to be that a limited use of race in college admissions does, in fact, achieve what it is designed to achieve: It helps equalize opportunity and advances respondents' objectives by increasing the number of underrepresented racial minorities on college campuses, particularly Black and Latino students. This is unacceptable, the Court says, because racial groups that are not underrepresented "would be admitted in greater numbers" without these policies. *Ante*, at 28. Reduced to its simplest terms, the Court's conclusion is that an increase in the representation of racial minorities at institutions of higher learning that were historically reserved for white Americans is an unfair and repugnant outcome that offends the Equal Protection Clause. It provides a license to discriminate against white Americans, the Court says, which requires the courts and state actors to "pic[k] the right races to benefit." *Ante*, at 38.

Nothing in the Fourteenth Amendment or its history supports the Court's shocking proposition, which echoes arguments made by opponents of Reconstruction-era laws and this Court's decision in *Brown*. *Supra*, at 2–17. In a society where opportunity is dispensed along racial lines, racial equality cannot be achieved without making room for underrepresented groups that for far too long were denied admission through the force of law, including at Harvard and UNC. Quite the opposite: A racially integrated vision of so-

ciety, in which institutions reflect all sectors of the American public and where "the sons of former slaves and the sons of former slave owners [are] able to sit down together at the table of brotherhood," is precisely what the Equal Protection Clause commands. Martin Luther King "I Have a Dream" Speech (Aug. 28, 1963). It is "essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U. S., at 332.[34]

By singling out race, the Court imposes a special burden on racial minorities for whom race is a crucial component of their identity. Holistic admissions require "truly individualized consideration" of the whole person. *Id.*, at 334. Yet, "by foreclosing racial considerations, colorblindness denies those who racially self-identify the full expression of their identity" and treats "racial identity as inferior" among all "other forms of social identity." E. Boddie, The Indignities of Colorblindness, 64 UCLA L. Rev. Discourse, 64, 67 (2016). The Court's approach thus turns the Fourteenth Amendment's equal protection guarantee on its head and creates an equal protection problem of its own.

There is no question that minority students will bear the burden of today's decision. Students of color testified at

---

[34]The Court suggests that promoting the Fourteenth Amendment's vision of equality is a "radical" claim of judicial power and the equivalent of "pick[ing] winners and losers based on the color of their skin." *Ante*, at 38. The law sometimes requires consideration of race to achieve racial equality. Just like drawing district lines that comply with the Voting Rights Act may require consideration of race along with other demographic factors, achieving racial diversity in higher education requires consideration of race along with "age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw* v. *Reno*, 509 U. S. 630, 646 (1993) ("[R]ace consciousness does not lead inevitably to impermissible race discrimination"). Moreover, in ordering the admission of Black children to all-white schools "with all deliberate speed" in *Brown* v. *Board of Education*, 349 U. S. 294, 301 (1955), this Court did not decide that the Black children should receive an "advantag[e] . . . at the expense of" white children. *Ante*, at 27. It simply enforced the Equal Protection Clause by leveling the playing field.

SOTOMAYOR, J., dissenting

trial that racial self-identification was an important component of their application because without it they would not be able to present a full version of themselves. For example, Rimel Mwamba, a Black UNC alumna, testified that it was "really important" that UNC see who she is "holistically and how the color of [her] skin and the texture of [her] hair impacted [her] upbringing." 2 App. in No. 21–707, p. 1033. Itzel Vasquez-Rodriguez, who identifies as Mexican-American of Cora descent, testified that her ethnoracial identity is a "core piece" of who she is and has impacted "every experience" she has had, such that she could not explain her "potential contributions to Harvard without any reference" to it. 2 App. in No. 20–1199, at 906, 908. Sally Chen, a Harvard alumna who identifies as Chinese American, explained that being the child of Chinese immigrants was "really fundamental to explaining who" she is. *Id.*, at 968–969. Thang Diep, a Harvard alumnus, testified that his Vietnamese identity was "such a big part" of himself that he needed to discuss it in his application. *Id.*, at 949. And Sarah Cole, a Black Harvard alumna, emphasized that "[t]o try to not see [her] race is to try to not see [her] simply because there is no part of [her] experience, no part of [her] journey, no part of [her] life that has been untouched by [her] race." *Id.*, at 932.

In a single paragraph at the end of its lengthy opinion, the Court suggests that "nothing" in today's opinion prohibits universities from considering a student's essay that explains "how race affected [that student's] life." *Ante*, at 39. This supposed recognition that universities can, in some situations, consider race in application essays is nothing but an attempt to put lipstick on a pig. The Court's opinion circumscribes universities' ability to consider race in any form by meticulously gutting respondents' asserted diversity interests. See *supra*, at 41–43. Yet, because the Court cannot escape the inevitable truth that race matters in students' lives, it announces a false promise to save face and appear

attuned to reality.  No one is fooled.

Further, the Court's demand that a student's discussion of racial self-identification be tied to individual qualities, such as "courage," "leadership," "unique ability," and "determination," only serves to perpetuate the false narrative that Harvard and UNC currently provide "preferences on the basis of race alone." *Ante*, at 28–29, 39; see also *ante*, at 28, n. 6 (claiming without support that "race alone . . . explains the admissions decisions for hundreds if not thousands of applicants").  The Court's precedents already require that universities take race into account holistically, in a limited way, and based on the type of "individualized" and "flexible" assessment that the Court purports to favor. *Grutter*, 539 U. S., at 334; see Brief for Students and Alumni of Harvard College as *Amici Curiae* 15–17 (Harvard College Brief ) (describing how the dozens of application files in the record "uniformly show that, in line with Harvard's 'whole-person' admissions philosophy, Harvard's admissions officers engage in a highly nuanced assessment of each applicant's background and qualifications").  After extensive discovery and two lengthy trials, neither SFFA nor the majority can point to a single example of an underrepresented racial minority who was admitted to Harvard or UNC on the basis of "race alone."

In the end, the Court merely imposes its preferred college application format on the Nation, not acting as a court of law applying precedent but taking on the role of college administrators to decide what is better for society.  The Court's course reflects its inability to recognize that racial identity informs some students' viewpoints and experiences in unique ways.  The Court goes as far as to claim that *Bakke*'s recognition that Black Americans can offer different perspectives than white people amounts to a "stereotype." *Ante*, at 29.

It is not a stereotype to acknowledge the basic truth that

young people's experiences are shaded by a societal structure where race matters. Acknowledging that there is something special about a student of color who graduates valedictorian from a predominantly white school is not a stereotype. Nor is it a stereotype to acknowledge that race imposes certain burdens on students of color that it does not impose on white students. "For generations, black and brown parents have given their children 'the talk'—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them." *Utah* v. *Strieff*, 579 U. S. 232, 254 (2016) (SOTOMAYOR, J., dissenting). Those conversations occur regardless of socioeconomic background or any other aspect of a student's self-identification. They occur because of race. As Andrew Brennen, a UNC alumnus, testified, "running down the neighborhood . . . people don't see [him] as someone that is relatively affluent; they see [him] as a black man." 2 App. in No. 21–707, at 951–952.

The absence of racial diversity, by contrast, actually contributes to stereotyping. "[D]iminishing the force of such stereotypes is both a crucial part of [respondents'] mission, and one that [they] cannot accomplish with only token numbers of minority students." *Grutter*, 539 U. S., at 333. When there is an increase in underrepresented minority students on campus, "racial stereotypes lose their force" because diversity allows students to "learn there is no 'minority viewpoint' but rather a variety of viewpoints among minority students." *Id.*, at 319–320. By preventing respondents from achieving their diversity objectives, it is the Court's opinion that facilitates stereotyping on American college campuses.

To be clear, today's decision leaves intact holistic college admissions and recruitment efforts that seek to enroll diverse classes without using racial classifications. Universities should continue to use those tools as best they can to

recruit and admit students from different backgrounds based on all the other factors the Court's opinion does not, and cannot, touch. Colleges and universities can continue to consider socioeconomic diversity and to recruit and enroll students who are first-generation college applicants or who speak multiple languages, for example. Those factors are not "interchangeable" with race. *UNC*, 567 F. Supp. 3d, at 643; see, *e.g.*, 2 App. in No. 21–707, at 975–976 (Laura Ornelas, a UNC alumna, testifying that her Latina identity, socioeconomic status, and first-generation college status are all important but different "parts to getting a full picture" of who she is and how she "see[s] the world"). At SFFA's own urging, those efforts remain constitutionally permissible. See Brief for Petitioner 81–86 (emphasizing "race-neutral" alternatives that Harvard and UNC should implement, such as those that focus on socioeconomic and geographic diversity, percentage plans, plans that increase community college transfers, and plans that develop partnerships with disadvantaged high schools); see also *ante*, at 51, 53, 55–56 (THOMAS, J., concurring) (arguing universities can consider "[r]ace-neutral policies" similar to those adopted in States such as California and Michigan, and that universities can consider "status as a first-generation college applicant," "financial means," and "generational inheritance or otherwise"); *ante*, at 8 (KAVANAUGH, J., concurring) (citing SFFA's briefs and concluding that universities can use "race-neutral" means); *ante*, at 14, n. 4 (GORSUCH, J., concurring) ("recount[ing] what SFFA has argued every step of the way" as to "race-neutral tools").

The Court today also does not adopt SFFA's suggestion that college admissions should be a function of academic metrics alone. Using class rank or standardized test scores as the only admissions criteria would severely undermine multidimensional diversity in higher education. Such a system "would exclude the star athlete or musician whose grades suffered because of daily practices and training. It

Cite as: 600 U. S. ____ (2023)           51

SOTOMAYOR, J., dissenting

would exclude a talented young biologist who struggled to maintain above-average grades in humanities classes. And it would exclude a student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school, only to find herself just outside of the top decile of her class." *Fisher II*, 579 U. S., at 386. A myopic focus on academic ratings "does not lead to a diverse student body." *Ibid.*[35]

2

As noted above, this Court suggests that the use of race in college admissions is unworkable because respondents' objectives are not sufficiently "measurable," "focused," "concrete," and "coherent." *Ante*, at 23, 26, 39. How much more precision is required or how universities are supposed to meet the Court's measurability requirement, the Court's opinion does not say. That is exactly the point. The Court is not interested in crafting a workable framework that promotes racial diversity on college campuses. Instead, it announces a requirement designed to ensure all race-conscious plans fail. Any increased level of precision runs the risk of violating the Court's admonition that colleges and universities operate their race-conscious admissions policies with no "'specified percentage[s]'" and no "specific number[s] firmly in mind." *Grutter*, 539 U. S., at 324, 335. Thus, the majority's holding puts schools in an untenable position. It creates a legal framework where race-conscious plans *must* be measured with precision but also *must not* be measured with precision. That holding is not meant to infuse clarity into the strict scrutiny framework; it is designed to render strict scrutiny "'fatal in fact.'" *Id.*, at 326 (quoting *Adarand*

_____

[35] Today's decision is likely to generate a plethora of litigation by disappointed college applicants who think their credentials and personal qualities should have secured them admission. By inviting those challenges, the Court's opinion promotes chaos and incentivizes universities to convert their admissions programs into inflexible systems focused on mechanical factors, which will harm all students.

*Constructors, Inc.*, 515 U. S., at 237). Indeed, the Court
gives the game away when it holds that, to the extent re-
spondents are actually measuring their diversity objectives
with any level of specificity (for example, with a "focus on
numbers" or specific "numerical commitment"), their plans
are unconstitutional. *Ante*, at 30–31; see also *ante*, at 29
(THOMAS, J., concurring) ("I highly doubt any [university]
will be able to" show a "measurable state interest").

3

The Court also holds that Harvard's and UNC's race-
conscious programs are unconstitutional because they rely
on racial categories that are "imprecise," "opaque," and "ar-
bitrary." *Ante*, at 25. To start, the racial categories that
the Court finds troubling resemble those used across the
Federal Government for data collection, compliance report-
ing, and program administration purposes, including, for
example, by the U. S. Census Bureau. See, *e.g.*, 62 Fed.
Reg. 58786–58790 (1997). Surely, not all "'federal grant-in-
aid benefits, drafting of legislation, urban and regional
planning, business planning, and academic and social stud-
ies'" that flow from census data collection, *Department of
Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op.,
at 2), are constitutionally suspect.

The majority presumes that it knows better and appoints
itself as an expert on data collection methods, calling for a
higher level of granularity to fix a supposed problem of
overinclusiveness and underinclusiveness. Yet it does not
identify a single instance where respondents' methodology
has prevented any student from reporting their race with
the level of detail they preferred. The record shows that it
is up to students to choose whether to identify as one, mul-
tiple, or none of these categories. See *Harvard I*, 397
F. Supp. 3d, at 137; *UNC*, 567 F. Supp. 3d, at 596. To the
extent students need to convey additional information, stu-
dents can select subcategories or provide more detail in

SOTOMAYOR, J., dissenting

their personal statements or essays. See *Harvard I*, 397
F. Supp. 3d, at 137. Students often do so. See, *e.g.*, 2 App.
in No. 20–1199, at 906–907 (student respondent discussing
her Latina identity on her application); *id.*, at 949 (student
respondent testifying he "wrote about [his] Vietnamese
identity on [his] application"). Notwithstanding this
Court's confusion about racial self-identification, neither
students nor universities are confused. There is no evi-
dence that the racial categories that respondents use are
unworkable.[36]

4

Cherry-picking language from *Grutter*, the Court also
holds that Harvard's and UNC's race-conscious programs
are unconstitutional because they do not have a specific ex-
piration date. *Ante*, at 30–34. This new durational require-
ment is also not grounded in law, facts, or common sense.
*Grutter* simply announced a general "expect[ation]" that
"the use of racial preferences [would] no longer be neces-
sary" in the future. 539 U. S., at 343. As even SFFA
acknowledges, those remarks were nothing but aspirational
statements by the *Grutter* Court. Tr. of Oral Arg. in No.
21–707, p. 56.

Yet this Court suggests that everyone, including the
Court itself, has been misreading *Grutter* for 20 years.

–––––––––

[36] The Court suggests that the term "Asian American" was developed
by respondents because they are "uninterested" in whether Asian Amer-
ican students "are adequately represented." *Ante*, at 25; see also *ante*, at
5 (GORSUCH, J., concurring) (suggesting that "[b]ureaucrats" devised a
system that grouped all Asian Americans into a single racial category).
That argument offends the history of that term. "The term 'Asian Amer-
ican' was coined in the late 1960s by Asian American activists—mostly
college students—to unify Asian ethnic groups that shared common ex-
periences of race-based violence and discrimination and to advocate for
civil rights and visibility." Brief for Asian American Legal Defense and
Education Fund et al. as *Amici Curiae* 9 (AALDEF Brief).

*Grutter*, according to the majority, requires that universities identify a specific "end point" for the use of race. *Ante*, at 33. JUSTICE KAVANAUGH, for his part, suggests that *Grutter* itself automatically expires in 25 years, after either "the college class of 2028" or "the college class of 2032." *Ante*, at 7, n. 1. A faithful reading of this Court's precedents reveals that *Grutter* held nothing of the sort.

True, *Grutter* referred to "25 years," but that arbitrary number simply reflected the time that had elapsed since the Court "first approved the use of race" in college admissions in *Bakke*. *Grutter*, 539 U. S., at 343. It is also true that *Grutter* remarked that "race-conscious admissions policies must be limited in time," but it did not do so in a vacuum, as the Court suggests. *Id.*, at 342. Rather than impose a fixed expiration date, the Court tasked universities with the responsibility of periodically assessing whether their race-conscious programs "are still necessary." *Ibid. Grutter* offered as examples sunset provisions, periodic reviews, and experimenting with "race-neutral alternatives as they develop." *Ibid.* That is precisely how this Court has previously interpreted *Grutter*'s command. See *Fisher II*, 579 U. S., at 388 ("It is the University's ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies").

*Grutter*'s requirement that universities engage in periodic reviews so the use of race can end "as soon as practicable" is well grounded in the need to ensure that race is "employed no more broadly than the interest demands." 539 U. S., at 343. That is, it is grounded in strict scrutiny. By contrast, the Court's holding is based on the fiction that racial inequality has a predictable cutoff date. Equality is an ongoing project in a society where racial inequality persists. See *supra*, at 17–25. A temporal requirement that rests on the fantasy that racial inequality will end at a predictable hour is illogical and unworkable. There is a sound reason

Cite as: 600 U. S. ____ (2023)          55

SOTOMAYOR, J., dissenting

why this Court's precedents have never imposed the majority's strict deadline: Institutions cannot predict the future. Speculating about a day when consideration of race will become unnecessary is arbitrary at best and frivolous at worst. There is no constitutional duty to engage in that type of shallow guesswork.[37]

Harvard and UNC engage in the ongoing review that the Court's precedents demand. They "use [their] data to scrutinize the fairness of [their] admissions program[s]; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures [they] dee[m] necessary." *Fisher II*, 579 U. S., at 388. The Court holds, however, that respondents' attention to numbers amounts to unconstitutional racial balancing. *Ante*, at 30–32. But "'[s]ome attention to numbers'" is both necessary and permissible. *Grutter*, 539 U. S., at 336 (quoting *Bakke*, 438 U. S., at 323). Universities cannot blindly operate their limited race-conscious programs without regard for any quantitative information. "Increasing minority enrollment [is] instrumental to th[e] educational benefits" that respondents seek to achieve, *Fisher II*, 579 U. S., at 381, and statistics, data, and numbers "have some value

––––––––––

[37] JUSTICE KAVANAUGH's reading, in particular, is quite puzzling. Unlike the majority, which concludes that respondents' programs should have an end point, JUSTICE KAVANAUGH suggests that *Grutter* itself has an expiration date. He agrees that racial inequality persists, *ante*, at 7–8, but at the same time suggests that race-conscious affirmative action was only necessary in "another generation," *ante*, at 4. He attempts to analogize expiration dates of court-ordered injunctions in desegregation cases, *ante*, at 5, but an expiring injunction does not eliminate the underlying constitutional principle. His musings about different college classes, *ante*, at 7, n. 1, are also entirely beside the point. Nothing in *Grutter*'s analysis turned on whether someone was applying for the class of 2028 or 2032. That reading of *Grutter* trivializes the Court's precedent by reducing it to an exercise in managing academic calendars. *Grutter* is no such thing.

as a gauge of [respondents'] ability to enroll students who can offer underrepresented perspectives." *Id.*, at 383–384. By removing universities' ability to assess the success of their programs, the Court obstructs these institutions' ability to meet their diversity goals.

5

JUSTICE THOMAS, for his part, offers a multitude of arguments for why race-conscious college admissions policies supposedly "burden" racial minorities. *Ante*, at 39. None of them has any merit.

He first renews his argument that the use of race in holistic admissions leads to the "inevitable" "underperformance" by Black and Latino students at elite universities "because they are less academically prepared than the white and Asian students with whom they must compete." *Fisher I*, 570 U. S., at 332 (concurring opinion). JUSTICE THOMAS speaks only for himself. The Court previously declined to adopt this so-called "mismatch" hypothesis for good reason: It was debunked long ago. The decades-old "studies" advanced by the handful of authors upon whom JUSTICE THOMAS relies, *ante*, at 40–41, have "major methodological flaws," are based on unreliable data, and do not "meet the basic tenets of rigorous social science research." Brief for Empirical Scholars as *Amici Curiae* 3, 9–25. By contrast, "[m]any social scientists have studied the impact of elite educational institutions on student outcomes, and have found, among other things, that attending a more selective school is associated with higher graduation rates and higher earnings for [underrepresented minority] students—conclusions directly contrary to mismatch." *Id.*, at 7–9 (collecting studies). This extensive body of research is supported by the most obvious data point available to this institution today: The three Justices of color on this Court graduated from elite universities and law schools with race-

conscious admissions programs, and achieved successful legal careers, despite having different educational backgrounds than their peers. A discredited hypothesis that the Court previously rejected is no reason to overrule precedent.

JUSTICE THOMAS claims that the weight of this evidence is overcome by a single more recent article published in 2016. *Ante*, at 41, n. 8. That article, however, explains that studies supporting the mismatch hypothesis "yield misleading conclusions," "overstate the amount of mismatch," "preclude one from drawing any concrete conclusions," and rely on methodologically flawed assumptions that "lea[d] to an upwardly-biased estimate of mismatch." P. Arcidiacono & M. Lovenheim, Affirmative Action and the Quality-Fit Trade-off, 54 J. Econ. Lit. 3, 17, 20 (2016); see *id.*, at 6 ("economists should be very skeptical of the mismatch hypothesis"). Notably, this refutation of the mismatch theory was coauthored by one of SFFA's experts, as JUSTICE THOMAS seems to recognize.

Citing nothing but his own long-held belief, JUSTICE THOMAS also equates affirmative action in higher education with segregation, arguing that "racial preferences in college admissions 'stamp [Black and Latino students] with a badge of inferiority.'" *Ante*, at 41 (quoting *Adarand*, 515 U. S., at 241 (THOMAS, J., concurring in part and concurring in judgment)). Studies disprove this sentiment, which echoes "tropes of stigma" that "were employed to oppose Reconstruction policies." A. Onwuachi-Willig, E. Houh, & M. Campbell, Cracking the Egg: Which Came First—Stigma or Affirmative Action? 96 Cal. L. Rev. 1299, 1323 (2008); see, *e.g.*, *id.*, at 1343–1344 (study of seven law schools showing that stigma results from "racial stereotypes that have attached historically to different groups, regardless of affirmative action's existence"). Indeed, equating state-sponsored segregation with race-conscious admissions policies that promote racial integration trivializes the harms of segregation and offends

*Brown*'s transformative legacy. School segregation "has a detrimental effect" on Black students by "denoting the inferiority" of "their status in the community" and by "'depriv[ing] them of some of the benefits they would receive in a racial[ly] integrated school system.'" 347 U. S., at 494. In sharp contrast, race-conscious college admissions ensure that higher education is "visibly open to" and "inclusive of talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U. S., at 332. These two uses of race are not created equal. They are not "equally objectionable." *Id.*, at 327.

Relatedly, JUSTICE THOMAS suggests that race-conscious college admissions policies harm racial minorities by increasing affinity-based activities on college campuses. *Ante*, at 46. Not only is there no evidence of a causal connection between the use of race in college admissions and the supposed rise of those activities, but JUSTICE THOMAS points to no evidence that affinity groups cause any harm. Affinity-based activities actually help racial minorities improve their visibility on college campuses and "decreas[e] racial stigma and vulnerability to stereotypes" caused by "conditions of racial isolation" and "tokenization." U. Jayakumar, Why Are All Black Students *Still* Sitting Together in the Proverbial College Cafeteria?, Higher Education Research Institute at UCLA (Oct. 2015); see also Brief for Respondent-Students in No. 21–707, p. 42 (collecting student testimony demonstrating that "affinity groups beget important academic and social benefits" for racial minorities); 4 App. in No. 20–1199, at 1591 (Harvard Working Group on Diversity and Inclusion Report) (noting that concerns "that culturally specific spaces or affinity-themed housing will isolate" student minorities are misguided because those spaces allow students "to come together . . . to deal with intellectual, emotional, and social challenges").

Citing no evidence, JUSTICE THOMAS also suggests that race-conscious admissions programs discriminate against

Cite as: 600 U. S. ____ (2023)           59

SOTOMAYOR, J., dissenting

Asian American students. *Ante*, at 43–44. It is true that SFFA "allege[d]" that Harvard discriminates against Asian American students. *Ante*, at 43. Specifically, SFFA argued that Harvard discriminates against Asian American applicants vis-à-vis white applicants through the use of the personal rating, an allegedly "highly subjective" component of the admissions process that is "susceptible to stereotyping and bias." *Harvard II*, 980 F. 3d, at 196; see Brief for Professors of Economics as *Amici Curiae* 24. It is also true, however, that there was a lengthy trial to test those allegations, which SFFA lost. JUSTICE THOMAS points to no legal or factual error below, precisely because there is none.

To begin, this part of SFFA's discrimination claim does not even fall under the strict scrutiny framework in *Grutter* and its progeny, which concerns the use of racial classifications. The personal rating is a facially race-*neutral* component of Harvard's admissions policy.[38] Therefore, even assuming for the sake of argument that Harvard engages in racial discrimination through the personal rating, there is no connection between that rating and the remedy that SFFA sought and that the majority grants today: ending the limited use of race in the entire admissions process. In any event, after assessing the credibility of fact witnesses and considering extensive documentary evidence and expert testimony, the courts below found "no discrimination against Asian Americans." *Harvard II*, 980 F. 3d, at 195, n. 34, 202; see *id.*, at 195–204.

There is no question that the Asian American community continues to struggle against potent and dehumanizing stereotypes in our society. It is precisely because racial discrimination persists in our society, however, that the use of

_____

[38] Before 2018, Harvard's admissions procedures were silent on the use of race in connection with the personal rating. *Harvard II*, 980 F. 3d, at 169. Harvard later modified its instructions to say explicitly that "'an applicant's race or ethnicity should not be considered in assigning the personal rating.'" *Ibid.*

race in college admissions to achieve racially diverse classes is critical to improving cross-racial understanding and breaking down racial stereotypes. See *supra*, at 16. Indeed, the record shows that some Asian American applicants are actually "advantaged by Harvard's use of race," *Harvard II*, 980 F. 3d, at 191, and "eliminating consideration of race would significantly disadvantage at least some Asian American applicants," *Harvard I*, 397 F. Supp. 3d, at 194. Race-conscious holistic admissions that contextualize the racial identity of each individual allow Asian American applicants "who would be less likely to be admitted without a comprehensive understanding of their background" to explain "the value of their unique background, heritage, and perspective." *Id.*, at 195. Because the Asian American community is not a monolith, race-conscious holistic admissions allow colleges and universities to "consider the vast differences within [that] community." AALDEF Brief 4–14. Harvard's application files show that race-conscious holistic admissions allow Harvard to "valu[e] the diversity of Asian American applicants' experiences." Harvard College Brief 23.

Moreover, the admission rates of Asian Americans at institutions with race-conscious admissions policies, including at Harvard, have "been steadily increasing for decades." *Harvard II*, 980 F. 3d, at 198.[39] By contrast, Asian American enrollment declined at elite universities that are prohibited by state law from considering race. See AALDEF Brief 27; Brief for 25 Diverse, California-Focused Bar Associations et al. as *Amici Curiae* 19–20, 23. At bottom, race-conscious admissions benefit all students, including racial minorities. That includes the Asian American community.

Finally, JUSTICE THOMAS belies reality by suggesting that "experts and elites" with views similar to those "that

---

[39] At Harvard, "Asian American applicants are accepted at the same rate as other applicants and now make up more than 20% of Harvard's admitted classes," even though "only about 6% of the United States population is Asian American." *Harvard I*, 397 F. Supp. 3d, at 203.

motivated *Dred Scott* and *Plessy*" are the ones who support race conscious admissions. *Ante*, at 39. The plethora of young students of color who testified in favor of race-consciousness proves otherwise. See *supra*, at 46–47; see also *infra*, at 64–67 (discussing numerous *amici* from many sectors of society supporting respondents' policies). Not a single student—let alone any racial minority—affected by the Court's decision testified in favor of SFFA in these cases.

### C

In its "radical claim to power," the Court does not even acknowledge the important reliance interests that this Court's precedents have generated. *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 53). Significant rights and expectations will be affected by today's decision nonetheless. Those interests supply "added force" in favor of *stare decisis. Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991).

Students of all backgrounds have formed settled expectations that universities with race-conscious policies "will provide diverse, cross-cultural experiences that will better prepare them to excel in our increasingly diverse world." Brief for Respondent-Students in No. 21–707, at 45; see Harvard College Brief 6–11 (collecting student testimony).

Respondents and other colleges and universities with race-conscious admissions programs similarly have concrete reliance interests because they have spent significant resources in an effort to comply with this Court's precedents. "Universities have designed courses that draw on the benefits of a diverse student body," "hired faculty whose research is enriched by the diversity of the student body," and "promoted their learning environments to prospective students who have enrolled based on the understanding that they could obtain the benefits of diversity of all kinds." Brief for Respondent in No. 20–1199, at 40–41 (internal

quotation marks omitted). Universities also have "expended vast financial and other resources" in "training thousands of application readers on how to faithfully apply this Court's guardrails on the use of race in admissions." Brief for University Respondents in No. 21–707, p. 44. Yet today's decision abruptly forces them "to fundamentally alter their admissions practices." *Id.*, at 45; see also Brief for Massachusetts Institute of Technology et al. as *Amici Curiae* 25–26; Brief for Amherst College et al. as *Amici Curiae* 23–25 (Amherst Brief). As to Title VI in particular, colleges and universities have relied on *Grutter* for decades in accepting federal funds. See Brief for United States as *Amicus Curiae* in No. 20–1199, p. 25 (United States Brief); Georgetown Brief 16.

The Court's failure to weigh these reliance interests "is a stunning indictment of its decision." *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 55).

## IV

The use of race in college admissions has had profound consequences by increasing the enrollment of underrepresented minorities on college campuses. This Court presupposes that segregation is a sin of the past and that race-conscious college admissions have played no role in the progress society has made. The fact that affirmative action in higher education "has worked and is continuing to work" is no reason to abandon the practice today. *Shelby County* v. *Holder*, 570 U. S. 529, 590 (2013) (Ginsburg, J., dissenting) ("[It] is like throwing away your umbrella in a rainstorm because you are not getting wet").

Experience teaches that the consequences of today's decision will be destructive. The two lengthy trials below simply confirmed what we already knew: Superficial colorblindness in a society that systematically segregates opportunity will cause a sharp decline in the rates at which underrepresented minority students enroll in our Nation's

SOTOMAYOR, J., dissenting

colleges and universities, turning the clock back and undo-
ing the slow yet significant progress already achieved. See
*Schuette*, 572 U. S., at 384–390 (SOTOMAYOR, J., dissenting)
(collecting statistics from States that have banned the use
of race in college admissions); see also Amherst Brief 13
(noting that eliminating the use of race in college admis-
sions will take Black student enrollment at elite universi-
ties back to levels this country saw in the early 1960s).

After California amended its State Constitution to pro-
hibit race-conscious college admissions in 1996, for exam-
ple, "freshmen enrollees from underrepresented minority
groups dropped precipitously" in California public universi-
ties. Brief for President and Chancellors of the University
of California as *Amici Curiae* 4, 9, 11–13. The decline was
particularly devastating at California's most selective cam-
puses, where the rates of admission of underrepresented
groups "dropped by 50% or more." *Id.*, at 4, 12. At the Uni-
versity of California, Berkeley, a top public university not
just in California but also nationally, the percentage of
Black students in the freshman class dropped from 6.32%
in 1995 to 3.37% in 1998. *Id.*, at 12–13. Latino representa-
tion similarly dropped from 15.57% to 7.28% during that
period at Berkeley, even though Latinos represented 31%
of California public high school graduates. *Id.*, at 13. To
this day, the student population at California universities
still "reflect[s] a persistent inability to increase opportuni-
ties" for all racial groups. *Id.*, at 23. For example, as of
2019, the proportion of Black freshmen at Berkeley was
2.76%, well below the pre-constitutional amendment level
in 1996, which was 6.32%. *Ibid.* Latinos composed about
15% of freshmen students at Berkeley in 2019, despite mak-
ing up 52% of all California public high school graduates.
*Id.*, at 24; see also Brief for University of Michigan as *Ami-
cus Curiae* 21–24 (noting similar trends at the University
of Michigan from 2006, the last admissions cycle before
Michigan's ban on race-conscious admissions took effect,

through present); *id.*, at 24–25 (explaining that the university's "experience is largely consistent with other schools that do not consider race as a factor in admissions," including, for example, the University of Oklahoma's most prestigious campus).

The costly result of today's decision harms not just respondents and students but also our institutions and democratic society more broadly. Dozens of *amici* from nearly every sector of society agree that the absence of race-conscious college admissions will decrease the pipeline of racially diverse college graduates to crucial professions. Those *amici* include the United States, which emphasizes the need for diversity in the Nation's military, see United States Brief 12–18, and in the federal workforce more generally, *id.*, at 19–20 (discussing various federal agencies, including the Federal Bureau of Investigation and the Office of the Director of National Intelligence). The United States explains that "the Nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially diverse—and who have been educated in diverse environments that prepare them to lead increasingly diverse forces." *Id.*, at 12. That is true not just at the military service academies but "at civilian universities, including Harvard, that host Reserve Officers' Training Corps (ROTC) programs and educate students who go on to become officers." *Ibid.* Top former military leaders agree. See Brief for Adm. Charles S. Abbot et al. as *Amici Curiae* 3 (noting that in *amici*'s "professional judgment, the status quo—which permits service academies and civilian universities to consider racial diversity as one factor among many in their admissions practices—is essential to the continued vitality of the U. S. military").

Indeed, history teaches that racial diversity is a national security imperative. During the Vietnam War, for example, lack of racial diversity "threatened the integrity and perfor-

mance of the Nation's military" because it fueled "perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders."  Military Leadership Diversity Comm'n, From Representation to Inclusion: Diversity Leadership for the 21st-Century Military xvi, 15 (2011); see also, *e.g.*, R. Stillman, Racial Unrest in the Military: The Challenge and the Response, 34 Pub. Admin. Rev. 221, 221–222 (1974) (discussing other examples of racial unrest). Based on "lessons from decades of battlefield experience," it has been the "longstanding military judgment" across administrations that racial diversity "is essential to achieving a mission-ready" military and to ensuring the Nation's "ability to compete, deter, and win in today's increasingly complex global security environment."  United States Brief 13 (internal quotation marks omitted).  The majority recognizes the compelling need for diversity in the military and the national security implications at stake, see *ante*, at 22, n. 4, but it ends race-conscious college admissions at civilian universities implicating those interests anyway.

*Amici* also tell the Court that race-conscious college admissions are critical for providing equitable and effective public services.  State and local governments require public servants educated in diverse environments who can "identify, understand, and respond to perspectives" in "our increasingly diverse communities."  Brief for Southern Governors as *Amici Curiae* 5–8 (Southern Governors Brief ). Likewise, increasing the number of students from underrepresented backgrounds who join "the ranks of medical professionals" improves "healthcare access and health outcomes in medically underserved communities."  Brief for Massachusetts et al. as *Amici Curiae* 10; see Brief for Association of American Medical Colleges et al. as *Amici Curiae* 5 (noting also that *all* physicians become better practitioners when they learn in a racially diverse environment).  So too, greater diversity within the teacher workforce improves student academic achievement in primary public

SOTOMAYOR, J., dissenting

schools. Brief for Massachusetts et al. as *Amici Curiae* 15–17; see Brief for American Federation of Teachers as *Amicus Curiae* 8 ("[T]here are few professions with broader social impact than teaching"). A diverse pipeline of college graduates also ensures a diverse legal profession, which demonstrates that "the justice system serves the public in a fair and inclusive manner." Brief for American Bar Association as *Amicus Curiae* 18; see also Brief for Law Firm Antiracism Alliance as *Amicus Curiae* 1, 6 (more than 300 law firms in all 50 States supporting race-conscious college admissions in light of the "influence and power" that lawyers wield "in the American system of government").

Examples of other industries and professions that benefit from race-conscious college admissions abound. American businesses emphasize that a diverse workforce improves business performance, better serves a diverse consumer marketplace, and strengthens the overall American economy. Brief for Major American Business Enterprises as *Amici Curiae* 5–27. A diverse pipeline of college graduates also improves research by reducing bias and increasing group collaboration. Brief for Individual Scientists as *Amici Curiae* 13–14. It creates a more equitable and inclusive media industry that communicates diverse viewpoints and perspectives. Brief for Multicultural Media, Telecom and Internet Council, Inc., et al. as *Amici Curiae* 6. It also drives innovation in an increasingly global science and technology industry. Brief for Applied Materials, Inc., et al. as *Amici Curiae* 11–20.

Today's decision further entrenches racial inequality by making these pipelines to leadership roles less diverse. A college degree, particularly from an elite institution, carries with it the benefit of powerful networks and the opportunity for socioeconomic mobility. Admission to college is therefore often the entry ticket to top jobs in workplaces where important decisions are made. The overwhelming majority

of Members of Congress have a college degree.[40]  So do most business leaders.[41]  Indeed, many state and local leaders in North Carolina attended college in the UNC system.  See Southern Governors Brief 8.  More than half of judges on the North Carolina Supreme Court and Court of Appeals graduated from the UNC system, for example, and nearly a third of the Governor's cabinet attended UNC.  *Ibid.*  A less diverse pipeline to these top jobs accumulates wealth and power unequally across racial lines, exacerbating racial disparities in a society that already dispenses prestige and privilege based on race.

The Court ignores the dangerous consequences of an America where its leadership does not reflect the diversity of the People.  A system of government that visibly lacks a path to leadership open to every race cannot withstand scrutiny "in the eyes of the citizenry."  *Grutter*, 539 U. S., at 332.  "[G]ross disparity in representation" leads the public to wonder whether they can ever belong in our Nation's institutions, including this one, and whether those institutions work for them.  Tr. of Oral Arg. in No. 21–707, p. 171 ("The Court is going to hear from 27 advocates in this sitting of the oral argument calendar, and two are women, even though women today are 50 percent or more of law school graduates.  And I think it would be reasonable for a woman to look at that and wonder, is that a path that's open to me, to be a Supreme Court advocate?" (remarks of Solicitor General Elizabeth Prelogar)).[42]

──────────

[40] K. Schaeffer, Pew Research Center, The Changing Face of Congress in 8 Charts (Feb. 7, 2023).

[41] See J. Martelli & P. Abels, The Education of a Leader: Educational Credentials and Other Characteristics of Chief Executive Officers, J. of Educ. for Bus. 216 (2010); see also J. Moody, Where the Top Fortune 500 CEOs Attended College, U. S. News & World Report (June 16, 2021).

[42] Racial inequality in the pipeline to this institution, too, will deepen.  See J. Fogel, M. Hoopes, & G. Liu, Law Clerk Selection and Diversity: Insights From Fifty Sitting Judges of the Federal Courts of Appeals 7–8

SOTOMAYOR, J., dissenting

By ending race-conscious college admissions, this Court closes the door of opportunity that the Court's precedents helped open to young students of every race. It creates a leadership pipeline that is less diverse than our increasingly diverse society, reserving "positions of influence, affluence, and prestige in America" for a predominantly white pool of college graduates. *Bakke*, 438 U. S., at 401 (opinion of Marshall, J.). At its core, today's decision exacerbates segregation and diminishes the inclusivity of our Nation's institutions in service of superficial neutrality that promotes indifference to inequality and ignores the reality of race.

\*    \*    \*

True equality of educational opportunity in racially diverse schools is an essential component of the fabric of our democratic society. It is an interest of the highest order and a foundational requirement for the promotion of equal protection under the law. *Brown* recognized that passive race neutrality was inadequate to achieve the constitutional guarantee of racial equality in a Nation where the effects of segregation persist. In a society where race continues to matter, there is no constitutional requirement that institutions attempting to remedy their legacies of racial exclusion must operate with a blindfold.

Today, this Court overrules decades of precedent and imposes a superficial rule of race blindness on the Nation. The devastating impact of this decision cannot be overstated. The majority's vision of race neutrality will entrench racial

_____

(2022) (noting that from 2005 to 2017, 85% of Supreme Court law clerks were white, 9% were Asian American, 4% were Black, and 1.5% were Latino, and about half of all clerks during that period graduated from two law schools: Harvard and Yale); Brief for American Bar Association as *Amicus Curiae* 25 (noting that more than 85% of lawyers, more than 70% of Article III judges, and more than 80% of state judges in the United States are white, even though white people represent about 60% of the population).

SOTOMAYOR, J., dissenting

segregation in higher education because racial inequality will persist so long as it is ignored.

Notwithstanding this Court's actions, however, society's progress toward equality cannot be permanently halted. Diversity is now a fundamental American value, housed in our varied and multicultural American community that only continues to grow.  The pursuit of racial diversity will go on.  Although the Court has stripped out almost all uses of race in college admissions, universities can and should continue to use all available tools to meet society's needs for diversity in education.  Despite the Court's unjustified exercise of power, the opinion today will serve only to highlight the Court's own impotence in the face of an America whose cries for equality resound.  As has been the case before in the history of American democracy, "the arc of the moral universe" will bend toward racial justice despite the Court's efforts today to impede its progress.  Martin Luther King "Our God is Marching On!" Speech (Mar. 25, 1965).

Cite as: 600 U. S. \_\_\_\_ (2023)          1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 20–1199 and 21–707

_____

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER
20–1199          *v.*
PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT


STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER
21–707          *v.*
UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and
JUSTICE KAGAN join, dissenting.*

Gulf-sized race-based gaps exist with respect to the
health, wealth, and well-being of American citizens. They
were created in the distant past, but have indisputably
been passed down to the present day through the genera-
tions. Every moment these gaps persist is a moment in
which this great country falls short of actualizing one of its
foundational principles—the "self-evident" truth that all of
us are created equal. Yet, today, the Court determines that

_____

*JUSTICE JACKSON did not participate in the consideration or decision
of the case in No. 20–1199, and issues this opinion with respect to the
case in No. 21–707.

holistic admissions programs like the one that the University of North Carolina (UNC) has operated, consistent with *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), are a problem with respect to achievement of that aspiration, rather than a viable solution (as has long been evident to historians, sociologists, and policymakers alike).

JUSTICE SOTOMAYOR has persuasively established that nothing in the Constitution or Title VI prohibits institutions from taking race into account to ensure the racial diversity of admits in higher education. I join her opinion without qualification. I write separately to expound upon the universal benefits of considering race in this context, in response to a suggestion that has permeated this legal action from the start. Students for Fair Admissions (SFFA) has maintained, both subtly and overtly, that it is *unfair* for a college's admissions process to consider race as one factor in a holistic review of its applicants. See, *e.g.*, Tr. of Oral Arg. 19.

This contention blinks both history and reality in ways too numerous to count. But the response is simple: Our country has never been colorblind. Given the lengthy history of state-sponsored race-based preferences in America, to say that anyone is now victimized if a college considers whether that legacy of discrimination has unequally advantaged its applicants fails to acknowledge the well-documented "intergenerational transmission of inequality" that still plagues our citizenry.[1]

It is *that* inequality that admissions programs such as UNC's help to address, to the benefit of us all. Because the majority's judgment stunts that progress without any basis in law, history, logic, or justice, I dissent.

---

[1] M. Oliver & T. Shapiro, Black Wealth/White Wealth: A New Perspective on Racial Inequality 128 (1997) (Oliver & Shapiro) (emphasis deleted).

JACKSON, J., dissenting

## I

### A

Imagine two college applicants from North Carolina, John and James. Both trace their family's North Carolina roots to the year of UNC's founding in 1789. Both love their State and want great things for its people. Both want to honor their family's legacy by attending the State's flagship educational institution. John, however, would be the seventh generation to graduate from UNC. He is White. James would be the first; he is Black. Does the race of these applicants properly play a role in UNC's holistic merits-based admissions process?

To answer that question, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921). Many chapters of America's history appear necessary, given the opinions that my colleagues in the majority have issued in this case.

Justice Thurgood Marshall recounted the genesis:

"Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 387–388 (1978).

Slavery should have been (and was to many) self-evidently dissonant with our avowed founding principles. When the time came to resolve that dissonance, eleven States chose slavery. With the Union's survival at stake, Frederick Douglass noted, Black Americans in the South "were almost the only reliable friends the nation had," and "but for their help . . . the Rebels might have succeeded in

breaking up the Union."[2] After the war, Senator John Sherman defended the proposed Fourteenth Amendment in a manner that encapsulated our Reconstruction Framers' highest sentiments: "We are bound by every obligation, by [Black Americans'] service on the battlefield, by their heroes who are buried in our cause, by their patriotism in the hours that tried our country, we are bound to protect them and all their natural rights."[3]

To uphold that promise, the Framers repudiated this Court's holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), by crafting Reconstruction Amendments (and associated legislation) that transformed our Constitution and society.[4] Even after this Second Founding—when the need to right historical wrongs should have been clear beyond cavil—opponents insisted that vindicating equality in this manner slighted White Americans. So, when the Reconstruction Congress passed a bill to secure all citizens "the same [civil] right[s]" as "enjoyed by white citizens," 14 Stat. 27, President Andrew Johnson vetoed it because it "discriminat[ed] . . . in favor of the negro."[5]

That attitude, and the Nation's associated retreat from Reconstruction, made prophesy out of Congressman Thaddeus Stevens's fear that "those States will all . . . keep up

---

[2] An Appeal to Congress for Impartial Suffrage, Atlantic Monthly (Jan. 1867), in 2 The Reconstruction Amendments: The Essential Documents 324 (K. Lash ed. 2021) (Lash).

[3] Speech of Sen. John Sherman (Sept. 28, 1866) (Sherman), in *id.*, at 276; see also W. Du Bois, Black Reconstruction in America 162 (1998) (Du Bois).

[4] See Sherman 276; M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 48, 71–75, 91, 173 (1986).

[5] Message Accompanying Veto of the Civil Rights Bill (Mar. 27, 1866), in Lash 145.

this discrimination, and crush to death the hated freed-
men."[6] And this Court facilitated that retrenchment.[7] Not
just in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), but "in al-
most every instance, the Court chose to restrict the scope of
the second founding."[8] Thus, thirteen years pre-*Plessy*, in
the *Civil Rights Cases*, 109 U. S. 3 (1883), our predecessors
on this Court invalidated Congress's attempt to enforce the
Reconstruction Amendments via the Civil Rights Act of
1875, lecturing that "there must be some stage . . . when
[Black Americans] tak[e] the rank of a mere citizen, and
ceas[e] to be the special favorite of the laws." *Id.*, at 25. But
Justice Harlan knew better. He responded: "What the na-
tion, through Congress, has sought to accomplish in refer-
ence to [Black people] is—what had already been done in
every State of the Union for the white race—to secure and
protect rights belonging to them as freemen and citizens;
nothing more." *Id.*, at 61 (dissenting opinion).

Justice Harlan dissented alone. And the betrayal that
this Court enabled had concrete effects. Enslaved Black
people had built great wealth, but only for enslavers.[9] No
surprise, then, that freedmen leapt at the chance to control
their own labor and to build their own financial security.[10]
Still, White southerners often "simply refused to sell land
to blacks," even when not selling was economically foolish.[11]
To bolster private exclusion, States sometimes passed laws
forbidding such sales.[12] The inability to build wealth

---

[6] Speech Introducing the [Fourteenth] Amendment (May 8, 1866), in
*id.*, at 159; see Du Bois 670–710.

[7] E. Foner, The Second Founding 125–167 (2019) (Foner).

[8] *Id.*, at 128.

[9] M. Baradaran, The Color of Money: Black Banks and the Racial
Wealth Gap 9–11 (2017) (Baradaran).

[10] Foner 179; see also Baradaran 15–16; I. Wilkerson, The Warmth of
Other Suns: The Epic Story of America's Great Migration 37 (2010)
(Wilkerson).

[11] Baradaran 18.

[12] *Ibid.*

6    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

JACKSON, J., dissenting

through that most American of means forced Black people
into sharecropping roles, where they somehow always
tended to find themselves in debt to the landowner when
the growing season closed, with no hope of recourse against
the ever-present cooking of the books.[13]

Sharecropping is but one example of race-linked obstacles
that the law (and private parties) laid down to hinder the
progress and prosperity of Black people. Vagrancy laws
criminalized free Black men who failed to work for White
landlords.[14] Many States barred freedmen from hunting or
fishing to ensure that they could not live without entering
*de facto* reenslavement as sharecroppers.[15] A cornucopia of
laws (*e.g.*, banning hitchhiking, prohibiting encouraging a
laborer to leave his employer, and penalizing those who
prompted Black southerners to migrate northward) en-
sured that Black people could not freely seek better lives
elsewhere.[16] And when statutes did not ensure compliance,
state-sanctioned (and private) violence did.[17]

Thus emerged Jim Crow—a system that was, as much as
anything else, a comprehensive scheme of economic exploi-
tation to replace the Black Codes, which themselves had re-
placed slavery's form of comprehensive economic exploita-
tion.[18] Meanwhile, as Jim Crow ossified, the Federal

—————

[13] R. Rothstein, The Color of Law: A Forgotten History of How Our Gov-
ernment Segregated America 154 (2017) (Rothstein); Baradaran 33–34;
Wilkerson 53–55.

[14] Baradaran 20–21; Du Bois 173–179, 694–696, 698–699; R. Goluboff,
The Thirteenth Amendment and the Lost Origins of Civil Rights, 50
Duke L. J. 1609, 1656–1659 (2001) (Goluboff); Wilkerson 152 (noting
persistence of this practice "well into the 1940s").

[15] Baradaran 20.

[16] Goluboff 1656–1659 (recounting presence of these practices well into
the 20th century); Wilkerson 162–163.

[17] Rothstein 154.

[18] C. Black, The Lawfulness of the Segregation Decisions, 69 Yale L. J.
421, 424 (1960); Foner 47–48; Du Bois 179, 696; Baradaran 38–39.

Cite as: 600 U. S. ____ (2023)          7

JACKSON, J., dissenting

Government was "giving away land" on the western frontier, and with it "the opportunity for upward mobility and a more secure future," over the 1862 Homestead Act's three-quarter-century tenure.[19] Black people were exceedingly unlikely to be allowed to share in those benefits, which by one calculation may have advantaged approximately 46 million Americans living today.[20]

Despite these barriers, Black people persisted. Their so-called Great Migration northward accelerated during and after the First World War.[21] Like clockwork, American cities responded with racially exclusionary zoning (and similar policies).[22] As a result, Black migrants had to pay disproportionately high prices for disproportionately subpar housing.[23] Nor did migration make it more likely for Black people to access home ownership, as banks would not lend to Black people, and in the rare cases banks would fund home loans, exorbitant interest rates were charged.[24] With Black people still locked out of the Homestead Act giveaway, it is no surprise that, when the Great Depression arrived, race-based wealth, health, and opportunity gaps were the norm.[25]

Federal and State Governments' selective intervention further exacerbated the disparities. Consider, for example,

––––––––

[19] T. Shanks, The Homestead Act: A Major Asset-Building Policy in American History, in Inclusion in the American Dream: Assets, Poverty, and Public Policy 23–25 (M. Sherraden ed. 2005) (Shanks); see also Baradaran 18.

[20] Shanks 32–37; Oliver & Shapiro 37–38.

[21] Wilkerson 8–10; Rothstein 155.

[22] *Id.*, at 43–50; Baradaran 90–92.

[23] *Ibid.*; Rothstein 172–173; Wilkerson 269–271.

[24] Baradaran 90.

[25] I. Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America 29–35 (2005) (Katznelson).

8    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
JACKSON, J., dissenting

the federal Home Owners' Loan Corporation (HOLC), created in 1933.[26] HOLC purchased mortgages threatened with foreclosure and issued new, amortized mortgages in their place.[27] Not only did this mean that recipients of these mortgages could gain equity while paying off the loan, successful full payment would make the recipient a homeowner.[28] Ostensibly to identify (and avoid) the riskiest recipients, the HOLC "created color-coded maps of every metropolitan area in the nation."[29] Green meant safe; red meant risky. And, regardless of class, every neighborhood with Black people earned the red designation.[30]

Similarly, consider the Federal Housing Administration (FHA), created in 1934, which insured highly desirable bank mortgages. Eligibility for this insurance required an FHA appraisal of the property to ensure a low default risk.[31] But, nationwide, it was FHA's established policy to provide "no guarantees for mortgages to African Americans, or to whites who might lease to African Americans," irrespective of creditworthiness.[32] No surprise, then, that "[b]etween 1934 and 1968, 98 percent of FHA loans went to white Americans," with whole cities (ones that had a disproportionately large number of Black people due to housing segregation) sometimes being deemed ineligible for FHA intervention on racial grounds.[33] The Veterans Administration operated similarly.[34]

One more example: the Federal Home Loan Bank Board

––––––––

[26] D. Massey & N. Denton, American Apartheid: Segregation and the Making of the Underclass 51–53 (1993); Oliver & Shapiro 16–18.

[27] Rothstein 63.

[28] *Id.*, at 63–64.

[29] *Id.*, at 64; see Oliver & Shapiro 16–18; Baradaran 105.

[30] Rothstein 64.

[31] *Ibid.*

[32] *Id.*, at 67.

[33] Baradaran 108; see Rothstein 69–75.

[34] *Id.*, at 9, 13, 70.

JACKSON, J., dissenting

"chartered, insured, and regulated savings and loan associations from the early years of the New Deal."[35]  But it did "not oppose the denial of mortgages to African Americans until 1961" (and even then opposed discrimination ineffectively).[36]

The upshot of all this is that, due to government policy choices, "[i]n the suburban-shaping years between 1930 and 1960, fewer than one percent of all mortgages in the nation were issued to African Americans."[37]  Thus, based on their race, Black people were "[l]ocked out of the greatest mass-based opportunity for wealth accumulation in American history."[38]

For present purposes, it is significant that, in so excluding Black people, government policies affirmatively operated—one could say, affirmatively acted—to dole out preferences to those who, if nothing else, were not Black.  Those past preferences carried forward and are reinforced today by (among other things) the benefits that flow to homeowners and to the holders of other forms of capital that are hard to obtain unless one already has assets.[39]

This discussion of how the existing gaps were formed is merely illustrative, not exhaustive.  I will pass over Congress's repeated crafting of family-, worker-, and retiree-protective legislation to channel benefits to White people, thereby excluding Black Americans from what was otherwise "a revolution in the status of most working Americans."[40]  I will also skip how the G. I. Bill's "creation of . . .

──────────

[35] *Id.*, at 108.

[36] *Ibid.*

[37] R. Schragger, The Limits of Localism, 100 Mich. L. Rev. 371, 411, n. 144 (2001); see also Rothstein 182–183.

[38] Oliver & Shapiro 18.

[39] *Id.*, at 43–44; Baradaran 109, 253–254; A. Dickerson, Shining a Bright Light on the Color of Wealth, 120 Mich. L. Rev. 1085, 1100 (2022) (Dickerson).

[40] Katznelson 53; see *id.*, at 22, 29, 42–48, 53–61; Rothstein 31, 155–156.

middle-class America" (by giving $95 billion to veterans and their families between 1944 and 1971) was "deliberately designed to accommodate Jim Crow."[41]  So, too, will I bypass how Black people were prevented from partaking in the consumer credit market—a market that helped White people who could access it build and protect wealth.[42]  Nor will time and space permit my elaborating how local officials' racial hostility meant that even those benefits that Black people could formally obtain were unequally distributed along racial lines.[43]  And I could not possibly discuss every way in which, in light of this history, facially race-blind policies *still* work race-based harms today (*e.g.*, racially disparate tax-system treatment; the disproportionate location of toxic-waste facilities in Black communities; or the deliberate action of governments at all levels in designing interstate highways to bisect and segregate Black urban communities).[44]

The point is this: Given our history, the origin of persistent race-linked gaps should be no mystery.  It has never been a deficiency of Black Americans' desire or ability to, in Frederick Douglass's words, "stand on [their] own legs."[45]  Rather, it was always simply what Justice Harlan recognized 140 years ago—the persistent and pernicious denial of "what had already been done in every State of the Union for the white race."  *Civil Rights Cases*, 109 U. S., at 61 (dissenting opinion).

———————

[41] Katznelson 113–114; see *id.*, at 113–141; see also, *e.g.*, *id.*, at 139–140 (Black veterans, North and South, were routinely denied loans that White veterans received); Rothstein 167.

[42] Baradaran 112–113.

[43] Katznelson 22–23; Rothstein 167.

[44] *Id.*, at 54–56, 65, 127–131, 217; Stanford Institute for Economic Policy Research, Measuring and Mitigating Disparities in Tax Audits 1–7 (2023); Dickerson 1096–1097.

[45] What the Black Man Wants: An Address Delivered in Boston, Massachusetts, on 26 January 1865, in 4 The Frederick Douglass Papers 68 (J. Blassingame & J. McKivigan eds. 1991).

B

History speaks. In some form, it can be heard forever. The race-based gaps that first developed centuries ago are echoes from the past that still exist today. By all accounts, they are still stark.

Start with wealth and income. Just four years ago, in 2019, Black families' median wealth was approximately $24,000.[46] For White families, that number was approximately eight times as much (about $188,000).[47] These wealth disparities "exis[t] at every income and education level," so, "[o]n average, white families with college degrees have over $300,000 more wealth than black families with college degrees."[48] This disparity has also accelerated over time—from a roughly $40,000 gap between White and Black household median net worth in 1993 to a roughly $135,000 gap in 2019.[49] Median income numbers from 2019 tell the same story: $76,057 for White households, $98,174 for Asian households, $56,113 for Latino households, and $45,438 for Black households.[50]

These financial gaps are unsurprising in light of the link

_____

[46] Dickerson 1086 (citing data from 2019 Federal Reserve Survey of Consumer Finances); see also Rothstein 184 (reporting, in 2017, even lower median-wealth number of $11,000).

[47] Dickerson 1086; see also Rothstein 184 (reporting even larger relative gap in 2017 of $134,000 to $11,000).

[48] Baradaran 249; see also Dickerson 1089–1090; Oliver & Shapiro 94–95, 100–101, 110–111, 197.

[49] See Brief for National Academy of Education as *Amicus Curiae* 14–15 (citing U. S. Census Bureau statistics).

[50] *Id.*, at 14 (citing U. S. Census Bureau statistics); Rothstein 184 (reporting similarly stark White/Black income gap numbers in 2017). Early returns suggest that the COVID–19 pandemic exacerbated these disparities. See E. Derenoncourt, C. Kim, M. Kuhn, & M. Schularick, Wealth of Two Nations: The U. S. Racial Wealth Gap, 1860–2020, p. 22 (Fed. Reserve Bank of Minneapolis, Opportunity & Inclusive Growth Inst., Working Paper No. 59, June 2022) (Wealth of Two Nations); L. Bollinger & G. Stone, A Legacy of Discrimination: The Essential Constitutionality of Affirmative Action 103 (2023) (Bollinger & Stone).

between home ownership and wealth. Today, as was true 50 years ago, Black home ownership trails White home ownership by approximately 25 percentage points.[51] Moreover, Black Americans' homes (relative to White Americans') constitute a greater percentage of household wealth, yet tend to be worth less, are subject to higher effective property taxes, and generally lost more value in the Great Recession.[52]

From those markers of social and financial unwellness flow others. In most state flagship higher educational institutions, the percentage of Black undergraduates is lower than the percentage of Black high school graduates in that State.[53] Black Americans in their late twenties are about half as likely as their White counterparts to have college degrees.[54] And because lower family income and wealth force students to borrow more, those Black students who do graduate college find themselves four years out with about $50,000 in student debt—nearly twice as much as their White compatriots.[55]

As for postsecondary professional arenas, despite being about 13% of the population, Black people make up only about 5% of lawyers.[56] Such disparity also appears in the business realm: Of the roughly 1,800 chief executive officers to have appeared on the well-known Fortune 500 list, fewer than 25 have been Black (as of 2022, only six are Black).[57] Furthermore, as the COVID–19 pandemic raged, Black-owned small businesses failed at dramatically higher rates

---

[51] *Id.*, at 87; Wealth of Two Nations 77–79.

[52] *Id.*, at 78, 89; Bollinger & Stone 94–95; Dickerson 1101.

[53] Bollinger & Stone 99–100.

[54] *Id.*, at 99, and n. 58.

[55] Dickerson 1088; Bollinger & Stone 100, and n. 63.

[56] ABA, Profile of the Legal Profession 33 (2020).

[57] Bollinger & Stone 106; Brief for HR Policy Association as *Amicus Curiae* 18–19.

JACKSON, J., dissenting

than White-owned small businesses, partly due to the dis-
proportionate denial of the forgivable loans needed to sur-
vive the economic downturn.[58]

Health gaps track financial ones.  When tested, Black
children have blood lead levels that are twice the rate of
White children—"irreversible" contamination working irre-
mediable harm on developing brains.[59]  Black (and Latino)
children with heart conditions are more likely to die than
their White counterparts.[60]  Race-linked mortality-rate dis-
parity has also persisted, and is highest among infants.[61]

So, too, for adults: Black men are twice as likely to die
from prostate cancer as White men and have lower 5-year
cancer survival rates.[62]  Uterine cancer has spiked in recent
years among all women—but has spiked highest for Black
women, who die of uterine cancer at nearly twice the rate
of "any other racial or ethnic group."[63]  Black mothers are
up to four times more likely than White mothers to die as a
result of childbirth.[64]  And COVID killed Black Americans
at higher rates than White Americans.[65]

"Across the board, Black Americans experience the high-
est rates of obesity, hypertension, maternal mortality, in-
fant mortality, stroke, and asthma."[66]  These and other dis-
parities—the predictable result of opportunity disparities—

——————
[58] Dickerson 1102.

[59] Rothstein 230.

[60] Brief for Association of American Medical Colleges et al. as *Amici
Curiae* 8 (AMC Brief).

[61] C. Caraballo et al., Excess Mortality and Years of Potential Life Lost
Among the Black Population in the U. S., 1999–2020, 329 JAMA 1662,
1663, 1667 (May 16, 2023) (Caraballo).

[62] Bollinger & Stone 101.

[63] S. Whetstone et al., Health Disparities in Uterine Cancer: Report
From the Uterine Cancer Evidence Review Conference, 139 Obstetrics &
Gynecology 645, 647–648 (2022).

[64] AMC Brief 8–9.

[65] Bollinger & Stone 101; Caraballo 1663–1665, 1668.

[66] Bollinger & Stone 101 (footnotes omitted).

lead to at least 50,000 excess deaths a year for Black Americans vis-à-vis White Americans.[67] That is 80 million excess years of life lost from just 1999 through 2020.[68]

*Amici* tell us that "race-linked health inequities pervad[e] nearly every index of human health" resulting "in an overall reduced life expectancy for racial and ethnic minorities that cannot be explained by genetics."[69] Meanwhile—tying health and wealth together—while she lays dying, the typical Black American "pay[s] more for medical care and incur[s] more medical debt."[70]

## C

We return to John and James now, with history in hand. It is hardly John's fault that he is the seventh generation to graduate from UNC. UNC should permit him to honor that legacy. Neither, however, was it James's (or his family's) fault that he would be the first. And UNC ought to be able to consider why.

Most likely, seven generations ago, when John's family was building its knowledge base and wealth potential on the university's campus, James's family was enslaved and laboring in North Carolina's fields. Six generations ago, the North Carolina "Redeemers" aimed to nullify the results of the Civil War through terror and violence, marauding in hopes of excluding all who looked like James from equal citizenship.[71] Five generations ago, the North Carolina Red Shirts finished the job.[72] Four (and three) generations ago, Jim Crow was so entrenched in the State of North Carolina

---

[67] Caraballo 1667.

[68] *Ibid.*

[69] AMC Brief 9.

[70] Bollinger & Stone 100.

[71] See Report on the Alleged Outrages in the Southern States, S. Rep. No. 1, 42d Cong., 1st Sess., I–XXXII (1871).

[72] See D. Tokaji, Realizing the Right To Vote: The Story of *Thornburg v. Gingles*, in Election Law Stories 133–139 (J. Douglas & E. Mazo eds. 2016); see Foner xxii.

JACKSON, J., dissenting

that UNC "enforced its own Jim Crow regulations."[73] Two generations ago, North Carolina's Governor still railed against "'integration for integration's sake'"—and UNC Black enrollment was minuscule.[74] So, at bare minimum, one generation ago, James's family was six generations behind because of their race, making John's six generations ahead.

These stories are not every student's story. But they are many students' stories. To demand that colleges ignore race in today's admissions practices—and thus disregard the fact that racial disparities may have mattered for where some applicants find themselves today—is not only an affront to the dignity of those students for whom race matters.[75] It also condemns our society to never escape the past that explains *how and why* race matters to the very concept of who "merits" admission.

Permitting (not requiring) colleges like UNC to assess merit fully, without blinders on, plainly advances (not thwarts) the Fourteenth Amendment's core promise. UNC considers race as one of many factors in order to best assess the entire unique import of John's and James's individual lives and inheritances *on an equal basis*. Doing so involves acknowledging (not ignoring) the seven generations' worth of historical privileges and disadvantages that each of these applicants was born with when his own life's journey started a mere 18 years ago.

## II

Recognizing all this, UNC has developed a holistic review process to evaluate applicants for admission. Students

_____

[73] 3 App. 1683.

[74] *Id.*, at 1687–1688.

[75] See O. James, Valuing Identity, 102 Minn. L. Rev. 127, 162 (2017); P. Karlan & D. Levinson, Why Voting Is Different, 84 Cal. L. Rev. 1201, 1217 (1996).

must submit standardized test scores and other conventional information.[76]   But applicants are *not* required to submit demographic information like gender and race.[77] UNC considers whatever information each applicant submits using a nonexhaustive list of 40 criteria grouped into eight categories: "academic performance, academic program, standardized testing, extracurricular activity, special talent, essay criteria, background, and personal criteria."[78]

Drawing on those 40 criteria, a UNC staff member evaluating John and James would consider, with respect to each, his "engagement outside the classroom; persistence of commitment; demonstrated capacity for leadership; contributions to family, school, and community; work history; [and his] unique or unusual interests."[79]   Relevant, too, would be his "relative advantage or disadvantage, as indicated by family income level, education history of family members, impact of parents/guardians in the home, or formal education environment; experience of growing up in rural or center-city locations; [and his] status as child or stepchild of Carolina alumni."[80]   The list goes on.   The process is holistic, through and through.

So where does race come in?   According to UNC's admissions-policy document, reviewers may also consider "the race or ethnicity of any student" (if that information is provided) in light of UNC's interest in diversity.[81]   And, yes, "the race or ethnicity of *any* student may—or may not—receive a 'plus' in the evaluation process depending on the in-

––––––––––
[76] 567 F. Supp. 3d 580, 595 (MDNC 2021).

[77] *Id.*, at 596; 1 App. 348; Decl. of J. Rosenberg in No. 1:14–cv–954 (MDNC, Jan. 18, 2019), ECF Doc. 154–7, ¶10 (Rosenberg).

[78] 1 App. 350; see also 3 *id.*, at 1414–1415.

[79] *Id.*, at 1414.

[80] *Id.*, at 1415.

[81] *Id.*, at 1416; see also 2 *id.*, at 706; Rosenberg ¶22.

JACKSON, J., dissenting

dividual circumstances revealed in the student's applica-
tion."[82] Stephen Farmer, the head of UNC's Office of Un-
dergraduate Admissions, confirmed at trial (under oath)
that UNC's admissions process operates in this fashion.[83]

Thus, to be crystal clear: *Every* student who chooses to
disclose his or her race is eligible for such a race-linked plus,
just as any student who chooses to disclose his or her unu-
sual interests can be credited for what those interests might
add to UNC. The record supports no intimation to the con-
trary. Eligibility is just that; a plus is never automatically
awarded, never considered in numerical terms, and never
automatically results in an offer of admission.[84] There are
no race-based quotas in UNC's holistic review process.[85] In
fact, during the admissions cycle, the school prevents any-
one who knows the overall racial makeup of the admitted-
student pool from reading any applications.[86]

More than that, every applicant is also eligible for a
diversity-linked plus (beyond race) more generally.[87] And,
notably, UNC understands diversity broadly, including "so-
cioeconomic status, first-generation college status . . . polit-
ical beliefs, religious beliefs . . . diversity of thoughts, expe-
riences, ideas, and talents."[88]

―――――――

[82] 3 App. 1416 (emphasis added); see also 2 *id.*, at 631–639.

[83] 567 F. Supp. 3d, at 591, 595; 2 App. 638 (Farmer, when asked how
race could "b[e] a potential plus" for "students other than underrepre-
sented minority students," pointing to a North Carolinian applicant,
originally from Vietnam, who identified as "Asian and Montagnard"); *id.*,
at 639 (Farmer stating that "the whole of [that student's] background
was appealing to us when we evaluated her applicatio[n]," and noting
how her "story reveals sometimes how hard it is to separate race out from
other things that we know about a student. That was integral to that
student's story. It was part of our understanding of her, and it played a
role in our deciding to admit her").

[84] 3 *id.*, at 1416; Rosenberg ¶25.

[85] 2 App. 631.

[86] *Id.*, at 636–637, 713.

[87] 3 *id.*, at 1416; 2 *id.*, at 699–700.

[88] *Id.*, at 699; see also Rosenberg ¶24.

18  STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

JACKSON, J., dissenting

A plus, by its nature, can certainly matter to an admissions case. But make no mistake: When an applicant chooses to disclose his or her race, UNC treats that aspect of identity on par with other aspects of applicants' identity that affect who they are (just like, say, where one grew up, or medical challenges one has faced).[89] And race is considered alongside any other factor that sheds light on what attributes applicants will bring to the campus and whether they are likely to excel once there.[90] A reader of today's majority opinion could be forgiven for misunderstanding how UNC's program really works, or for missing that, under UNC's holistic review process, a White student could receive a diversity plus while a Black student might not.[91]

UNC does not do all this to provide handouts to either John or James. It does this to ascertain who among its tens

---

[89] 2 App. 706, 708; 3 *id.*, at 1415–1416.

[90] 2 *id.*, at 706, 708; 3 *id.*, at 1415–1416.

[91] A reader might miss this because the majority does not bother to drill down on how UNC's holistic admissions process operates. Perhaps that explains its failure to apprehend (by reviewing the evidence presented at trial) that everyone, no matter their race, is eligible for a diversity-linked plus. Compare *ante*, at 5, and n. 1, with 3 App. 1416, and *supra*, at 17. The majority also repeatedly mischaracterizes UNC's holistic admissions-review process as a "race-based admissions system," and insists that UNC's program involves "separating students on the basis of race" and "pick[ing only certain] races to benefit." *Ante*, at 5, and n. 1, 26, 38. These claims would be concerning if they had any basis in the record. The majority appears to have misunderstood (or categorically rejected) the established fact that UNC treats race as merely one of the many aspects of an applicant that, in the real world, matter to understanding the whole person. Moreover, its holistic review process involves reviewing a wide variety of personal criteria, not just race. Every applicant competes against thousands of other applicants, each of whom has personal qualities that are taken into account and that other applicants do not—and could not—have. Thus, the elimination of the race-linked plus would *still* leave SFFA's members competing against thousands of other applicants to UNC, each of whom has potentially plus-conferring qualities that a given SFFA member does not.

JACKSON, J., dissenting

of thousands of applicants has the capacity to take full advantage of the opportunity to attend, and contribute to, this prestigious institution, and thus merits admission.[92]  And UNC has concluded that ferreting this out requires understanding the *full* person, which means taking seriously not just SAT scores or whether the applicant plays the trumpet, but also any way in which the applicant's race-linked experience bears on his capacity and merit.  In this way, UNC is able to value what it means for James, whose ancestors received no race-based advantages, to make himself competitive for admission to a flagship school nevertheless.  Moreover, recognizing this aspect of James's story does not preclude UNC from valuing John's legacy or any obstacles that his story reflects.

So, to repeat: UNC's program permits, but does not require, admissions officers to value both John's and James's love for their State, their high schools' rigor, and whether either has overcome obstacles that are indicative of their "persistence of commitment."[93]  It permits, but does not require, them to value John's identity as a child of UNC alumni (or, perhaps, if things had turned out differently, as a first-generation White student from Appalachia whose family struggled to make ends meet during the Great Recession).  And it permits, but does not require, them to value James's race—not in the abstract, but as an element of who he is, no less than his love for his State, his high school courses, and the obstacles he has overcome.

Understood properly, then, what SFFA caricatures as an unfair race-based preference cashes out, in a holistic system, to a personalized assessment of the advantages and disadvantages that every applicant might have received by accident of birth plus all that has happened to them since.  It ensures a full accounting of everything that bears on the

──────────

[92] See 3 App. 1409, 1414, 1416.

[93] *Id.*, at 1414–1415.

individual's resilience and likelihood of enhancing the UNC campus. It also forecasts his potential for entering the wider world upon graduation and making a meaningful contribution to the larger, collective, societal goal that the Equal Protection Clause embodies (its guarantee that the United States of America offers genuinely equal treatment to every person, regardless of race).

Furthermore, and importantly, the fact that UNC's holistic process ensures a full accounting makes it far from clear that any particular applicant of color will finish ahead of any particular nonminority applicant. For example, as the District Court found, a higher percentage of the most academically excellent in-state Black candidates (as SFFA's expert defined academic excellence) were denied admission than similarly qualified White and Asian American applicants.[94] That, if nothing else, is indicative of a genuinely

---

[94] See 567 F. Supp. 3d, at 617, 619; 3 App. 1078–1080. The majority cannot deny this factual finding. Instead, it conducts its own back-of-the-envelope calculations (its numbers appear nowhere in the District Court's opinion) regarding "the *overall* acceptance rates of academically excellent applicants to UNC," in an effort to trivialize the District Court's conclusion. *Ante,* at 5, n. 1. I am inclined to stick with the District Court's findings over the majority's unauthenticated calculations. Even when the majority's ad hoc statistical analysis is taken at face value, it hardly supports what the majority wishes to intimate: that Black students are being admitted based on UNC's myopic focus on "race—and race alone." *Ante,* at 28, n. 6. As the District Court observed, if these Black students "were largely defined in the admissions process by their race, one would expect to find that *every*" such student "demonstrating academic excellence . . . would be admitted." 567 F. Supp. 3d, at 619 (emphasis added). Contrary to the majority's narrative, "race does not even act as a tipping point for some students with otherwise exceptional qualifications." *Ibid.* Moreover, as the District Court also found, UNC does not even use the bespoke "academic excellence" metric that SFFA's expert "'invented'" for this litigation. *Id.,* at 617, 619; see also *id.,* at 624–625. The majority's calculations of overall acceptance rates by race on *that* metric bear scant relationship to, and thus are no indictment of, how UNC's admissions process actually works (a recurring theme in its opinion).

holistic process; it is evidence that, both in theory and in practice, UNC recognizes that race—like any other aspect of a person—may bear on where both John and James start the admissions relay, but will not fully determine whether either eventually crosses the finish line.

III

A

The majority seems to think that race blindness solves the problem of race-based disadvantage. But the irony is that requiring colleges to ignore the initial race-linked opportunity gap between applicants like John and James will inevitably widen that gap, not narrow it. It will delay the day that every American has an equal opportunity to thrive, regardless of race.

SFFA similarly asks us to consider how much longer UNC will be able to justify considering race in its admissions process. Whatever the answer to that question was yesterday, today's decision will undoubtedly extend the duration of our country's need for such race consciousness, because the justification for admissions programs that account for race is inseparable from the race-linked gaps in health, wealth, and well-being that still exist in our society (the closure of which today's decision will forestall).

To be sure, while the gaps are stubborn and pernicious, Black people, and other minorities, have generally been doing better.[95] But those improvements have only been made possible because institutions like UNC have been willing to grapple forthrightly with the burdens of history. SFFA's complaint about the "indefinite" use of race-conscious admissions programs, then, is a non sequitur. These programs respond to deep-rooted, objectively measurable problems; their definite end will be when we succeed, together, in solving those problems.

_____

[95] See Bollinger & Stone 86, 103.

Accordingly, while there are many perversities of today's judgment, the majority's failure to recognize that programs like UNC's carry with them the seeds of their own destruction is surely one of them. The ultimate goal of recognizing James's full story and (potentially) admitting him to UNC is to give him the necessary tools to contribute to closing the equity gaps discussed in Part I, *supra*, so that he, his progeny—and therefore all Americans—can compete without race mattering in the future. That intergenerational project is undeniably a worthy one.

In addition, and notably, that end is not fully achieved just because James is admitted. Schools properly care about preventing racial isolation on campus because research shows that it matters for students' ability to learn and succeed while in college if they live and work with at least some other people who look like them and are likely to have similar experiences related to that shared characteristic.[96] Equally critical, UNC's program ensures that students who don't share the same stories (like John and James) will interact in classes and on campus, and will thereby come to understand each other's stories, which *amici* tell us improves cognitive abilities and critical-thinking skills, reduces prejudice, and better prepares students for postgraduate life.[97]

Beyond campus, the diversity that UNC pursues for the betterment of its students and society is not a trendy slogan. It saves lives. For marginalized communities in North Carolina, it is critically important that UNC and other area institutions produce highly educated professionals of color. Research shows that Black physicians are more likely to accurately assess Black patients' pain tolerance and treat

———————

[96]See, *e.g.*, Brief for University of Michigan as *Amicus Curiae* 6, 24; Brief for President and Chancellors of University of California as *Amici Curiae* 20–29; Brief for American Psychological Association et al. as *Amici Curiae* 14–16, 21–23 (APA Brief).

[97]*Id.*, at 14–20, 23–27.

JACKSON, J., dissenting

them accordingly (including, for example, prescribing them appropriate amounts of pain medication).[98]  For high-risk Black newborns, having a Black physician more than doubles the likelihood that the baby will live, and not die.[99]  Studies also confirm what common sense counsels: Closing wealth disparities through programs like UNC's—which, beyond diversifying the medical profession, open doors to every sort of opportunity—helps address the aforementioned health disparities (in the long run) as well.[100]

Do not miss the point that ensuring a diverse student body in higher education helps *everyone*, not just those who, due to their race, have directly inherited distinct disadvantages with respect to their health, wealth, and wellbeing.  *Amici* explain that students of every race will come to have a greater appreciation and understanding of civic virtue, democratic values, and our country's commitment to equality.[101]  The larger economy benefits, too: When it comes down to the brass tacks of dollars and cents, ensuring diversity will, if permitted to work, help save hundreds of billions of dollars annually (by conservative estimates).[102]

Thus, we should be celebrating the fact that UNC, once a stronghold of Jim Crow, has now come to understand this.

---

[98] AMC Brief 4, 14; see also Brief for American Federation of Teachers as *Amicus Curiae* 10 (AFT Brief) (collecting further studies on the "tangible benefits" of patients' access to doctors who look like them).

[99] AMC Brief 4.

[100] National Research Council, New Horizons in Health: An Integrative Approach 100–111 (2001); Pollack et al., Should Health Studies Measure Wealth? A Systematic Review, 33 Am. J. Preventative Med. 250, 252, 261–263 (2007); see also Part I–B, *supra*.

[101] See APA Brief 14–20, 23–27 (collecting studies); AFT Brief 11–12 (same); Brief for National School Boards Association et al. as *Amici Curiae* 6–11 (same); see also 567 F. Supp. 3d, at 592–593, 655–656 (factual findings in this case with respect to these benefits).

[102] LaVeist et al., The Economic Burden of Racial, Ethnic, and Educational Health Inequities in the U. S., 329 JAMA 1682, 1683–1684, 1689, 1691 (May 16, 2023).

24   STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
JACKSON, J., dissenting

The flagship educational institution of a former Confederate State has embraced its constitutional obligation to afford genuine equal protection to applicants, and, by extension, to the broader polity that its students will serve after graduation. Surely that is progress for a university that once engaged in the kind of patently offensive race-dominated admissions process that the majority decries.

With its holistic review process, UNC now treats race as merely one aspect of an applicant's life, when race played a totalizing, all-encompassing, and singularly determinative role for applicants like James for most of this country's history: No matter what else was true about him, being Black meant he had no shot at getting in (the ultimate race-linked uneven playing field). Holistic programs like UNC's reflect the reality that Black students have only relatively recently been permitted to get into the admissions game at all. Such programs also reflect universities' clear-eyed optimism that, one day, race *will* no longer matter.

So much upside. Universal benefits ensue from holistic admissions programs that allow consideration of *all* factors material to merit (including race), and that thereby facilitate diverse student populations. Once trained, those UNC students who have thrived in the university's diverse learning environment are well equipped to make lasting contributions in a variety of realms and with a variety of colleagues, which, in turn, will steadily decrease the salience of race for future generations. Fortunately, UNC and other institutions of higher learning are already on this beneficial path. In fact, all that they have needed to continue moving this country forward (toward full achievement of our Nation's founding promises) is for this Court to get out of the way and let them do their jobs. To our great detriment, the majority cannot bring itself to do so.

B

The overarching reason the majority gives for becoming

JACKSON, J., dissenting

an impediment to racial progress—that its own conception of the Fourteenth Amendment's Equal Protection Clause leaves it no other option—has a wholly self-referential, two-dimensional flatness.  The majority and concurring opinions rehearse this Court's idealistic vision of racial equality, from *Brown* forward, with appropriate lament for past indiscretions.  See, *e.g.*, *ante*, at 11.  But the race-linked gaps that the law (aided by this Court) previously founded and fostered—which indisputably define our present reality—are strangely absent and do not seem to matter.

With let-them-eat-cake obliviousness, today, the majority pulls the ripcord and announces "colorblindness for all" by legal fiat.  But deeming race irrelevant in law does not make it so in life.  And having so detached itself from this country's actual past and present experiences, the Court has now been lured into interfering with the crucial work that UNC and other institutions of higher learning are doing to solve America's real-world problems.

No one benefits from ignorance.  Although formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways, and today's ruling makes things worse, not better.  The best that can be said of the majority's perspective is that it proceeds (ostrich-like) from the hope that preventing consideration of race will end racism.  But if that is its motivation, the majority proceeds in vain.  If the colleges of this country are required to ignore a thing that matters, it will not just go away.  It will take *longer* for racism to leave us.  And, ultimately, ignoring race just makes it matter more.[103]

_____

[103] JUSTICE THOMAS's prolonged attack, *ante*, at 49–55 (concurring opinion), responds to a dissent I did not write in order to assail an admissions program that is not the one UNC has crafted.  He does not dispute any historical or present fact about the origins and continued existence of race-based disparity (nor could he), yet is somehow persuaded that these realities have no bearing on a fair assessment of "individual achieve-

The only way out of this morass—for all of us—is to stare at racial disparity unblinkingly, and then do what evidence and experts tell us is required to level the playing field and march forward together, collectively striving to achieve true equality for all Americans. It is no small irony that the judgment the majority hands down today will forestall the end of race-based disparities in this country, making the colorblind world the majority wistfully touts much more difficult to accomplish.

\*  \*  \*

As the Civil War neared its conclusion, General William T. Sherman and Secretary of War Edwin Stanton convened a meeting of Black leaders in Savannah, Georgia. During the meeting, someone asked Garrison Frazier, the group's spokesperson, what "freedom" meant to him. He answered, "'placing us where we could reap the fruit of our own labor, and take care of ourselves . . . to have land, and turn it and

------

ment," *ante*, at 51. JUSTICE THOMAS's opinion also demonstrates an obsession with race consciousness that far outstrips my or UNC's holistic understanding that race can be a factor that affects applicants' unique life experiences. How else can one explain his detection of "an organizing principle based on race," a claim that our society is "fundamentally racist," and a desire for Black "victimhood" or racial "silo[s]," *ante*, at 49–52, in this dissent's approval of an admissions program that advances all Americans' shared pursuit of true equality by treating race "on par with" other aspects of identity, *supra*, at 18? JUSTICE THOMAS ignites too many more straw men to list, or fully extinguish, here. The takeaway is that those who demand that no one think about race (a classic pink-elephant paradox) refuse to see, much less solve for, the elephant in the room— the race-linked disparities that continue to impede achievement of our great Nation's full potential. Worse still, by insisting that obvious truths be ignored, they prevent our problem-solving institutions from directly addressing the real import and impact of "social racism" and "government-imposed racism," *ante*, at 55 (THOMAS, J., concurring), thereby deterring our collective progression toward becoming a society where race no longer matters.

JACKSON, J., dissenting

till it by our own labor.'"[104]

Today's gaps exist because that freedom was denied far longer than it was ever afforded. Therefore, as JUSTICE SOTOMAYOR correctly and amply explains, UNC's holistic review program pursues a righteous end—legitimate "'because it is defined by the Constitution itself. The end is the maintenance of freedom.'" *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 443–444 (1968) (quoting Cong. Globe, 39th Cong., 1st Sess., 1118 (1866) (Rep. Wilson)).

Viewed from this perspective, beleaguered admissions programs such as UNC's are not pursuing a patently unfair, ends-justified ideal of a multiracial democracy at all. Instead, they are engaged in an earnest effort to secure a more functional one. The admissions rubrics they have constructed now recognize that an individual's "merit"—his ability to succeed in an institute of higher learning and ultimately contribute something to our society—cannot be fully determined without understanding that individual in full. There are no special favorites here.

UNC has thus built a review process that *more accurately* assesses merit than most of the admissions programs that have existed since this country's founding. Moreover, in so doing, universities like UNC create pathways to upward mobility for long excluded and historically disempowered racial groups. Our Nation's history more than justifies this course of action. And our present reality indisputably establishes that such programs are still needed—for the general public good—because after centuries of state-sanctioned (and enacted) race discrimination, the aforementioned intergenerational race-based gaps in health, wealth, and well-being stubbornly persist.

Rather than leaving well enough alone, today, the majority is having none of it. Turning back the clock (to a time before the legal arguments and evidence establishing the

_____

[104] Foner 179.

soundness of UNC's holistic admissions approach existed),
the Court indulges those who either do not know our Na-
tion's history or long to repeat it. Simply put, the race-blind
admissions stance the Court mandates from this day for-
ward is unmoored from critical real-life circumstances.
Thus, the Court's meddling not only arrests the noble gen-
erational project that America's universities are attempt-
ing, it also launches, in effect, a dismally misinformed soci-
ological experiment.

Time will reveal the results. Yet the Court's own mis-
steps are now both eternally memorialized and excruciat-
ingly plain. For one thing—based, apparently, on nothing
more than Justice Powell's initial say so—it drastically dis-
counts the primary reason that the racial-diversity objec-
tives it excoriates are needed, consigning race-related his-
torical happenings to the Court's own analytical dustbin.
Also, by latching onto arbitrary timelines and professing in-
security about missing metrics, the Court sidesteps unre-
futed proof of the compelling benefits of holistic admissions
programs that factor in race (hard to do, for there is plenty),
simply proceeding as if no such evidence exists. Then, ulti-
mately, the Court surges to vindicate equality, but Don
Quixote style—pitifully perceiving itself as the sole van-
guard of legal high ground when, in reality, its perspective
is not constitutionally compelled and will hamper the best
judgments of our world-class educational institutions about
who they need to bring onto their campuses right now to
benefit every American, no matter their race.[105]

---

[105] JUSTICE SOTOMAYOR has fully explained why the majority's analysis
is legally erroneous and how UNC's holistic review program is entirely
consistent with the Fourteenth Amendment. My goal here has been to
highlight the interests at stake and to show that holistic admissions pro-
grams that factor in race are warranted, just, and universally beneficial.
All told, the Court's myopic misunderstanding of what the Constitution
permits will impede what experts and evidence tell us is required (as a
matter of social science) to solve for pernicious race-based inequities that
are themselves rooted in the persistent denial of equal protection. "[T]he

JACKSON, J., dissenting

The Court has come to rest on the bottom-line conclusion that racial diversity in higher education is only worth potentially preserving insofar as it might be needed to prepare Black Americans and other underrepresented minorities for success in the bunker, not the boardroom (a particularly awkward place to land, in light of the history the majority opts to ignore).[106]  It would be deeply unfortunate if the Equal Protection Clause actually demanded this perverse, ahistorical, and counterproductive outcome.  To impose this result in that Clause's name when it requires no such thing, and to thereby obstruct our collective progress toward the full realization of the Clause's promise, is truly a tragedy for us all.

_____

potential consequences of the [majority's] approach, as measured against the Constitution's objectives . . . provides further reason to believe that the [majority's] approach is legally unsound."  *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 858 (2007) (Breyer, J., dissenting).  I fear that the Court's folly brings our Nation to the brink of coming "full circle" once again.  *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 402 (1978) (opinion of Marshall, J.).

[106] Compare *ante*, at 22, n. 4, with *ante*, at 22–30, and *supra*, at 3–4, and nn. 2–3.